## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

In re:

**OLGA'S KITCHEN, INC.**    **Case No. 15-49008**
    Debtor.    **Chapter 11**
    **Hon. Walter Shapero**

_____/

### DEBTOR'S MOTION TO CONFIRM THAT BID BY COSMO HOSPITALITY IS A QUALIFIED BID, OR TO THE EXTENT NECESSARY, FOR MODIFICATION OF SALE PROCEDURES ORDER

Debtor states:

1.    Cosmo Hospitality, LLC timely submitted a bid package on November 16, 2015, and submitted the $250,000 forfeitable deposit thereby meeting the requirements to be qualified. No other bids were received by Debtor (other than the SOK Stalking Horse Bid which is deemed a Qualified Bid).

2.    Pursuant to the Sales Procedures Order, only those submitting a Qualified Bid may bid at the auction set for Friday, October 20, 2015.

3.    In its bid package, Cosmo attached a proposed purchase agreement that provides for a termination fee to Cosmo of $150,000.00, in the event it is not the Successful Bidder at the auction. Their proposed purchase agreement is attached to this motion. Paragraph 4.2 of the Cosmo purchase agreement provides,

> 4.2    <u>Termination Fee</u>. Notwithstanding the terms of the Bid Procedures and Sale Procedures Order, and subject to the approval of the Bankruptcy Court, if Seller agrees to sell the Acquired Assets to any other Person at the Auction, then Seller shall pay to Purchaser out of the proceeds of sale or any forfeited deposit from the Successful Bidder a termination fee equal to $150,000 (the "<u>Termination Fee</u>"). Approval of the Termination Fee by the Bankruptcy Court prior to the Auction shall be an additional condition precedent to Purchaser's obligation to close to those set forth in Section 5, which Purchaser may waive in its sole and absolute discretion. Seller and Purchaser agree that the Termination Fee is Purchaser's liquidated damages and Purchaser's only recovery because Purchaser's damages will not be reasonably calculable.

4.    The Sale Procedures Order provides that a prospective bidder shall submit, pursuant to para. 8.i.b

> "a clean and a duly executed purchase and sale agreement, substantially in the form of the Purchase Agreement and including all conditions to closing set forth in Article 6 of the Purchase Agreement, and the documents set forth as schedules and exhibits thereto, along with copies that are marked to reflect the amendments and modifications from the Purchase Agreement executed with Purchaser, which may not be materially more burdensome to Seller or otherwise inconsistent with these Bidding Procedures"

5.    The SOK Stalking Horse Bidder also has termination fee of $150,000 pursuant to the Sale Procedures Order at para. 31, thus the Cosmo $150,000 termination fee

is not "materially more burdensome to Seller" than the Stalking Horse Bidder's Purchase Agreement.

6.          Moreover, the Cosmo bid benefits the estate and its creditors.   The Cosmo bid is $8,250,000 plus the Sysco prepaid inventory amount, which is $100,000 greater than the SOK Stalking Horse bid of $8,000,000 plus the Sysco prepaid inventory amount plus the $150,000 termination fee.  The estate and its creditors are at least $100,000 better off as a result of the Cosmo bid even if there is no further bidding.

7.          Accordingly, the Cosmo bid will be the Baseline Bid at the auction, that SOK would have to overbid by at least $100,000 which is the minimum overbid requirement.

8.          The Sale Procedures Order provides in para. 6 and 9 that,

"    6.     No other party submitting any other offer to purchase the Acquired Assets (or a portion thereof) or having made a Qualified Bid of any nature: (a) may request as part of any such offer any expense reimbursement, break-up fee, or termination payment or any other similar fee or payment in connection with the Sale process contemplated by the Bidding Procedures; or (b) shall be entitled to any of the foregoing payments by reason of having tendered any such offer to purchase the Acquired Assets (or a portion thereof).

**Bidder Protections**
     9.     The Bidder Protections described in the Purchase Agreement and the Sale Motion are hereby approved and shall be enforceable in accordance with the terms of the Purchase Agreement and the Sale Motion.  Recognizing the value and benefits that the Purchaser has provided to the estate by entering into the Purchase Agreement, as well as Purchaser's expenditure of time, energy, and resources, the Termination Fee is approved in the amount of $150,000, with such fee payable in accordance with the terms of the Purchase Agreement and the Sale Motion.  The Debtor is authorized to pay the Termination Fee, subject to the terms and conditions set forth in the Purchase Agreement and Sale Motion, provided that in no event will the Termination Fee be paid in the absence of an order approving the Sale of the Acquired Assets to a Successful Bidder other than Purchaser.  The Debtor's obligations in respect of the Termination Fee shall survive termination of the Purchase Agreement and, until paid, shall constitute an administrative expense of the Debtor's estates pursuant to sections 503(b) and 507(a)(1) of the Bankruptcy Code, and shall be paid in accordance with the terms of the Purchase Agreement and Sale Motion without further order of this Court."

9.          Debtor's goal is to maximize the value of the Debtor's assets through a fair auction process.

10.          Out of an abundance of caution, Debtor is filing this motion for a determination confirming that the Cosmo bid is a Qualified Bid.  Paragraph 9 of the Sale Procedures Order grants the ability of the Debtor to pay a termination fee to the Stalking Horse Bidder, it does not provide that Debtor may pay a termination fee to Cosmo.  To the extent that the Cosmo bid is deemed inconsistent with the Sale Procedures Order, especially

paragraphs 6 and 9, Debtor requests modification of the Sale Procedures Order to allow it to pay a termination fee to Cosmo if there is the entry of an order approving the Sale of the Acquired Assets to a Successful Bidder other than Cosmo.

11.      Because Cosmo was the initial proposed stalking horse bidder and spent substantial amounts of time and attorney fees on preparing and revising the various sale documents, Debtor believes that the amount of the termination fee as to Cosmo is reasonable.

12.      The Cosmo termination fee appears to be reasonably related to the risk, effort and expenses of Cosmo. See *In re Integrated Resources, Inc.* 147 B.R. 650, 662-63 (S.D.N.Y 1992) (break-up fee "should be reasonable related to the risk, effort, and expenses of the prospective purchaser.").

13.      Further, the Cosmo termination fee is only payable to Cosmo if a person submitting a Qualified Bid other than Cosmo is the Successful Bidder. Accordingly, even if Debtor is obligated to pay the Cosmo termination fee, Debtor's estate will be better off by at least $200,000 (the initial overbid by Cosmo of $100,000 and a further overbid by SOK of $100,000), and likely more depending on the auction results.

14.      SOK's efforts and Cosmo's efforts have benefitted the estate and its creditors, and their termination fees are appropriate.

WHEREFORE, the Debtor respectfully requests the entry of the attached proposed Order, and such further relief as this Court deems just.

Respectfully submitted,
\_\_\_\_/s/ Robert Bassel_____
ROBERT N. BASSEL (P48420)
Attorneys for Debtor
P.O. Box T
Clinton, MI 49236
DATED: 11/17/2015      (248) 677-1234
bbassel@gmail.com

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**

In re:

**OLGA'S KITCHEN, INC.**                        **Case No. 15-49008**
                        Debtor.                 **Chapter 11**
                                                **Hon. Walter Shapero**

_____/


**ORDER GRANTING DEBTOR'S MOTION TO CONFIRM THAT BID BY**
**COSMO HOSPITALITY IS A QUALIFIED BID, OR TO THE EXTENT**
**NECESSARY, FOR MODIFICATION OF SALE PROCEDURES ORDER**


Upon the above-captioned motion, it appearing that cause exists for the relief requested,

IT IS HEREBY ORDERED that the Cosmo Hospitality, LLC's bid is hereby and shall be deemed a qualified bid for purposes of the sale procedures order and the bid procedures and to the extent inconsistent with the sale procedures order or bid procedures, the sale procedures order and bid procedures are hereby amended to allow a termination fee of $150,000 for Cosmo Hospitality on the terms set forth in its purchase agreement attached to its bid.

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is dated as of November __, 2015. The parties to this Agreement (individually a "Party" and collectively the "Parties") are:

Cosmo Hospitality, LLC, a Michigan limited liability company, (the "Purchaser");

Olga's Kitchen, Inc., a Michigan corporation, debtor and debtor in possession in bankruptcy case number 15-49008-wjs pending in the U.S. Bankruptcy Court of the Eastern District of Michigan, Southern Division ("Company");

OKI, LLC, a Michigan limited liability company ("OKI"); and

Kobacker & Associates of Kentwood, a Michigan limited partnership, and Kobacker & Associates, a Michigan co-partnership, its limited partner in ("Kobacker" and together with Company and OKI, collectively, "Seller").

## Recitals

A.      Company is engaged in the business of owning and operating 15 Olga's restaurants, which are identified by their respective store numbers (being store numbers 106, 113, 116, 117, 119, 125, 135, 137, 139, 142, 143, 149, 150, 153 and 154) (the "Company Stores").

B.      Company's subsidiary OKI owns a 50% interest in Olga's SOK Holdings, LLC (the "JV"), which is a joint venture with SOK Venture LLC ("SOK") that is in the business of owning and operating eleven (11) Olga's restaurants, through the JV and its wholly-owned subsidiaries (the "JV Subsidiaries"), which are identified by their respective store numbers (being store numbers 600, 601, 603, 604, 605, 606, 607, 608, 609, 610, and 612) (the "JV Stores").

C.      Company is a partner with Kobacker in the business of owning and operating one Olga's restaurant, located in the Woodland Mall in Kentwood, Michigan, which is identified by its store number (being store number 122) (the "Kobacker Store").  The Company Stores, JV Stores and Kobacker Store are collectively referred to herein as the "Business".

D.      Company leases the locations from which the Company Stores are operated (the "Company Lease Locations") pursuant to lease agreements with landlords with respect to each Company Lease Location, and in addition, leases a location for Company's corporate headquarters (collectively, the "Company Leases").

E.      The JV and/or the JV Subsidiaries lease the locations from which JV Stores are operated (the "JV Lease Locations") pursuant to lease agreements with landlords with respect to each JV Lease Location (the "JV Leases").

F.      Kobacker leases the Kobacker Store in the Woodland Mall in Kentwood, Michigan (the "Kobacker Lease Location") pursuant to a lease agreement with a landlord with

respect to the Kobacker Lease Location (the "Kobacker Lease").  The Company Stores and Kobacker Store are collectively referred to herein as the "Seller Stores".  The Company Lease Locations and Kobacker Lease Location are collectively referred to herein as the "Seller Lease Locations".  The Company Leases and Kobacker Lease are collectively referred to herein as the "Seller Leases".

G.     On June 11, 2015 ("Petition Date"), Company filed a voluntary petition ("Petition") for relief in the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division (the "Bankruptcy Court"), commencing a case under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 *et seq*. (the "Bankruptcy Code"), case number 15-49008-wjs (the "Case").

H.     Purchaser wants to buy, and Seller wants to sell substantially all of assets of Seller, including, but not limited to, Company's interest in OKI, OKI's interest in the JV and SOK's interest in the JV through exercise of OKI's Drag-Along Right, pursuant to the terms contained in this Agreement.

## Agreement

In consideration of the above Recitals and the promises and provisions contained in this Agreement, the receipt and sufficiency of which is acknowledged by each of the Parties, the Parties agree as follows:

## ARTICLE 1
## DEFINED TERMS

1.1     Defined Terms.  The following terms have the following meanings:

"Access Period" has the meaning set forth in Section 4.3.

"Acquired Assets" means all of Seller's right, title, and interest in and to all assets owned, used, occupied, operated and/or held for the benefit of Seller with respect to the Business, including:

(a)     The Assumed Contracts and Assumed Leases;

(b)     All books, records, files, and correspondence related to the Business (in whatever form they exist)("Books and Records");

(c)     Goodwill relating to the Business and the other Acquired Assets (including telephone numbers and fax numbers);

(d)     Intellectual Property;

(e)     Life Insurance Policies;

(f)     Inventory;

(g)     Receivables;

(h)     Permits;

(i)     Liquor Licenses;

(j)     Tangible Personal Property;

(k)     Franchise Rights;

(l)     Intangible Assets;

(m)     Company's membership interest in OKI;

(n)     OKI's interest in the JV;

(o)     SOK's interest in the JV through exercise of OKI's Drag-Along Right; and

(p)     All other assets owned, used, occupied, operated and/or held for the benefit of Seller with respect to the Business.

The listed items in subsections (a)-(p) above are not intended (and shall not be construed) as all inclusive and the Acquired Assets shall be given the broadest meaning possible; provided, however, the Acquired Assets shall not include any Excluded Assets.

"Ancillary Agreements" means all of the documents, instruments and agreements (other than this Agreement) executed by one or more Party in connection with the transactions contemplated by this Agreement and/or delivered by one or more Party at Closing.

"Assumed Contracts" means the Contracts that are identified on Exhibit 1, which Exhibit 1 may be updated at any time prior to the Closing in Purchaser's sole discretion.

"Assumed Leases" means the Leases that are identified on Exhibit 2, which Exhibit 2 may be updated at any time prior to the Closing in Purchaser's sole discretion.

"Assumed Liabilities" has the meaning set forth in Section 3.1(a).

"Auction" has the meaning set forth in Section 4.2(b).

"Back-Up Bidder" has the meaning set forth in Section 4.1(a).

"Breach" means, with respect to a representation, warranty, covenant, obligation, or other provision of this Agreement or any instrument delivered pursuant to this Agreement (a) any inaccuracy in or breach of, or any failure to perform or comply with, such representation, warranty, covenant, obligation, or other provision, or (b) any claim (by any Person) or other occurrence or circumstance that is or was inconsistent with such representation, warranty,

covenant, obligation, or other provision, and the term "Breach" means any such inaccuracy, breach, failure, claim, occurrence, or circumstance.

"Claim" has the meaning given to that term in Section 101(5) of the Bankruptcy Code) and (if not included within the foregoing meaning and without duplication) all claims, rights, demands, breach of Contract, promissory estoppel, injunctive relief, loss of business, loss of goodwill, covenants, actions, suits, charges, causes of action, obligations, attorneys' fees, controversies, debts, costs, expenses, damages (of every kind), judgments, suits, Orders and Liabilities whatsoever, whether known or unknown, suspected or unsuspected, fixed, vested or contingent, and of whatsoever nature, whether in law, in equity or bankruptcy, asserted, unasserted, claimed or unclaimed, foreseen or unforeseen, absolute or contingent, accrued or unaccrued, whether consequential and/or otherwise, whether permanent, temporary or intermittent, liquidated or unliquidated, joint and/or several, executory, determined, determinable and/or otherwise, conceived or not conceived, and whether intentional, unintentional, and/or inadvertent acts and/or omission, and/or all of the consequences thereof, in law, equity, bankruptcy or otherwise.

"Closing" has the meaning set forth in Section 2.5(a).

"Closing Date" has the meaning set forth in Section 2.5(a).

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including applicable provisions contained in the Code and ERISA.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Consent" means any approval, consent, ratification, waiver, or other authorization, including any Governmental Authorization.

"Contract" means any agreement, contract, obligation, promise, or undertaking, whether written or oral and whether express or implied, that is legally binding.

"Convey" or "Conveyance" means sale, transfer, conveyance, assignment and delivery.

"Cure Costs" has the meaning set forth in Section 3.1(a).

"Deposit" has the meaning set forth in Section 2.3.

"Drag-Along Right" means the "Drag-Along Right" as defined in the Joint Development Agreement.

"Effective Time" means the time at which all Closing Documents are fully executed on the Closing Date.

"Employee Benefit Plan" means any (a) qualified or nonqualified Employee Pension Benefit Plan (including any Multiemployer Plan), (b) Employee Welfare Benefit Plan, and/or (c)

fringe or other employee benefit plan, policy, program, and arrangement, whether or not subject to ERISA and whether or not funded.

"Employee Pension Benefit Plan" shall have the meaning set forth under Section 3(2) of ERISA.

"Employee Welfare Benefit Plan" shall have the meaning set forth under Section 3(1) of ERISA.

"Environment" means soil, land surface or subsurface strata, surface waters (including navigable waters, ocean waters, streams, ponds, drainage basins, and wetlands), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

"Environmental, Health, and Safety Requirements" means all federal, state, local and foreign statutes, regulations, ordinances and other provisions having the force or effect of law, all Orders, all contractual obligations and all common law concerning public health and safety, worker health and safety, and pollution or protection of the Environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, Release, threatened Release, control, or cleanup of any Hazardous Materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise or radiation, each as amended and as now or hereafter in effect.

"Environmental Law" means any Law that requires or relates to:

(a)     advising appropriate authorities, employees, and the public of intended or actual releases of pollutants or hazardous substances or materials, violations of discharge limits, or similar prohibitions that could have significant adverse impact on the Environment;

(b)     prohibiting, preventing, or reducing to acceptable levels the Release of Hazardous Materials, pollutants, oil, or other potentially harmful substances into the Environment;

(c)     reducing the quantities, preventing the Release, or minimizing the hazardous characteristics of wastes that are generated;

(d)     assuring that products are designed, formulated, packaged, and used so that they do not present unreasonable risks to human health or the Environment when used or disposed of;

(e)     protecting the Environment, public health and welfare, natural resources, species or ecological amenities;

(f)     reducing to acceptable levels the risks inherent in the transportation of Hazardous Materials, pollutants, oil, or other potentially harmful substances;

(g)     cleaning up Hazardous Materials, pollutants, oil, or other potentially harmful substances that have been Released, preventing the threat of Release, or paying the costs of such clean up or prevention;

(h)     the recovery of costs and damages by private parties, or groups of them, or any Governmental Body, for damages done to public health or the Environment, or permitting self-appointed representatives of the public interest to recover for injuries done to public assets; or

(i)     the manufacture, processing, distribution, use, treatment, storage, disposal, transportation, recycling, handling, reporting, or labeling of Hazardous Materials, pollutants, oil, or other potentially harmful substances.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" means all cash or cash equivalents, including, but not limited to, deposits such as lease deposits and utility deposits, refunds, vendor overpayments, prepaid items, and credit card payments that have been charged but not yet processed, as well as any assets specifically set forth on Exhibit 3.

"Excluded Liabilities" has the meaning set forth in Section 3.2(a).

"Franchise Rights" means all rights of Seller in and to all pending, completed or initiated franchise registrations with any Governmental Body regarding the Business, and all records, papers, filings, forms, agreements, licenses, certificates, approvals, and correspondence related to such rights or registrations.

"Governmental Authorization" means any Consent, license, permit, waiver, or other authorization which Purchaser determines is necessary or appropriate as a condition to Closing which needs to be issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

"Governmental Body" means any (a) nation, state, county, city, town, village, district, or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign, or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (d) multi-national organization or body; or (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

"Hazardous Materials" means any substance, chemical, compound, product, solid, gas, liquid, waste, byproduct, pollutant, contaminant, condition, object, or material that is or may be hazardous to human health or safety or the environment due to its ignitability, corrosiveness, reactivity, explosiveness, toxicity, carcinogenicity, infectiousness, radioactivity, or other harmful or potentially harmful properties or effected, including all of those substances, chemicals, compounds, products, solids, gases, liquids, wastes, byproducts, pollutants, contaminants, conditions, objects, and materials and combinations thereof that are now or hereafter listed or defined as hazardous or toxic, or are regulated, pursuant to Environmental Law or

6

Environmental, Health, and Safety Requirements and includes, without limitation, asbestos, polychlorinated biphenyls, and petroleum (including crude oil or any fraction thereof.

"Improvements" means all buildings, structures, fixtures, appurtenances, lighting and plumbing fixtures, built-in shelving units, built-in cabinets, built-in equipment, security and alarm systems, ceiling fans, carpeting, landscaping, window treatments, as well as all other improvements with respect to the Leased Real Property and all items attached to or located at the Leased Real Property.

"Including", "included" and similar words shall be deemed to be read with the words "without limitation" after them.

"Intangible Assets" means all general intangibles within the meaning of the Uniform Commercial Code.

"Intellectual Property" means all (a) patents, patent applications and patent disclosures, (b) trademarks, service marks, trade dress, trade names, associated assumed names, logos, Internet domain names and corporate and/or Business names, websites, email addresses, and registrations and applications for registration thereof together with all of the goodwill associated therewith, (c) all licenses and sublicenses granted and obtained with respect thereto, and rights thereunder, (d) remedies against infringements thereof, and rights to protection of interests therein (e) copyrights (registered or unregistered) and copyrightable works and registrations and applications for registration thereof, (f) mask works and registrations and applications for registration thereof, (g) computer software, data, data bases and documentation thereof, (h) trade secrets and other confidential and/or proprietary information (including ideas, formulas, compositions, inventions (whether patentable or unpatentable and whether or not reduced to practice), know-how, production processes and techniques, research and development information, drawings, specifications, designs, plans, proposals, technical data, copyrightable works, financial and marketing plans and customer and supplier lists and information), (i) other intellectual property rights, (j) drawings and advertising materials, (k) all other intangible property, rights or claims, (l) formulas, (m) and all other intellectual property rights of every kind, and (n) copies and tangible embodiments thereof (in whatever form or medium).

"Inventory" means all inventories, goods, merchandise and commodities of every kind (whether food related or not), inventory in transit, supplies, and all other inventory items.

"Joint Development Agreement" means the Joint Development Agreement among the Company, OKI and SOK dated April 24, 2004 attached as Exhibit 4.

"Joint Venture Agreements" means, collectively, the Joint Development Agreement, JV Operating Agreement and JV Management Agreements.

"JV Liabilities" has the meaning set forth in Section 2.5(d).

"JV Management Agreements" means, collectively, the Management Agreements between the Company and each of the JV Subsidiaries attached as Exhibit 5.

15-49008-wsd    Doc 367    Filed 11/17/15    Entered 11/17/15 14:56:28    Page 11 of 66

"JV Operating Agreement" means the Operating Agreement of the JV dated October 27, 2008 attached as Exhibit 6.

"Kobacker Liabilities" means all Liabilities of any kind or nature, whether accrued or unaccrued, due or not due including without limitation any Liability under the Kobacker Lease;

"Law" means any federal, state, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, or treaty.

"Leased Real Property" means the Real Property that is being leased pursuant to the Seller Leases.

"Liability" or "Liabilities" means any liability, debt, or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether fixed or contingent, and whether due or to become due), including any liability for Taxes.

"Lien" means any Claim, mortgage, pledge, security interest, lease, tenancy, right of use, covenant, easement, encumbrance, interest, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof), any sale of receivables with or without recourse, any filing or agreement to file a financing statement as debtor under the applicable Uniform Commercial Code or any similar statute other than to reflect ownership by a third party of property leased to Seller under a lease which is not in the nature of a conditional sale or title retention agreement, or any subordination arrangement in favor of another Person), any other claim, condition, equitable interest, option, right of first refusal, or restriction of any kind, including any restriction on use, transfer, receipt of income, or exercise of any other attribute of ownership, any other rights of other in the nature of a lien, however evidenced or created, and/or other encumbrance.

"Life Insurance Policies" means all life insurance contracts or life insurance policies and all rights arising from such contracts or policies owned by any Seller, including the rights to receive, in whole or part, the proceeds payable to the beneficiaries of such policies or contracts, and all rights to receive payment of cash surrender values, refunds or other available payments arising upon cancellation, termination or surrender of any life insurance policies or life insurance contracts to which all or any of such entities may be entitled.

"Liquor Licenses" means any liquor licenses held by any Seller, including the following liquor licenses issued by the State of Michigan: Canton License No. 202642-2015 and Compuware License No. 211712-2015.

"Loss" means, with respect to any Person, any Liability, demand, claim, action, cause of action, cost, damage, deficiency, Tax, penalty, fine or other loss or expense (including reasonable legal expenses and costs and including interest and penalties).

"Material Adverse Effect" or "Material Adverse Change" means any state of facts, change, event, effect or occurrence that, individually or in the aggregate, has or could reasonably

be expected to have a material adverse effect on the business, financial condition, results of operations, prospects, properties, assets or Seller (including the Acquired Assets and/or the Business).

"Order" means any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court (including the Bankruptcy Court), administrative agency, or other Governmental Body or by any arbitrator.

"Permits" means all municipal, state, federal, local or foreign consents, franchises, permits, approvals, certificates, licenses, and authorizations held or used by Seller and which relate to the Acquired Assets and/or the Business, or required under applicable Laws for the continued operation of the Business and/or the Acquired Assets.

"Permitted Liens" means: (a) statutory Liens and Liens for current Taxes or other governmental charges with respect to the Acquired Assets not yet due and payable; (b) all existing building and use restrictions, subdivision and other land use ordinances and/or regulations, easements, covenants, conditions, restrictions, zoning and other matters of record which are imposed by any Governmental Body having jurisdiction over any of the Leased Real Property, and which do not unreasonably interfere with the present use of the Leased Real Property; and (c) the rights of the public and of any Governmental Body in any part thereof taken, used or deeded for street, road or highway purposes.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, an estate, a joint venture, an unincorporated organization, and a governmental entity or any department, agency or political subdivision thereof.

"Proceeding" or "Proceedings" mean any action, arbitration, audit, hearing, investigation, litigation, lawsuit, proceeding, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body or arbitrator (including any proceeding in eminent domain or similar proceeding).

"Purchase Price" has the meaning set forth in Section 2.2.

"Real Property" means all items which are considered to be real property under applicable legal principles in the locale in which such real property is located, as well as (if not already included) all real estate, land, Improvements, and all privileges, rights, and easements belonging to or for the benefit of the land and Improvements, certificates of occupancy and rights-of-way, including all rights existing in and to any streets, roads, alleys, and other rights-of-way included or adjacent to the foregoing.

"Receivables" means all rights to payment of any kind or nature, whether or not in the ordinary course of business, including rights to payment on account, rights to payment for the sale of goods or services, all rights to refunds, pre-paid expenses, deposits, credits, rebates, incentive payments, reimbursements, loans receivable, notes receivable or other form of payment due and owing or to become due and owing to Seller.

"Release" means any spilling, leaking, emitting, discharging, depositing, escaping, leaching, dumping, or other releasing of Hazardous Materials into the Environment, whether intentional or unintentional, and including all releases as defined under Environmental Law or Environmental, Health, and Safety Requirements.

"Sale Order" has the meaning set forth in Section 4.1(a).

"Sale Procedures Order" has the meaning set forth in Section 4.1(a).

"Successful Bidder" has the meaning set forth in Section 4.1(a).

"Sysco Payment" has the meaning set forth in Section 2.2.

"Tangible Personal Property" means all tangible personal property (including all items which are not Real Property), including computer hardware and software, tools, machinery, equipment (including office equipment, kitchen equipment, telecommunications equipment, and maintenance equipment), replacement parts, supplies, fixtures, furniture, customer amenities, goods, leasehold improvements, trucks, vans, automobiles, other vehicles, materials, and all other tangible personal property owned by Seller (including items which have been fully depreciated and/or expensed) and which are used or useable in connection with the Business.

"Tax" or "Taxes" mean any tax (including any income tax, franchise tax, branch profits tax, excise tax, gross receipts tax, employment tax, withholding tax, capital gains tax, value-added tax, sales tax, use tax, property tax, stamp tax, transfer tax, registration tax, alternative or add-on minimum tax, gift tax, or estate tax), levy, assessment, tariff, duty (including any customs duty), deficiency, or other fee, and any related charge or amount (including any fine, penalty, interest, or addition to tax), imposed, assessed, or collected by or under the authority of any Governmental Body or payable pursuant to any tax-sharing agreement or any other Contract relating to the sharing or payment of any such tax, levy, assessment, tariff, duty, deficiency, or fee.

"Tax Return" or "Tax Returns" means any return (including any information return), report, statement, schedule, notice, form, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of or compliance with any Law relating to any Tax.

### ARTICLE 2
### PURCHASE AND SALE OF ACQUIRED ASSETS; PURCHASE PRICE; DEPOSIT; CLOSING

2.1     Purchase and Sale of Acquired Assets.   Upon the terms and expressly subject to the conditions precedent set forth in this Agreement, at the Closing Seller shall Convey the Acquired Assets to Purchaser.

10

2.2     Purchase Price for the Acquired Assets.  The purchase price ("Purchase Price") for the Acquired Assets is (a) $8,250,000 plus (b) an amount equal to the cost of prepaid inventory maintained by Sysco as set forth on Schedule 2.2 attached hereto (to be updated at Closing) (the "Sysco Payment").

2.3     Deposit.

        (a)     Following delivery of this executed Agreement, Purchaser will deposit with Gene Kohut, in his capacity as Chief Restructuring Officer of Company, an earnest money deposit in the amount of $250,000 (the "Deposit"), to be held in escrow and applied to the Purchase Price or returned to the Purchaser in accordance with the terms of this Agreement and the Sale Procedures Order and related Bid Procedures.

        (b)     If Purchaser is the Successful Bidder, at the Closing, the Deposit will be applied in reduction of the Purchase Price on a dollar-for-dollar basis.  If Purchaser is the Successful Bidder but before Closing Seller properly terminates this Agreement strictly in conformity with Section 10.1(d), the Deposit will be forfeited in full to Seller without further action of any party.

        (c)     If Purchaser is the Back-Up Bidder, either (i) the Deposit will be returned to Purchaser within 2 business days of the closing to the Successful Bidder or (ii) if the Successful Bidder does not close and the Seller proceeds with a sale to Purchaser as the Back-Up Bidder, the Deposit will be applied in reduction of the Purchase Price on a dollar-for-dollar basis.

        (d)     If Purchaser is not the Successful Bidder or the Back-Up Bidder, the Deposit will be returned to Purchaser within 2 business days of the Auction.

        (e)     If Purchaser terminates this Agreement pursuant to Section 10.1(c), the Deposit will be immediately returned to Purchaser.

2.4     Payment of Purchase Price.  On the Closing Date, Purchaser will pay the Purchase Price, after application of the Deposit, to an account designated by Seller by wire transfer of immediately available funds, except to the extent required to pay those Liabilities provided for in Section 5.10, which amounts if paid shall be credited against the Purchase Price.  All amounts payable pursuant to this Agreement are in United States Dollars.

2.5     Closing.

        (a)     The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Purchaser on the earlier of (i) 1 day following entry of a final and non-appealable Sale Order or (ii) December 11, 2015; provided, however, the Closing may occur on any earlier date selected by the Purchaser occurring after entry of the Sale Order (the "Closing Date").

        (b)     At the Closing, the parties will deliver to one another the various payments, certificates, instruments and documents referred to in Articles 5 and 6 below.

(c)     The Parties may conduct the Closing by exchanging authorized signatures on duplicate originals of this Agreement and the Ancillary Agreements.  Legal title, equitable title and the risk of loss with respect to the Acquired Assets and the Assumed Liabilities will pass to Purchaser at the Effective Time on the Closing Date.

(d)     On or prior to the Closing, Seller will (i) pay in full all Liabilities of the JV and any JV Subsidiaries of any kind or nature, whether accrued or unaccrued, due or not due, (collectively, "JV Liabilities") and (ii) disburse all remaining cash to its members OKI and SOK in accordance with the terms of the JV Operating Agreement. Seller shall provide Purchaser with records demonstrating such payment and disbursements.  All JV Liabilities are set forth on Schedule 2.5(d) (to be updated at Closing).

(e)     Following Purchaser's receipt and review of all transaction documents required to be executed pursuant to Section 2.5(d), and Purchaser's satisfaction that such transactions have been properly completed in Purchaser's reasonable discretion, Seller shall sell and deliver all Acquired Assets and assign all Assumed Contracts and Assumed Leases to Purchaser, and Purchaser shall pay the Purchase Price in the manner set forth herein.

(f)     Simultaneously with the Conveyance of the Acquired Assets to the Purchaser, the Company will assume the Joint Venture Agreements, and exercise its and/or OKI's Drag-Along Right pursuant to the Joint Venture Agreements, resulting in the Conveyance of both OKI and SOK's membership interest in the JV to the Purchaser.  Following such Conveyance, and upon Closing, Purchaser shall be the sole member of the JV.

(g)     Company will deliver to Purchaser at Closing (i) a duly executed amendment to Company's Articles of Incorporation changing its name from "Olga's Kitchen, Inc." to another name which does not include the words "Olga" or "Kitchen", and (ii) additional executed documents terminating Company's right to use all of its assumed names, which Purchaser shall file following Closing.

## ARTICLE 3
## ASSUMED LIABILITIES; EXCLUDED LIABILITIES

3.1     Assumed Liabilities.

(a)     Simultaneous with the Closing, Seller will assume, cure all defaults and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code, and Purchaser will take assignment of, the (i) the Assumed Leases and (ii) the Assumed Contracts except for the Joint Development Agreement (collectively, the "Assumed Liabilities"), but only with respect to Liabilities relating to the Assumed Leases and such Assumed Contracts that arise after and relate to periods after the Effective Time.  In no event shall Purchaser be responsible for Liabilities with respect to the Assumed Leases and/or the Assumed Contracts that (A) were incurred and/or accrued before the Effective Time on the Closing Date, or (B) which constitute costs required to cure any defaults as required by Section 365 of the Bankruptcy Code ("Cure Costs").

(b)     Notwithstanding anything in this Agreement to the contrary, in the event and to the extent that any of the Assumed Contracts or Assumed Leases cannot be assumed by Seller and assigned to Purchaser under Section 365 of the Bankruptcy Code, then this Agreement shall

not constitute an agreement to assign any such particular Assumed Contract or Assumed Lease or any claim or right or any benefit arising thereunder or resulting therefrom if the agreement to assign or attempt to assign, without the required Consent would constitute a breach thereof, accelerate any obligations thereunder, permit the termination thereof or in any other way adversely affect the rights of Purchaser or Seller thereunder. Until such consent is obtained, or if an attempted assignment thereof would be ineffective or would affect the rights of Seller thereunder so that Purchaser would not, in fact, receive all such rights, Purchaser and Seller will cooperate with each other in any arrangement designed to provide for Purchaser the benefits of, and to permit Purchaser to assume, insofar as expressly set forth herein, the stated liabilities under such particular Assumed Contract or Assumed Lease, including enforcement at the request and expense and for the benefit of Purchaser of any and all rights of Seller against a third party thereto arising out of the breach or cancellation thereof by such third party or otherwise.

(c) Purchaser shall not assume any rights or obligations under any Contracts that are not Assumed Contracts or Assumed Leases, and to the extent that any Contracts exist with respect to the Business that Purchaser is not choosing to assume, Seller shall be solely responsible for any financial costs associated with or otherwise dealing with them as the Bankruptcy Court determines.

(d) Purchaser's assumption of the Assumed Liabilities shall in no way expand the rights or remedies of third parties against Purchaser as compared to the rights and remedies which such third parties would have had against Seller had the transactions contemplated by this Agreement not been consummated.

3.2     Excluded Liabilities.

(a) Except for the Assumed Liabilities, Purchaser is not assuming any Liability of Seller of any kind, and Seller shall pay, satisfy and perform or discharge (as they and/or the Bankruptcy Court determines) all of its respective Liabilities that may affect in any way the Acquired Assets, the Assumed Leases, the Assumed Contracts or Purchaser in any way whatsoever (collectively, the "Excluded Liabilities").

(b) Without limiting the generality of the provisions of Section 3.2(a), the Excluded Liabilities shall include, and under no circumstances shall Purchaser be deemed to assume any Liability of Seller arising out of or relating to: (i) any actual or alleged tortious conduct of Seller or any of its employees or agents which were incurred prior to the Effective Time or arose out of acts or omissions of Seller or any of its respective agents prior to the Effective Time; (ii) any Liabilities pertaining to products sold by Seller prior to the Effective Time; (iii) any claim for breach of warranty or Contract by Seller which were incurred prior to the Effective Time or arose out of acts or omissions of Seller prior to the Effective Time; (iv) any claim predicated on strict liability or any similar legal theory; (v) any actual or alleged violation of any Law; (vi) any business activities of Seller; (vii) any Liability for Taxes; (viii) any Liability relating to an Excluded Asset; (ix) any Liability of Seller in connection with employee compensation expenses whether accrued before or after the Effective Time, including payroll, benefits, severance, commissions, withholding Taxes and any Liabilities under any Employee Benefit Plan, including any Liability of Seller under the Code or ERISA; (x) any Liability of Seller incurred in connection with the transactions contemplated by this Agreement; (xi) any other Liabilities

which otherwise arise or are asserted by reason of the conduct of the Business prior to the Effective Time or events, acts (or failures to act) or transactions occurring or conditions existing on or before the Effective Time, (xii) any Liability arising out of, or resulting from Seller's ownership and/or use of the Acquired Assets or conduct of the Business prior to the Closing Date, (xiii) any Liability arising out of or resulting from any Contract between Company and Kobacker; (xiv) all Liabilities of Seller to pay, satisfy or discharge as a condition precedent to the Closing this Transaction; (xv) the Kobacker Liabilities; (xvi) any Liability arising out of or relating to any Contract between Company and the JV or between Company and any one or more of the members of the JV including but not limited to the Joint Venture Agreements; (xvii) any Liability arising out of or relating to any Claim by SOK against the Company, OKI or the JV; (xviii) any amounts due and owing to SOK, the JV or the JV subsidiaries pursuant to a certain Order Reinstating Action, Confirming Arbitration Award and Entering Judgment on Arbitration Award entered in Oakland County Circuit Court Case No. 12-130137-CB; (xix) any Liabilities of the JV; (xx) any Liability or Claim by SOK for any dividend or distribution from the JV; and/or (xxi) any other Liability of any kind of Seller that are not Assumed Liabilities.

3.3     Costs of transaction. Subject to Section 4.3 hereof, all costs or expenses of performance of obligations hereunder and of the consummation of the transactions contemplated by this Agreement that have not been specifically assumed by either Party under the terms hereof shall be borne by the Party incurring such cost or expense.  The provisions of this Section shall survive the Closing.

<h2 style="text-align:center">ARTICLE 4<br>SPECIAL BANKRUPTCY PROVISIONS</h2>

4.1     Bankruptcy Actions.

(a)     This agreement is submitted pursuant to certain Bid Procedures established by the Bankruptcy Court, pursuant a motion and supporting papers Seller filed with the Bankruptcy Court (the "Sale Motion"), that sought, among other things, entry of (i) an Order in the form attached as Exhibit A (the "Sale Procedures Order") approving the bidding and auction procedures for the Acquired Assets and selection of the winning bidder (the "Successful Bidder") and the back-up bidder (the "Back-Up Bidder") at the Auction in the form attached as Exhibit B (the "Bidding Procedures"), which Exhibit B has been entered by Bankruptcy Court and (ii) should the purchase offer made by this Agreement constitute the highest and otherwise best offer for the Acquired Assets pursuant to the Sale Procedures Order, an Order in the form attached as Exhibit C (the "Sale Order") approving (A) this Agreement and the transactions contemplated thereby (including the sale of the Acquired Assets to Purchaser free and clear of all Liens except Permitted Liens; (B) the assumption and assignment of the Assumed Contracts and Assumed Leases; (C) the payment of all Liabilities required to be paid under the terms hereof at Closing including all JV Liabilities; (D) the Conveyance of OKI's interest and SOK's interest in the JV to Purchaser free of any Liabilities to SOK or Claims by SOK under the Joint Venture Agreements including but not limited to any Liabilities to or Claims of SOK for dividends or distributions, claims that the "drag along" process was not proper, or otherwise; and (E) finding that due process has been provided to all creditors of Seller.

(b)     Unless otherwise ordered by the Bankruptcy Court, Seller shall conduct the auction consistent with the Bidding Procedures (the "Auction") on November 20, 2015, and enter the Sale Order as and when contemplated by the Sale Procedures Order, but in any case no later than 1 business day after a hearing on the Sale Order, which hearing, unless otherwise ordered by the Bankruptcy Court, shall take place November 23, 2015.

(c)     With respect to each Assumed Contract and Assumed Lease, Seller shall (i) within 2 business days following entry of the Sale Procedures Order, file and serve a notice of Assumed Contracts and Assumed Leases for potential assumption and assignment to Purchaser, together with the corresponding Cure Costs, to each counterparty to an Assumption Contract or Assumed Lease and (ii) cooperate as reasonably necessary or desirable to provide adequate assurance of future performance to counterparties to such Assumed Contract as required under Section 365 of the Bankruptcy Code.

(d)     Within 2 business days following entry of the Sale Procedures Order, Seller shall give notice of the transactions contemplated by this Agreement and of the auction procedures described in the Sale Procedures Order to, among others, all Persons to whom Seller sent notice of the fact that Seller was seeking to sell some or all of its assets and to such other Persons and in such manner as the Bankruptcy Court shall direct or Seller may otherwise reasonably deem necessary.  Seller may provide potential bidders with a copy of this executed Agreement.

(e)     Seller will provide Purchaser and Purchaser's counsel with copies of all motions, applications, and supporting papers prepared by Seller (including forms of orders and notices to interested parties) relating in any way to Purchaser or the transactions contemplated by this Agreement as far in advance as practicable prior to the service and filing thereof.  Seller shall promptly give appropriate notice in accordance with Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure and any order of the Bankruptcy Court, and provide opportunity for hearing, to all parties entitled thereto, of all motions, order, hearings, or other proceedings relating to this Agreement or the transactions contemplated hereby.

(f)     Notwithstanding the inclusion of Books and Records as Acquired Assets under this Agreement, Seller may retain a copy of the Books and Records for its use in connection with preparing tax returns, filing and administering a plan of liquidation in the Bankruptcy Case and other wind down activities.  After the Closing, Purchaser will provide Seller and its agents reasonable access to any pre-Closing Books and Records of Seller that are transferred to Purchaser as Acquired Assets under this Agreement.

4.2     Termination Fee.  Notwithstanding the terms of the Bid Procedures and Sale Procedures Order, and subject to the approval of the Bankruptcy Court, if Seller agrees to sell the Acquired Assets to any other Person at the Auction, then Seller shall pay to Purchaser out of the proceeds of sale or any forfeited deposit from the Successful Bidder a termination fee equal to $150,000 (the "Termination Fee").  Approval of the Termination Fee by the Bankruptcy Court prior to the Auction shall be an additional condition precedent to Purchaser's obligation to close to those set forth in Section 5, which Purchaser may waive in its sole and absolute discretion. Seller and Purchaser agree that the Termination Fee is Purchaser's liquidated damages and Purchaser's only recovery because Purchaser's damages will not be reasonably calculable.

4.3    Access Period.  From the date of this Agreement until the earlier of the Closing Date or the date on which this Agreement is terminated pursuant to the terms of Article 10 (the "Access Period"), Seller shall:

(a)    provide Purchaser and its representatives, inspectors, accountants, lawyers and consultants with reasonable access upon reasonable notice during normal business hours to the Acquired Assets, to senior management, operations and store employees, and to financial information, books, business records and other information relating to the Acquired Assets and the Assumed Liabilities, in order for Purchaser and its Representatives to conduct all "due diligence" investigations that Purchaser may wish to pursue and as otherwise provided in this Agreement;

(b)    provide all necessary authorizations or consents reasonably required by Purchaser to perform its Governmental Body inquiries with respect to the Acquired Assets and the Assumed Liabilities;

(c)    arrange or assist in arranging meetings and discussions with any Person referenced in any Schedule to the extent reasonably requested by Purchaser; and

(e)    Timely and diligently comply with all of Seller's obligations and agreements set forth in this Agreement.

4.4    Post-Closing.    In the event Seller receives or fails to transfer or remit any Acquired Assets to Purchaser at Closing, or in the event Seller comes into possession of Acquired Assets after Closing, Seller shall immediately transfer possession or remit payment of such Acquired Assets to Purchaser.  Purchaser shall have the right to audit Seller's and any related fiduciary's business records related to Seller upon reasonable request, and to enforce this right by application to the Bankruptcy Court.

## ARTICLE 5
## PURCHASER'S CONDITIONS TO CLOSE

In addition to the provisions of Article 4 above, the obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the following conditions precedent:

5.1    Representations and Warranties.  The representations and warranties of Seller contained in Article 8 shall be true and correct in all material respects at and as of the Closing as though then made (without giving effect to any disclosures made by Seller after the date of execution of this Agreement).

5.2    Material Adverse Change.  A copy of the Company's most recent consolidating and consolidated financial statement including balance sheet, income statement and statement of cash flows (including all operations of the JV and Kobacker) is attached hereto as Schedule 5.2 ("Financial Statement").  Since the date of the latest Financial Statement, there shall not have occurred any event which has had or would be likely to have a Material Adverse Effect.  Further, all risk of loss, damage to, or destruction of the Acquired Assets prior to the Closing shall be on

Seller.  In the event of any such casualty or similar event, Purchaser, at its option, may proceed to Closing with an assignment of all insurance proceeds, etc., and an abatement of the Purchase Price equal to the amount of the loss or casualty, or terminate this Agreement.

5.3     Proceedings.  All corporate and other proceedings taken or required to be taken by Seller in connection with the transactions contemplated by this Agreement to be consummated at or prior to the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to Purchaser and its counsel.

5.4     Compliance with Applicable Laws.  Except for the provisions contained in Article 4 of this Agreement, no Proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling or charge would, in Purchaser's reasonable judgment, (a) prevent consummation of any of the transactions contemplated by this Agreement, (b) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, (c) affect adversely the right of Purchaser to own the Acquired Assets, or (d) affect adversely the right of Purchaser to lease or occupy the Leased Real Property (and no such injunction, judgment, order, decree, ruling or charge shall be in effect).

5.5     Consents.

        (a)     (i)     The Purchaser shall have received (in form and substance acceptable to the Purchaser) each Governmental Authorization (including the Sale Procedures Order and Sale Order), as well as all other Consents that are required for the consummation of the transactions contemplated by this Agreement, the Ancillary Agreements and all of the other agreements contemplated by this Agreement, (ii) all Consents, if required, from third parties shall have been received by Purchaser (in form and substance acceptable to Purchaser) that are required in order to prevent a breach of, a default under, or a termination, any acceleration, change in the terms or conditions or modification of, any instrument, Contract, lease, license or other agreement (including the Assumed Contracts and Assumed Leases), and (iii) all Consents necessary for Purchaser to continue to conduct the Business shall have been received.  Seller will deliver all such Consents to Purchaser prior to the Closing.

        (b)     The Sale Procedures Order and the Sale Order shall each have been entered by the Bankruptcy Court, served on all creditors of Sellers and parties in interest, and shall have become a final order, and the applicable appeal period with respect thereto shall have expired without the filing of any appeals.

5.6     Compliance by Seller and the Company.  Seller shall have performed or complied with all agreements, obligations and covenants required by this Agreement to be performed or complied with by it by the time of the Closing.

5.7     Good Title to Acquired Assets; Releases.  The Acquired Assets shall be free and clear of any and all Liens (other than Permitted Liens) pursuant to the Sale Order.  Seller shall use its best efforts to obtain releases of all Liens (other than Permitted Liens), including appropriate

17

UCC termination statements and mortgage discharges, against the Acquired Assets, all on terms reasonably satisfactory to Purchaser.

5.8     Disclosure Supplements.  Prior to the Closing, Seller shall supplement or amend the Exhibits and Schedules to this Agreement with respect to any matter arising after the date of execution of this Agreement or any information obtained after the date of execution of this Agreement which, if existing, occurring or known at or prior to the date of this Agreement, would have been required to be set forth or described in such Exhibit or Schedule or which is necessary to complete or correct any information in such Exhibit or Schedule or in any representation and warranty which has been rendered inaccurate thereby; provided, however, that no such supplement or amendment shall affect the representations, warranties, covenants or agreements of Seller or the conditions to the obligations of Purchaser under this Agreement.

5.9     Closing Documents. At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following items, certificates, documents, instruments, statements and data, duly executed by Seller where required, the form and substance of which shall all be satisfactory to Purchaser:

        (a)     A bill of sale with respect to all Acquired Assets, and other instruments of transfer, that Conveys all of the other Acquired Assets to Purchaser free and clear of Liens;

        (b)     Actual exclusive physical possession of all of the Acquired Assets, free and clear of all Liens, other than Permitted Liens;

        (c)     All documents in connection with fulfilling the provisions of Section 5.6 on terms and conditions satisfactory to Purchaser, in its sole discretion.

        (d)     One or more assignment and assumption agreements with respect to the Assumed Contracts and Assumed Leases;

        (e)     An assignment of any and all claims, guarantees, warranties, indemnifications, and any other rights which Seller may have against any service providers, suppliers, laborers, material providers, or subcontractors, or with respect to the Acquired Assets or arising out of, or in connection with, but not limited to, the installation, construction, and maintenance of the Leased Real Property or other Acquired Assets;

        (f)     All necessary certificates, amendments or instruments executed by the appropriate officer(s) of Seller, in proper form for filing with the appropriate Governmental Bodies or officials, and duly authorized by Seller, to effect the change of Seller's name(s) so that Purchaser shall have the full and exclusive use of Seller's name(s);

        (g)     All titles to vehicles (properly endorsed) to be transferred to Purchaser and any additional documents necessary to transfer title to such vehicles to Purchaser, free and clear of Liens.

        (h)     Such other and further documents, instruments, letters, Consents, affidavits, notices, assignments, and/or certificates executed by an officer of Seller, as Purchaser shall

18

reasonably require or request to carry out and effectuate the purposes and terms of this Agreement.

5.10    <u>Seller Liabilities</u>.  In addition to all JV Liabilities to be paid in full at Closing, the following Seller Liabilities must be paid in full by Seller on or before Closing or from the Purchase Price:

(a)    All utilities (including natural gas, electricity, utilities and cable or satellite television service), association dues and fees, water bills, and other similar items incurred in the operation of the Business and/or ownership of the Acquired Assets shall be paid by Seller as of the Closing Date except for such Liabilities of Company that constitute "Claims" accruing prior to the filing of the bankruptcy proceeding, which shall be subject to the distribution provisions of the Bankruptcy Code.  <u>Schedule 5.10(a)</u> attached sets forth the balances due for such utilities as of a date reasonably calculable  through the date of execution this Agreement, and if there are no such balances for utilities, Seller shall produce paid receipts along with the most recent billing statement from each such utility. One day prior to the Closing Date, Seller shall provide an updated <u>Schedule 5.10(a)</u> current through that date. If Purchaser deems it appropriate, amounts payable for utilities may be withheld from the Purchase Price and paid at Closing, or escrowed, and in either event, such amounts paid or escrowed will be credited as payment of part of the Purchase Price on a dollar for dollar basis.

(b)    All personal property Taxes assessable with respect to any portion of the Acquired Assets, the basis of which is determined by the value of, or ownership of, assets owned as of any date on or before the Closing Date have been, or shall be, paid by Seller as of the Closing Date or from the Purchase Price.  Seller shall provide <u>Schedule 5.10(b)</u> setting forth the balances due for personal property Taxes as of a date reasonably calculable through the date of execution of this Agreement, and if there are no such balances for personal property Taxes, Seller shall produce paid receipts along with the most recent billing statement from each Governmental Body. One day prior to the Closing Date, Seller, shall provide an updated <u>Schedule 5.10(b)</u> current through that date.  If Purchaser deems it appropriate, amounts payable for personal property Taxes may be withheld from the Purchase Price and paid at Closing, or escrowed, and in either event, such amounts paid or escrowed will be credited as payment of part of the Purchase Price on a dollar for dollar basis.

(c)    All salaries, wages, federal, state and local withholding taxes, other government withholdings, accruals, vacation pay, benefits, bonuses, retention bonuses or other income or benefit obligations whatsoever incurred during Seller's course of business or through order of the Bankruptcy Court through the Closing Date shall be paid by Seller except for such Liabilities of Company that constitute Claims accruing prior to the filing of the bankruptcy proceeding, which shall be subject to the distribution provisions of the Bankruptcy Code.  Seller shall provide <u>Schedule 5.10(c)</u> setting forth the balances due for all such amounts as of a date reasonably calculable through the date of execution of this Agreement.  One day prior to the Closing Date, Seller shall provide an updated <u>Schedule 5.10(c)</u> current through that date. If Purchaser deems it appropriate, such unpaid amounts may be withheld from the Purchase Price, and paid at Closing, and such amounts paid will be credited as payment of part of the Purchase Price on a dollar for dollar basis.

15-49008-wsd    Doc 367    Filed 11/17/15    Entered 11/17/15 14:56:28    Page 23 of 66

Any condition specified in this <u>Article 5</u> may be waived if consented to in writing by Purchaser.

**ARTICLE 6**
**SELLER'S CONDITIONS PRECEDENT TO CLOSE**

In addition to the provisions of <u>Article 4</u> above, the obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the following conditions precedent:

6.1    <u>Representations and Warranties; Covenants</u>.    The representations and warranties contained in <u>Article 9</u> shall be true and correct in all material respects at and as of the Closing as though then made (without giving effect to any disclosures made by Purchaser after the date of this Agreement), and Purchaser shall have performed in all material respects all of the covenants required to be performed by Purchaser at or prior to the Closing, provided however that any litigation commenced by SOK against Purchaser shall not be a breach of Purchaser's representations and warranties and shall not be deemed a failure to satisfy this condition precedent.

6.2    <u>Proceedings</u>.    All corporate and other proceedings taken or required to be taken by Purchaser in connection with the transactions contemplated by this Agreement to be consummated at or prior to the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to Seller and Seller's counsel.

6.3    <u>Compliance with Applicable Laws</u>.    As of the Closing, no Proceeding against Purchaser shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling or charge would, in Seller's reasonable judgment, (a) prevent consummation of any of the transactions contemplated by this Agreement, or (b) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, provided however that any litigation commenced by SOK against any Party shall not be a failure to satisfy this condition precedent, and shall not be a basis on which Seller will terminate this Agreement or otherwise refuse to close the transaction.

6.4    <u>Consents and Approvals</u>.    All Consents and approvals by any Governmental Bodies (excluding any such Governmental Bodies with authority over the transfer of liquor licenses) that are required for the consummation of the transactions contemplated by this Agreement or the other agreements contemplated by this Agreement will have been obtained at or prior to the Closing.

6.5    <u>Closing Documents</u>. At or prior to the Closing, Purchaser shall deliver or cause to be delivered to Seller, or Company, as the case may be, copies of the resolutions of Purchaser authorizing the execution, delivery and performance of this Agreement.

6.6    <u>Purchase Price</u>.  On the Closing Date, Seller shall have received by wire transfer to one or more bank accounts designated in writing by Company on behalf of Seller (at least 2 business days prior to the Closing Date), immediately available funds in an amount equal to the Purchase Price after application of the Deposit (subject to <u>Sections 2.5(d)</u> and <u>5.10</u>).

20

6.7    Guarantee Releases.  At or prior to the Closing, Seller shall have either received from Purchaser written evidence reasonably satisfactory to Seller that Purchaser has obtained a release from any applicable third parties of all guarantees extended by SOK with respect to the JV or the JV Subsidiaries (including with respect to any real estate lease or obligations for borrowed money) as set forth on Schedule 6.7 (collectively, the "Guarantee Releases"). In the event that SOK is the Successful Bidder, the requirements of this Section 6.7 shall be deemed satisfied.

Except as set forth in Section 6.7, Seller may waive any condition specified in this Article 6.

## ARTICLE 7
## ADDITIONAL COVENANTS

7.1    Employment Matters.

(a)    Purchaser shall make offers of employment, on such terms and conditions as Purchaser in its sole and absolute discretion shall determine, and effective on the Closing Date, to such employees of, or leased to, the Business (the "Business Employees") as Purchaser in its sole and absolute discretion shall decide.  The Business Employees who are hired and employed by Purchaser are referred to as "Hired Employees."  Former employees of, or leased to, Seller, if any, hired by Purchaser shall be considered new hires by Purchaser.

(b)    Seller shall terminate or cause to terminate the employment of the Hired Employees as of the Closing Date, in such form as is reasonably acceptable to Purchaser.

(c)    Seller shall cooperate with Purchaser in the hiring of those of Seller's employees or leased employees, if any, as Purchaser may wish to employ.

(d)    Nothing set forth in this Agreement shall constitute an assumption by Purchaser of past or future obligations of Seller with respect to any employees or leased employees of Seller, including any Hired Employees, whether arising under existing employment agreements or arrangements (oral or written), and any such obligations shall be and remain obligations of Seller.

(e)    Seller shall retain all COBRA liability under Section 4980B of the Code and the treasury regulations promulgated thereunder with respect to continuation coverage to qualified beneficiaries, including the Hired Employees and any M&A Qualified Beneficiary, whose qualifying event occurs prior to, or in connection with, the transaction described in this Agreement.  The terms "continuation coverage", "qualified beneficiary", "M&A Qualified Beneficiary" and  "qualifying event" have the meanings ascribed to them under Section 4980B of the Code and the treasury regulations promulgated thereunder.

(f)    Purchaser and Seller shall furnish each other with such information concerning employees, subject to confidentiality and privacy considerations, and to take all such other action, as is necessary and appropriate to effect the transactions contemplated hereby.

21

(g)     Seller represents and warrants to Purchaser that Seller has delivered, at least two days prior to execution of this Agreement, a full, complete and correct Department of Labor & Economic Growth, Unemployment Insurance Agency (U/A) Form 1027.

7.2     <u>Tax Allocations.</u> The Purchase Price and, to the extent required, the Assumed Liabilities and relevant transaction costs, shall be allocated for Tax purposes only in accordance with <u>Schedule 7.2</u>.  After the Closing, the Parties shall make consistent use of the allocation specified in <u>Schedule 7.2</u> for all Tax purposes and in any and all filings, declarations and reports with the IRS in respect thereof, including the reports required to be filed under Section 1060 of the Code it being understood that Purchaser and Seller shall jointly prepare and deliver to one another IRS Form 8594 within 45 days after the Closing Date.  In any Proceeding related to the determination of any Tax, neither Purchaser nor Seller shall contend or represent that such allocation is not a correct allocation.  No Party will take any position on or with respect to any Tax return, report or filing (including amendments thereto) inconsistent with such allocations. The foregoing allocation and <u>Schedule 7.2</u> shall not be considered an admission by any Party or utilized in any manner in connection with the valuation of the SOK interest in the JV pursuant to the Sale Procedures Order and the Joint Development Agreement.

# ARTICLE 8
# REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as follows, which representations and warranties shall be true and correct as of the date hereof and true and correct as of the Closing but which shall not survive the Closing:

8.1     <u>Organization and Standing of Seller; Authorization</u>.

(a)     Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Michigan, with full corporate power and authority to own its assets (including the Acquired Assets) and to conduct the Business subject to being a debtor in possession under chapter 11 of the Bankruptcy Code.

(b)     Upon the expiration of any applicable appeal period following the entry of the Sale Order, this Agreement will have been duly executed and delivered by Seller and shall constitute the legal, valid and binding obligations of Seller enforceable in accordance with its terms.  Upon expiration of any applicable appeal period following the entry of the Sale Order, Seller will have full power and authority, corporate or otherwise, to enter into and deliver this Agreement and to execute and deliver all contemplated agreements and documents provided in this Agreement and perform the transactions contemplated herein.

8.2     <u>Acquired Assets</u>.  At the Closing, Seller shall sell and transfer to Purchaser all of its rights, title and interest to all of the Acquired Assets, free and clear of all Liens except the Permitted Liens pursuant to the Sale Order, "AS IS", "WHERE IS" and with all faults and except as otherwise provided herein, without any warranties or representations, express or implied, of kind or nature, including without limitation, warranties or merchantability or fitness for a particular purpose.  Upon entry of the Sale Order, Seller shall have the right to freely assign all of its rights, title and interest in the Acquired Assets (including the Assumed Contracts and

Assumed Leases) to Purchaser free and clear of all Liens except for the Permitted Liens and the rights of the owners of the personal property leased by Seller pursuant to the Assumed Contracts and Assumed Leases from and after the Closing Date.

8.3     Consents, Approvals or Authorizations.  Except as set forth on Schedule 8.3, no Consent from, filing or registration with, or notification to, any Person or Governmental Body is required in connection with the execution and delivery of this Agreement by Seller and/or the consummation of the transactions contemplated hereby.

8.4     Tangible Personal Property.  Schedule 8.4 includes all of the Tangible Personal Property owned and/or leased by Seller and/or used or held for use in connection with the Business. Unless expressly set forth on Schedule 8.4, all Tangible Personal Property identified on Schedule 8.4 is owned (and not leased) by Seller.  All Tangible Personal Property is now, or as of Closing pursuant to the Sale Order will be, free and clear of any Liens, except for (a) those that will be discharged (or transferred to the proceeds of the Acquired Assets) concurrently with the Closing, or (b) the Permitted Liens, or (c) the rights of the owners of the Tangible Personal Property leased by Seller pursuant to the Assumed Contracts and Assumed Leases with respect to obligations accruing from and after the Closing Date.

8.5     Leased Real Property.  With regard to all Seller Leases, other than as set forth on Schedule 8.5:

        (a)     (i)     Each of the Assumed Leases is valid, binding, in full force and effect, and enforceable by Seller in accordance with its terms; (ii) no event has occurred which (whether with or without notice, lapse of time or both or the happening or occurrence of any other event) would constitute a default under the Assumed Leases by Seller or entitle any other party to the Assumed Leases to declare a default or to accelerate, or which does accelerate, the maturity of any indebtedness of Seller under any of the Assumed Leases; and (iii) no damage or destruction has occurred with respect to any of the Leased Real Property.

        (b)     Seller has no Knowledge of any pending or threatened special assessments against the Leased Real Property.

        (c)     Neither Seller nor any other Person contracting regarding services or materials for the Improvement of the Leased Real Property has incurred any Liability pursuant to which mechanic's, laborer's or materialman's Liens could be filed against the Leased Real Property or any portion of the other Acquired Assets and no notice of intent to file any such Lien has been received by Seller.

        (d)     Seller is the sole occupant of the Leased Real Property and no other Person has any right to use or occupy any portion of the Leased Real Property, whether as a lessee, tenant, subtenant, at sufferance, trespasser or otherwise.

        (e)     To the best of Seller's knowledge, information and belief, the present use, occupancy and operation of the Leased Real Property by Seller are in compliance with all Laws and private restrictive covenants, and there has not been any proposed change thereto that would affect any of the Leased Real Property or its use, occupancy or operation.  There exists no

conflict or dispute involving Seller (or to the knowledge of Seller any other Person) with any Governmental Body or other Person relating to any of the Leased Real Property or the activities thereon. No portion of the Leased Real Property is subject to any classification, designation or preliminary determination of any Governmental Body or pursuant to any Law which would restrict its use, development, occupancy or operation in connection with the Business.

(f)     All requisite certificates of occupancy and other Permits and approvals required of Seller with respect to the Leased Real Property or the Improvements and the use, occupancy and operation thereof by Seller have been obtained and paid for.

(g)     The Leased Real Property are presently zoned pursuant to the building and zoning ordinances and/or use regulations in force in the area in which the Leased Real Property is situated (the "Ordinances").   The current use and condition of the Leased Real Property conforms to all Ordinances required by any Governmental Body having jurisdiction or pursuant to all Laws necessary for Seller to lawfully own, use and occupy the Leased Real Property. No fact has been brought to the attention of Seller respecting any fact, action or Proceeding, whether actual, pending, or threatened, which could result in a modification or the termination of such conformity.

8.6     Ownership of all Assets in Seller Entity.   Seller owns or has a lessee's interest in all of the Acquired Assets and there are no assets of any kind which are owned by a Person other than Seller (after exercise of the Drag-Along Rights) which are necessary, used or usable in connection with the Business.

8.7     Noncontravention.

(a)     Upon the expiration of any applicable appeal period following the entry of the Sale Order, the execution and the delivery of this Agreement and the Ancillary Agreements being executed by Seller, any other documents contemplated hereby or thereby, the performance by Seller of its obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby or thereby, do not and will not (i) violate any Law or Order to which Seller or any of the Acquired Assets or Assumed Contracts or Assumed Leases, is subject,  (ii) except as set forth on Schedule 8.7(a), require any Consent or notice under, or registration under or payment on account of, or conflict with, result in a breach of, or constitute (with or without the giving of notice or the lapse of time or both) a default (or give rise to any right of termination, modification (including in the case of leases, any change in the amount or nature of the rent), cancellation, maturation or acceleration or give any third Person any interests or rights therein) under, any of the terms, conditions or provisions of any (A) Assumed Contract or Assumed Lease, or any other agreement, Contract or instrument to which Seller is a party or by which any portion of its properties or assets or the Acquired Assets may be bound, including all Assumed Contracts or Assumed Leases (whether or not material), or (B) Permit or other Governmental Body authorization held or used by or binding on Seller with respect to the Acquired Assets, the Business or the Leased Real Property, or (iv) result in the imposition of any Lien upon any of the Acquired Assets.

(b)     Except as set forth on Schedule 8.7(b), Seller is not required to give any notice to, make any filing with, or obtain any Consent of any Governmental Body in order for Seller to consummate the transactions contemplated by this Agreement.

8.8     Permits.  Seller holds all Permits required for the conduct of the Business and ownership of the Acquired Assets, except where the failure to hold any such Permit would not have a Material Adverse Affect.  Seller is in compliance with the terms and conditions of all such Permits which it holds and all such Permits will be available for use by Purchaser immediately after the Closing.

8.9     Tangible Personal Property.  The Tangible Personal Property includes all equipment, and other tangible assets necessary for the current conduct of the Business in accordance with past practice.

8.10     Contracts.  All of the Assumed Contracts, Assumed Leases and all other Contracts of Seller are valid, binding and enforceable in accordance with their respective terms.  Seller has performed all obligations required to be performed by it as of the date hereof and is not in default under or in breach of nor in receipt of any claim of default or breach under any Contract to which Seller is subject; no event has occurred which with the passage of time or the giving of notice or both would result in a default, breach or event of noncompliance by Seller under any Contract to which Seller is subject; and Seller has no present expectation or intention of not fully performing all such obligations.

8.11     Tax Matters.

(a)     All Taxes that give rise to a Lien on the Acquired Assets shall either be (i) specifically subject to the Sale Order transferring to Purchaser such Acquired Assets free and clear of all Liens and encumbrances or (ii) paid in full at Closing.

(b)     Seller is not a "foreign person" for purposes of the withholding requirements of Section 1445(a) of the Code (or any corresponding provision of state, local or foreign Tax Law), and Seller has no permanent establishment in any foreign country, as defined in the relevant tax treaty between the United States of America and such foreign country.

(c)     Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholder, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly, completely and timely filed.

(d)     Seller is not a party to any Contract that has resulted or could result, separately or in the aggregate, in the obligation to make any payments that will not be deductible under Code Section 280G or which is subject to Code Section 409A.

(e)     Seller is not a party to any Tax allocation, indemnification or sharing agreement that will remain in effect following the Closing.

8.12     Intellectual Property.

(a)    Schedule 8.12(a) identifies, with respect to the Business and the Acquired Assets, (i) each item of Intellectual Property which has been issued to Seller or which is used by Seller or which has been applied for by Seller, (ii) each material item of unregistered Intellectual Property owned or used by Seller, (iii) each license, agreement, or other permission that Seller has granted to any third party with respect to any Intellectual Property used by Seller (together with any exceptions); and (iv) each material license, agreement or other permission under which Seller uses any Intellectual Property owned by a third party.

(b)    Except as set forth on Schedule 8.12(b), Seller has not received notice from any Person and Seller has no knowledge that the conduct of the Business or the Intellectual Property owned or used by Seller interferes with, infringes, misappropriates, or otherwise conflicts with any Intellectual Property or other rights of third parties.

8.13   Labor and Employment Matters.

(a)    Seller is not a party to or bound by any collective bargaining agreement or relationship with any labor organization.

(b)    With respect to the Business: Company has paid all wages, benefits, accrued vacation pay and accrued bonuses through the Closing Date which arose after the Petition Date. In addition (i) no labor organization or group of employees has filed any representation petition or made any written or oral demand for recognition; (ii) to the knowledge of Seller, no union organizing efforts are underway or threatened and no other question concerning representation exists; (iii) there is no employment-related charge, complaint, grievance, investigation, inquiry or obligation of any kind, pending or to the knowledge of Seller, threatened in any forum, relating to an alleged violation or breach by Seller (or its officers or directors) of any Law or Contract; and (iv) to the knowledge of Seller, Seller has not committed any act or omission giving rise to liability for any violation identified in subclause (iii) above, or as a result of any adverse workers compensation experience.

8.14   Employee Benefits.

(a)    Seller has not maintained, contributed to or had any Liability with respect to any Employee Pension Benefit Plan.

(b)    Seller does not maintain, has no obligation to contribute to and does not have any Liability (including any liability under Parts 6 and 7 of Subtitle B of Title I of ERISA and Sections 4980B, 4980D and 5000 of the Code) with respect to any Employee Welfare Benefit Plan nor with respect to any Employee Welfare Benefit Plan, whether or not terminated, which provides medical, health, life insurance or other welfare-type benefits for current or future retirees or current or future former employees or their spouses or dependents (other than in accordance with Section 4980B(f) of the Code or other applicable Law).

(c)    Seller does not maintain, contribute to or have any Liability under (or with respect to) any deferred compensation, severance or retirement plans or arrangements, employee welfare, fringe benefit, vacation, incentive or bonus plan, program, policy or other arrangement,

whether or not terminated, other than discretionary bonuses and increases in compensation in the ordinary course of business other than as disclosed to Purchaser.

(d)     No Employee Pension Benefit Plan has or has incurred an accumulated funding deficiency within the meaning of Section 302 of ERISA or Section 412 of the Code, nor has any waiver of the minimum funding standards of Section 302 of ERISA and Section 412 of the Code been requested of or granted by the Internal Revenue Service with respect to any Employee Pension Benefit Plan, nor has any lien in favor of any Employee Pension Benefit Plan arisen under Section 412(n) of the Code or Section 302(f) of ERISA.

(e)     No other trade or business is or, at any time within the past six years, has been treated together with Seller, as a single employer under Section 414 of the Code or Section 4001 of ERISA.

8.15    Environment, Health and Safety Matters.    With regarding to environmental, health and safety matters, except as provided in Schedule 8.15:

(a)     Seller has complied in all material respects and is in compliance in all material respects with Environmental Law and all Environmental, Health, and Safety Requirements.

(b)     Seller has not received any written or oral notice, report or other information regarding any actual or alleged material violation of Environmental Law or Environmental, Health, and Safety Requirements, or any liabilities or potential liabilities, including any investigatory, remedial or corrective obligations under Environmental Law or Environmental, Health, and Safety Requirements.

(c)     Seller has not assumed or undertaken any obligation for corrective or remedial action, of any other person or entity relating to Environmental Laws or Environmental, Health, and Safety Requirements with respect to any of the Real Property.

(d)     To the best of Seller's knowledge, information and belief, (i) no facts, events or conditions relating to the Leased Real Property will (A) give rise to any material investigatory, remedial or corrective obligations pursuant to Environmental Laws or Environmental, Health, and Safety Requirements, or (B) give rise to any other material Liabilities pursuant to Environmental Laws or Environmental, Health, and Safety Requirements, and (ii) there has been no Release or threatened Release of any Hazardous Material on, to, from, or under the Leased Real Property now or previously leased, or operated by Seller.

(e)     Seller has never owned or operated any underground or above-ground storage tanks, nor are there any active or inactive underground or above-ground storage tanks located at any Leased Real Property now or previously leased, or operated by Seller.  Seller has obtained, is, and has been in compliance with all licenses, Permits, certificates, and other authorizations and approvals required under all applicable Environmental Law and Environmental, Health, and Safety Requirements.  All such licenses, permits, certificates, and other authorizations or approvals are set forth in Schedule 8.15.

(f)     There have been no environmental assessments, inspections, or audits conducted by Seller, any Governmental Body, or any other Person with respect to the Leased Real Property other than those with respect to which copies of the assessment, inspection, or audit reports have been delivered to Purchaser.

(g)     None of the Leased Real Property now or previously owned, leased, or operated by Seller has been operated as a Treatment, Storage, or Disposal facility for Hazardous Waste (as such terms are defined under the Resource Conservation and Recovery Act or any other Environmental Law).

(h)     No property or facility to which Seller transported or arranged for disposal of Hazardous Materials is listed or proposed for listing as a site requiring investigation, cleanup, or remediation or is otherwise the source of liability under Environmental Law or Environmental, Health, and Safety Requirements.

8.16    Names and Locations.  Except as set forth on Schedule 8.16, with respect to the Business, during the five-year period prior to the execution and delivery of this Agreement, Seller has not used any trade name or fictitious names under which it has invoiced account debtors, maintained records concerning its assets or otherwise conducted business.

8.17    Sufficiency of Assets.  The assets and properties making up the Acquired Assets and the Leased Real Property constitute all of the assets (tangible, intangible, real and personal of any nature whatsoever) that are necessary, used or available to operate the Business in the manner presently operated by Seller.

8.18    Brokers or Finders.  Seller and its agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

8.19    Litigation.  Except as set forth on Schedule 8.19, there is no Proceeding pending or, to the knowledge of Seller, threatened against Seller, the Acquired Assets or the Business, which, if determined adversely, would have a Material Adverse Effect upon the transactions contemplated by this Agreement, Purchaser or the Acquired Assets.

8.20    Disclosure.  No representation or warranty made by Seller or its principals contained in this Agreement or in any Ancillary Agreement contains any untrue statement of material fact or omits to state a material fact necessary to make the statements and facts contained herein, in light of the circumstances in which they were or are made, not false or misleading.

8.21    Disclosure Schedules.  Unless otherwise provided in this Agreement, all Exhibits and Schedules will be provided by Seller to Purchaser as soon as possible after execution of this Agreement but, in no event, later than 10 days after execution of this Agreement and shall be supplemented and updated as provided in Section 5.8.

## ARTICLE 9
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows, which representations and warranties shall be true and correct as of the date hereof and true and correct as of the Closing:

9.1     Due Organization.   Purchaser is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Michigan.  Purchaser has full power and authority to own and lease its assets and properties and to conduct its business as it is now being conducted.

9.2     Authorization.  This Agreement has been duly executed and delivered by Purchaser and constitutes the legal, valid and binding obligation of Purchaser enforceable in accordance with its terms.  Purchaser has full power and authority, or otherwise, to enter into and deliver this Agreement and to execute and deliver all contemplated agreements and documents provided in Agreement and perform the transactions contemplated therein.   Purchaser is not required to obtain the consent, approval or waiver of any person not a party to this Agreement to consummate the transactions contemplated hereby.

9.3     Financial Ability to Close.   Purchaser has adequate financial resources to consummate the transactions contemplated hereby, including the payment of the Purchase Price.

9.4     Litigation.   There is no Proceeding in progress or, to the knowledge of Purchaser, pending or threatened against or relating to Purchaser, which, if determined adversely to Purchaser, would prevent Purchaser from paying the Purchase Price to Seller; enjoin, restrict or prohibit the transfer of all or any part of the Acquired Assets as contemplated by this Agreement; or prevent Purchaser from fulfilling all of its obligations set out in this Agreement or arising from this Agreement, and Purchaser has no knowledge of any existing ground on which any such action, suit, litigation or proceeding might be commenced with any reasonable likelihood of success.

9.5     No Broker.  Purchaser has carried on all negotiations relating to this Agreement and the transactions contemplated in this Agreement directly and without the intervention on its behalf of any other party in such manner as to give rise to any valid claim for a brokerage commission, finder's fee or other like payment, except Seller's broker.  Seller shall be liable for all such payments due to its broker.

## ARTICLE 10
## TERMINATION

10.1    Termination of the Agreement.  This Agreement may be terminated as provided below:

(a)      Purchaser and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing.

(b)      Purchaser may terminate this Agreement if the Closing shall not have occurred on or before December 11, 2015 (the "Expiration Date").  Seller may terminate this Agreement after the Expiration Date only in the event Seller has performed and delivered all requirements of Closing and Purchaser has failed to close.

15-49008-wsd    Doc 367    Filed 11/17/15    Entered 11/17/15 14:56:28    Page 33 of 66

(c)     Purchaser may terminate this Agreement by giving written notice to Seller at any time prior to the Closing (i) in the event Seller has Breached any representation, warranty, covenant or agreement contained in this Agreement in any material respect or (ii) the conditions precedent of Purchaser to close as set forth in Section 5 or Section 4.2 of this Agreement have not been fully satisfied in Purchaser's reasonable discretion or waived in writing by Purchaser.

(d)     Seller may terminate this Agreement at any time prior to the Closing by giving written notice to Purchaser, that (i) Purchaser materially failed to satisfy the conditions to closing set forth in Section 6, or (ii) Purchaser materially Breached its representations and warranties set forth in Article 9 and as a result Purchaser cannot close the transactions contemplated herein. Such notice to terminate must set forth in specific factual detail Seller's reasons for declaring Breach or failure to satisfy a condition. Seller may waive any such Breach or failure to satisfy in Seller's reasonable discretion except as set forth in section 6.7.

(e)     This Agreement shall automatically terminate if Purchaser is not selected as the Successful Bidder, subject to the provisions of the Sale Procedures Order and Bidding Procedures, including the Back-Up Bidder provisions, in which case the Termination Fee will be paid to Purchaser in accordance with this Agreement.

10.2    Limitations; Effect. Notwithstanding anything in Section 10.01 to the contrary, no Party may terminate this Agreement if such Party is in material Breach of this Agreement or if the circumstance giving rise to such Party's right to terminate results primarily from a Breach by such Party itself of any representation, warranty, covenant or agreement contained in this Agreement. If any Party terminates this Agreement pursuant to Section 10.01, all rights and obligations of the Parties hereunder and any third party beneficiaries shall terminate and there shall be no liability on the part of any Party to any other Party under this Agreement, except that nothing herein shall relieve any Party from liability for any Breach of this Agreement prior to such termination or in connection with such termination.

## ARTICLE 11
## MISCELLANEOUS

11.1    Expenses. Except as otherwise provided in this Agreement, Seller, on the one hand, and Purchaser, on the other hand, will bear their own costs and expenses (including all legal, accounting, consulting, investment banking, brokerage and other fees and expenses) (collectively, "Expenses") incurred in connection with this Agreement and the transactions contemplated hereby.

11.2    Further Assurances. Seller will execute and deliver such further instruments of conveyance and transfer and take such additional action as Purchaser may reasonably request to effect, consummate, confirm or evidence the transactions contemplated by this Agreement. Purchaser will execute and deliver such further instruments of conveyance and transfer and take such additional action as Seller may reasonably request to effect, consummate, confirm or evidence the transactions contemplated by this Agreement.

11.3    Entire Agreement. This Agreement (including the Ancillary Agreements and documents referred to herein) constitutes the entire agreement between the Parties and supersedes any prior

understandings, agreements, or representations by or between the Parties, written or oral, that may have related in any way to the subject matter hereof.

11.4    Counterparts.  This Agreement and any of the Ancillary Agreements may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier or other electronic means (pdf, e-mail or otherwise) shall be as effective as delivery of a manually executed signature page to this Agreement.  At the request of either Party, the other Party shall re-execute original forms of any such agreement or instrument thereof and deliver them to the requesting Party.  No Party shall raise the use of a fax or electronic signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a fax or other electronic means as a defense to the formation of a Contract and both Parties forever waive any such defense.

11.5    Headings.    The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

11.6    Notices.  Any notice, demand, consent, waiver, and/or other communication required or permitted to be given under this Agreement ("Notice") shall be deemed to have been duly given if personally delivered, sent by email, sent by reputable overnight delivery service, or mailed, certified or registered mail, return receipt requested.  Notice shall be deemed given upon the earliest to occur of (a) personal delivery, (b) when sent via email, (c) on the business day after such Notice is sent by reputable overnight delivery service, or (d) on the first day that the United States Post Office actually delivers, or first attempts to deliver, such mailed Notice (whether or not the addressee accepts such Notice).  All Notices shall be sent to the appropriate addresses, and fax numbers, as the case may be, as follows:

    If to Seller or Company:

        Olga's Kitchen, Inc.
        c/o Gene Kohut, Chief Restructuring Officer
        17000 Kercheval Ave., Suite 210
        Grosse Pointe, MI 48230
        gene@gktrustee.com

    with a copy to:

        Robert Bassel
        PO Box T
        Clinton, MI 49236
        bbassel@gmail.com

    If to Purchaser:

        Cosmo Hospitality, LLC
        Attn: Paul Rhodes

15-49008-wsd    Doc 367    Filed 11/17/15    Entered 11/17/15 14:56:28    Page 35 of 66

5750 New King Drive, Suite 200
Troy, MI 48098
prhodes@uticaenterprises.com

and

Attn: Jason Miller
28470 Thirteen Mile Rd. Suite 220
Farmington Hills, MI 48334

with a copy to:

Frederick Berg
Butzel Long, P.C.
150 W. Jefferson Suite 100
Detroit, MI 48226

David Lerner
Plunkett Cooney
38505 Woodward
Bloomfield Hills, MI  48304

If to OKI:

Dalto Consulting, Inc.
Attn:  Kenneth J. Dalto
32400 Telegraph Road, Suite 102
Bingham Farms, MI 48025
kdalto@kendalto.com

with a copy to:

Frank & Frank, PLLC
Attn: Jerome D. Frank
30833 Northwestern Hwy., Suite 205
Farmington Hills, MI 48334
jfrank@frankfirm.com

Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth above using any other means, but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient.  Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

11.7    Governing Law; Venue.    This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Michigan without giving effect to any choice

or conflict of law provision or rule (whether of the State of Michigan or any other jurisdiction) that would cause the application to this Agreement of the laws of any jurisdiction other than the State of Michigan. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the Parties in the Bankruptcy Court, or, if the Bankruptcy Court does not have jurisdiction, in the courts of the State of Michigan, County of Oakland, or, if it has or can acquire jurisdiction, in the United States District Court for the Eastern District of Michigan, and both of the Parties consent to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waive any objection to venue in those courts. Process in any action or proceeding referred to in the preceding sentence may be served on any Party anywhere in the world.

11.8     Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Purchaser and Seller.  No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

11.9     Construction.  Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates.  Nothing in any Exhibit or Schedule attached hereto shall be deemed adequate to disclose an exception to a representation or warranty made herein unless such Exhibit or Schedule identifies the exception with reasonable particularity.

11.10    No Strict Construction.  Notwithstanding the fact that this Agreement has been drafted or prepared by one of the Parties, both of the Parties confirm that it and its counsel have reviewed, negotiated and adopted this Agreement as the joint agreement and understanding of the Parties, and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any person.  Seller and Purchaser acknowledge that they each have been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguity in this Agreement against the Party that drafted it has no application and is expressly waived by both Parties.

11.11    Remedies.  Both of the Parties shall have and retain all other rights and remedies existing in their favor at law or in equity or bankruptcy, including any actions for specific performance and/or injunctive or other equitable relief (including the remedy of rescission) to enforce or prevent any violations of the provisions of this Agreement.

11.12    Binding Agreement; Assignment.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns; provided that neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by the Seller without the prior written consent of Purchaser, or by Purchaser without the prior written consent of Seller.

11.13 <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

11.14 <u>Parties in Interest</u>. Nothing in this Agreement, express or implied, is intended to confer on any person other than the Parties and their respective successors and assigns any rights or remedies under or by virtue of this Agreement.

*[signatures on next page]*

IN WITNESS WHEREOF, the undersigned have hereunto subscribed their names as of the day and date first written above.

**Purchaser:**

**Cosmo Hospitality, LLC**, a Michigan limited liability company

By: _____

Print name: _STEFAN WANCZYK_

Its: _MEMBER_

**Seller:**

**Olga's Kitchen, Inc.**, a Michigan corporation

By: _____

Print name: _____

Its: _____

**OKI, LLC**, a Michigan limited liability company

By: _____

Print name: _____

Its: _____

**Kobacker & Associates of Kentwood**, Michigan limited partnership

By: _____
       Its General Partner

Print name: _____

By: _____
       Its Limited Partner

Print name: _____

# EXHIBIT A
## SALE PROCEDURES ORDER

**EXHIBIT B**
**BIDDING PROCEDURES**

**EXHIBIT C**
**SALE ORDER**

**SCHEDULE 1**
**ASSUMED CONTRACTS**

**SCHEDULE 2**
**ASSUMED LEASES**

**SCHEDULE 3**
**EXCLUDED ASSETS**

# SCHEDULE 4
## JOINT DEVELOPMENT AGREEMENT

**SCHEDULE 5**
**JV MANAGEMENT AGREEMENTS**

# SCHEDULE 6
## JV OPERATING AGREEMENT

**SCHEDULE 2.2**
**SYSCO INVENTORY PAYMENT**

**SCHEDULE 2.5(d)**
**JV LIABILITIES**

## SCHEDULE 5.2
## FINANCIAL STATEMENT

**SCHEDULE 5.10(a)**
**UTILITY AMOUNTS OWED**

**SCHEDULE 5.10(b)**
**PERSONAL PROPERTY TAXES OWED**

**SCHEDULE 5.10(c)**
WAGES AND OTHER LABOR CHARGES AND BENEFITS OWED

**SCHEDULE 6.7**
**SOK GUARANTEES**

**SCHEDULE 7.2**
**TAX ALLOCATION**

**SCHEDULE 8.3**
GOVERNMENTAL BODY CONSENTS

**SCHEDULE 8.4**
TANGIBLE PERSONAL PROPERTY

**SCHEDULE 8.5**
SELLER LEASE DISCLOSURES

**SCHEDULE 8.7(a)**
NONCONTRAVENTION DISCLOSURES

**SCHEDULE 8.7(b)**
NOTICE DISCLOSURES

**SCHEDULE 8.12(a)**
INTELLECTUAL PROPERTY LIST

**SCHEDULE 8.12(b)**
INFRINGEMENT DISCLOSURES

**SCHEDULE 8.15**
ENVIRONMENTAL DISCLOSURES

**SCHEDULE 8.16**
USE OF OTHER NAMES DISCLOSURE

**SCHEDULE 8.19**
PENDING OR THREATENED LITIGATION DISCLOSURE