# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

In re:

**OLGA'S KITCHEN, INC.**                            **Case No. 15-49008**

         Debtor.                                   **Chapter 11**

                                                **Hon. Walter Shapero**

_____/

## STIPULATION IN SUPPORT OF ENTRY OF
## ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH AND (III) GRANTING RELATED RELIEF

The parties below stipulate to entry of the attached proposed Order as follows:

**Approved:**

/s/ Robert Bassel
Robert Bassel (P48420)
Attorney for Debtor
PO Box T
Clinton, MI 49236
bbassel@gmail.com

/s/ Joseph Sgroi
Joseph R. Sgroi (P68666)
Co-Counsel for SOK Venture, LLC
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
jsgroi@honigman.com

/s/ Kellie M. Blair
Kellie M. Blair—P58642
Matta Blair PLC
Attorney for FIDVI Associates, LLC
39572 Woodward Ave Ste 200
Bloomfield Hills, MI 48304-5005
Phone: (248) 593-6100
Fax: (248) 593-6116
e-Mail: kblair@mattablair.com

/s/ Andrew S. Conway
Andrew S. Conway—P36244
Attorney for 12 Oaks Mall, LLC,
VP and Senior Counsel
The Taubman Company
200 E Long Lake Rd Ste 300
Bloomfield Hills, MI 48304-2324
Phone:  (248) 258-7427
Fax: (248) 258-7586
e-Mail:  aconway@taubman.com


/s/ David M. Blau
David M. Blau—P52542
Attorney for RLV Orchard, LP, PR Woodland Limited Partnership,
 and Laurel Park Retail Properties, LLC
Clark Hill PLC
151 S Old Woodward Ave Ste 200
Birmingham, MI 48009-6103
Phone:  (248) 988-1817
Fax: (248) 988-2336
e-Mail:  dblau@clarkhill.com

/s/ Kimberly K. Pendrick
Kimberly K. Pendrick—P60348
Attorney for MUA
Assistant Attorney General
DEPT of Attorney General
3030 W Grand Blvd Ste 9-600
Cadillac Pl
Detroit, MI 48202-6030
Phone:  (313) 456-2206
Fax: (313) 456-2201


KILPATRICK & ASSOCIATES PC

    /s/ Leonora Baughman
Leonora K. Baughman - P33534
Attorneys for Oakland  County Treasurer's Office
903 N Opdyke Rd Ste C
Auburn Hills, MI  48326
Phone: (248) 377-0700
Fax: (248) 377-0800
e-Mail: lbaughman@kaalaw.com

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                            Chapter 11

OLGA'S KITCHEN, INC.,                             Case No. 15-49008

       Debtor.                                Hon. Walter Shapero

_____/

**ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL DEBTOR'S**
**ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND**
**ENCUMBRANCES, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF**
**CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION**
**THEREWITH AND (III) GRANTING RELATED RELIEF**

This matter having coming before the Court on the Motion for Entry of (I) an

Order (A) Approving Bidding Procedures for the Sale of Assets, (B) Approving Certain Bidder

Protections, and (C) Scheduling a Final Sale Hearing and Approving the Form and Manner of

Notice Thereof; and (II) an Order (A) Authorizing the Sale of Substantially All Debtor's Assets

Free and Clear of All Claims, Liens, and Encumbrances, (B) Authorizing the Assumption and

Assignment of Certain Executory Contracts and Unexpired Leases In Connection Therewith, and

(C) Granting Related Relief (Docket No. 277) (the "Sale Motion") dated October 16, 2015,[1] filed

by Olga's Kitchen, Inc. (the "Debtor"), as debtor in possession, seeking, among other things,

pursuant to Sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et

seq., as amended (the "Bankruptcy Code"), and Rules 2002, 6004 and 6006 of the Federal Rules

of Bankruptcy Procedure, as amended (the "Bankruptcy Rules"), the entry of an order (the "Sale

Approval Order"): (i) authorizing and approving the Asset Purchase Agreement dated as of

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Sale Motion.

November 20, 2015 (including all exhibits, schedules and ancillary agreements related thereto, the "Agreement"), substantially in the form attached hereto as Exhibit 1, by and among Debtor, OKI, Inc. ("OKI") and Kobacker & Associates of Kentwood and Kobacker & Associates ("Kobacker" and together with Debtor and OKI, collectively, "Seller") and SOK Venture LLC ("Purchaser"), pursuant to which Seller has agreed to sell substantially all of its assets including the Debtor Contracts (as defined below) (collectively, the "Assets") to the Purchaser (collectively, the "Sale Transaction"); (ii) authorizing and approving the sale by the Seller of the Assets, free and clear of all liens, claims, encumbrances and interests (other than certain liabilities that will be assumed by the Purchaser, as set forth in the Agreement (the "Assumed Liabilities")); (iii) authorizing the assumption and assignment to the Purchaser of certain executory contracts and unexpired leases of the Debtors in connection with the Sale Transaction (collectively, the "Debtor Contracts") identified on Exhibit 2 attached hereto;[2] and (iv) granting other related relief; the Court having conducted a hearing on the Sale Motion on November 23, 2015 (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; the Court having reviewed and considered (i) the Sale Motion and the exhibits thereto, (ii) the Agreement attached hereto as Exhibit 1, (iii) this Court's Amended Order (A) Approving Bidding Procedures For The Sale of Assets and The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (B) Approving Certain Bidder Protections, and (c) Scheduling a Final Sale Hearing and Approving the Form and Manner of Notice Therefore  (Docket No. 363), dated November 12,

---

[2] Although the Debtor is authorized to assume and assign to Purchaser the Debtor Contracts listed on Exhibit 2, the Purchaser may remove any Debtor Contracts from Exhibit 2 at any time prior to the closing of the Sale Transaction, and upon such removal such Debtor Contract will no longer be included in the Debtor Contracts assumed by Debtor and assigned to Purchaser pursuant to this Order and the Agreement.  Debtor will file a final list of Debtor Contracts that are assumed by the Debtor and assigned to the Purchaser within 1 business day after the closing of the Sale Transaction.

2015 (the "Sale Procedures Order") approving competitive bidding procedures for the Assets (the "Bidding Procedures"), (iv) all objections to the Sale Transaction filed in accordance with the Sale Procedures Order and (v) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and it appearing that due notice of the Sale Motion, the Sale Procedures Order and the auction conducted in accordance with the Bidding Procedures on November 20, 2015 (the "Auction") has been provided in accordance with the Sale Procedures Order, and that the relief requested in the Sale Motion is in the best interests of the Debtor, its estate and creditor and other parties in interest; and upon the record of the Sale Hearing and these cases; and after due deliberation thereon; and good cause appearing therefore,

### IT IS HEREBY FOUND AND DETERMINED THAT:[3]

### JURISDICTION, FINAL ORDER AND STATUTORY PREDICATES

A.    This Court has jurisdiction over the Sale Motion, the transactions contemplated by the Agreement and any other ancillary documents and agreements related thereto pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a).   This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).   Venue of these cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    This Sale Approval Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).   Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Sale Approval Order, and expressly directs entry of judgment as set forth herein.

---

[3]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

C.      The statutory predicates for the relief sought in the Sale Motion are Sections 105(a), 363(b), (f) and (m) and 365(a), (b) and (f) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

<u>**SOUND BUSINESS PURPOSE**</u>

D.      The Seller seeks to convey the Assets, all of which are related to Seller's business of owning and operating Olga's branded restaurants, including through Olga's SOK Holdings, LLC (the "<u>Joint Venture</u>"), a joint venture owned 50% by OKI and 50% by SOK Venture LLC and operated by the Debtor (collectively, the "<u>Business</u>").

E.      The Seller has demonstrated, and the Agreement reflects, both (1) good, sufficient, and sound business purposes and justifications for the Sale Transaction, and (2) compelling circumstances for the Sale Transaction outside of the ordinary course of the Debtor's business pursuant to Section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization in that, among other things, the value of the Assets and the Business would be harmed by any delay of the Sale Transaction.  Time is of the essence in consummating the proposed Sale Transaction.

F.      The consummation of the Sale Transaction outside of a plan of reorganization or plan of liquidation pursuant to the Agreement neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a liquidating plan of reorganization of the Debtor.  The Sale Transaction does not constitute a *sub rosa* plan of reorganization.

G.      The Agreement was not entered into, and neither the Seller nor the Purchaser has entered into the Agreement or proposes to consummate the Sale Transaction, for the purpose of hindering, delaying or defrauding the Seller's creditors.  Neither the Seller nor the

Purchaser has entered into the Agreement or proposes to consummate the Sale Transaction fraudulently for the purpose of statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory or possession thereof, or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

<u>HIGHEST AND BEST OFFERS</u>

H.      The Seller actively marketed the sale of substantially all of its assets both before and after the Petition Date and engaged in discussions with a variety of advisors and consultants in an effort to maximize the value of the Assets.  The Seller and its advisors undertook exhaustive efforts to solicit interest from third parties with the potential to acquire all or a substantial portion of the Assets.

I.      On November 12, 2015, this Court entered the Sale Procedures Order approving Bidding Procedures for the Assets.  The Bidding Procedures provided a full, fair and reasonable opportunity for any entity to make an offer to purchase the Assets.  Additionally, the Seller conducted the Auction in accordance with the Sale Procedures Order and complied with that order in all respects.  The Auction was duly noticed and conducted in a non-collusive, fair and good faith manner.  The Purchaser participated in the Auction and complied with the Sale Procedures Order and the Bidding Procedures.

J.      As demonstrated by the testimony and other evidence proffered or adduced at the Sale Hearing, (1) the Debtors have adequately marketed the Assets; (2) the purchase price contained in the Agreement constitutes the highest and otherwise best offer for the Assets and provides fair and reasonable consideration for the Assets; (3) the Sale Transaction will provide a greater recovery for the Debtor's creditors than would be provided by any other

practical available alternative including, without limitation, liquidation under Chapter 7 or Chapter 11 of the Bankruptcy Code; (4) the Sale Transaction under Section 363 of the Bankruptcy Code is preferable to a sale under a plan of reorganization or plan of liquidation due to, among other things, the Debtor's deteriorating financial conditional and value and lack of available financing to support ongoing operations; (5) no other party has offered to purchase the Assets for greater economic value to the Debtor or its estate; and (6) the Agreement and the consideration to be paid by the Purchaser under the Agreement constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and Section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory or possession thereof or the District of Columbia.  The Debtor's determination that the Agreement constitutes the highest and best offer for the Assets constitutes a valid and sound exercise of the Debtor's business judgment.

## BEST INTEREST OF CREDITORS

K.    Approval of the Agreement and the consummation of the Sale Transaction to the Purchaser at this time are in the best interest of the Debtor, its creditors, its estate and other parties in interest.

## GOOD FAITH

L.    The Purchaser is not an "insider" of the Debtor, as that term is defined by Section 101(31) of the Bankruptcy Code.

M.    The Agreement and each of the transactions contemplated therein were negotiated, proposed and entered into by the Sellers and the Purchaser in good faith, without collusion and from arm's-length bargaining positions.  The Purchaser has proceeded in good

faith in all respects in connection with this proceeding, is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby. Neither the Seller nor the Purchaser have engaged in any conduct that would cause or permit the Agreement to be avoided; that would tend to hinder or delay creditors; or impose costs and damages under Section 363(n) of the Bankruptcy Code.

## NOTICE OF THE SALE MOTION, THE AUCTION AND THE CURE AMOUNTS

N.      As evidenced by the certificates of service filed with the Court, (1) proper, timely, adequate and sufficient notice of the Sale Motion and the Sale Hearing has been provided by the Debtor, (2) such notice was good, sufficient and appropriate under the particular circumstances and (3) no other or further notice of the Sale Motion, the proposed Sale Transaction, the Bidding Procedures, the Auction or the Sale Hearing is or will be required. A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities, including, but not limited to:

1.      all parties listed on the matrix in Debtor's bankruptcy case;

2.      counsel to Purchaser;

3.      any party who, in the past year, expressed in writing to the Seller an interest in the Assets;

4.      nondebtor parties to the Debtor's executory contracts and unexpired leases listed on Exhibit 1 and Exhibit 2 to the Agreement;

5.      all parties who are known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Assets;

6.      the Internal Revenue Service;

7.      the Michigan Department of Revenue; and

8.      the United States Trustee.

Additionally, the Debtors published notice of the Sale Transaction in the Detroit News, Detroit Free Press and Crain's Detroit Business. With regard to (1) parties who have claims against the Debtor but whose identities are not reasonably ascertainable by the Debtor, and (2) all other persons or entities, and the Court finds that such publication notice was sufficient and reasonably calculated under the circumstances to reach such parties, persons and entities.

O. In accordance with the provisions of the Sale Procedures Order, the Debtor has served notice of its intent to assume and assign the Debtor Contracts and of the related proposed Cure Costs (the "Contract and Cure Schedule") upon each nondebtor counterparty to the Debtor Contracts. The service of such notice was good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the Debtor Contracts listed in the Contract and Cure Schedule and the assumption and assignment of the Debtor Contracts. All nondebtor parties to the Debtor Contracts have had an opportunity to object to both the Cure Costs listed in the Contract and Cure Schedule and the assumption and assignment of the Debtor Contracts (including objections related to adequate assurance of future performance and objections based on whether applicable law excuses the non-debtor counterparty to each Debtor Contract from accepting performance by, or rendering performance to, the Purchaser for purposes of Section 365(c)(1) of the Bankruptcy Code).

### SECTION 363(F) REQUIREMENTS MET FOR FREE AND CLEAR SALES

P. The Debtor may sell the Assets free and clear of all liens, claims, interests and encumbrances of any kind or nature whatsoever ("Claims") (except for any Assumed Liabilities), because, in each case, one or more of the standards set forth in Section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. The assumption and assignment of each of the Debtor Contracts is also free and clear of all Claims other than the payment of Cure Costs.

Those holders of Claims who did not object, or who withdrew their objections, to the Sale Transaction or the Sale Motion are deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code. Those holders of Claims who did object fall within one or more of the other subsections of Section 363(f) of the Bankruptcy Code and are adequately protected by having their Claims, if any, attach to the proceeds of the Sale Transaction ultimately attributable to the property against which they have a Claim, in the same order of priority and with the same validity, force and effect that such creditor had prior to the Sale Transaction, subject to any defenses of the Debtor.

Q.    The Seller is the sole and lawful owner of the Assets and no other person has any ownership right, title or interest therein.

R.    All holders of Claims are adequately protected, and the Sale Transaction thus satisfies Section 363(e) of the Bankruptcy Code, by having their Claims, if any, attach to the proceeds of the Sale Transaction ultimately attributable to the property against which they have a Claim, in the same order of priority and with the same validity, force and effect that such Claim holder had prior to the Sale Transaction, subject to any rights, claims and defenses of the Debtor and its estate.

S.    The Purchaser would not have entered into the Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate and its creditors, if the sale of the Assets were not free and clear of all Claims other than Assumed Liabilities, or if the Purchaser would, or in the future could, be liable for any such Claims, including, without limitation and as applicable, certain liabilities (collectively, the "Excluded Liabilities") related to the Business that will not be assumed by the Purchaser, as set forth in the Agreement.

-9-

T.     Except for the Assumed Liabilities, the Sale Transaction will not impose or result in the imposition of any liability or responsibility of the Purchaser or its affiliates, successors or assigns or any of their assets (including the Assets) and the transfer of the Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or any of their assets (including the Assets) to any liability for any Claims including, without limitation, successor liability or any products liability.

## ASSUMPTION AND ASSIGNMENT OF THE DEBTOR CONTRACTS

U.     The assumption and assignment of the Debtor Contracts are integral to the Agreement, are in the best interests of the Debtor and its estate, and represent the reasonable exercise of the Debtor's sound business judgment.

V.     With respect to each of the Debtor Contracts, the Debtor has met all requirements of Section 365(b) of the Bankruptcy Code. Further, the Purchaser has provided all necessary adequate assurance of future performance under the Debtor Contracts in satisfaction of Sections 365(b) and 365(f) of the Bankruptcy Code. Accordingly, the Debtor Contracts can be assumed by the Debtor and assigned to the Purchaser, as provided for in the Sale Procedures Order, the Sale Motion and the Agreement.

## VALIDITY OF THE TRANSFER

W.     As of the closing of the Sale Transaction (the "Closing"), the transfer of the Assets to the Purchaser will be a legal, valid, and effective transfer of the Assets, and will vest the Purchaser with all right, title and interest of the Seller in and to the Assets, free and clear of (1) all Claims other than Assumed Liabilities and (2) all debts arising under or out of, in connection with, or in any way relating to, any acts of the Debtor, claims (as defined in Section 101(5) of the Bankruptcy Code), rights or causes of action (whether in law or in equity,

-10-

including, but not limited to, any rights or causes of action based on theories of transferee or successor liability under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), obligations, demands, guaranties, rights, contractual commitments, restrictions, interests and matters of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise.

X.     The Seller (1) has full corporate power and authority to execute the Agreement and all other documents contemplated thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate action of the Seller, (2) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Agreement, (3) has taken all actions necessary to authorize and approve the Agreement and the consummation by the Seller of the transactions contemplated thereby and (4) no consents or approvals, other than those expressly provided for in the Agreement, are required for the Seller to consummate such transactions.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

### GENERAL PROVISIONS

1.     The Sale Motion is granted in full and the Sale Transaction is approved as set forth in this Sale Approval Order.

2.     The findings of fact set forth above and conclusions of law stated herein will constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any

finding of fact later will be determined to be a conclusion of law, it will be so deemed, and to the extent any conclusion of law later will be determined to be a finding of fact, it will be so deemed.

3.      All objections, if any, to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits, except as expressly provided herein.

4.      The Sale Procedures Order and all of its terms are reaffirmed, ratified and approved.

### APPROVAL OF THE AGREEMENT

5.      The Agreement, all transactions contemplated therein and all of the terms and conditions thereof are hereby approved.

6.      Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Debtor is authorized to perform its obligations under and comply with the terms of the Agreement and consummate the Sale Transaction, pursuant to and in accordance with the terms and conditions of the Agreement and this Sale Approval Order.

7.      The Debtor, as well as its affiliates, officers, employees and agents, are authorized to execute and deliver, and empowered to perform under, consummate and implement, the Agreement, in substantially the same form as the Agreement attached hereto as Exhibit 1, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement and to take all further actions as may be (a) reasonably requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to possession, the Assets, (b) necessary

or appropriate to the performance of the obligations contemplated by the Agreement, and (c) as may be reasonably requested by the Purchaser to implement the Agreement and consummate the Sale Transaction in accordance with the terms thereof, all without further order of the Court.

8.    The Debtor is hereby authorized to credit, prorate, escrow and pay any amounts, whether at, prior to or after the Closing, in the exercise of its reasonable discretion and consistent with the Agreement, the Sale Procedures Order and this Sale Approval Order.

9.    This Sale Approval Order and the Agreement will be binding in all respects upon the Purchaser, the Seller and its affiliates, any trustees appointed in the Debtor's bankruptcy cases (whether under Chapter 7 or Chapter 11 of the Bankruptcy Code), all creditors (both known and unknown) of Debtor, all interested parties and their successors and assigns including, but not limited to, any person or entity asserting a Claim and any non-debtor counterparty to one of the Debtor Contracts.

10.    Nothing contained in any Chapter 11 plan confirmed in these Chapter 11 cases, or any order confirming any such Chapter 11 plan will conflict with or derogate from the provisions of the Agreement and this Sale Approval Order, and to the extent of any conflict or derogation between the Agreement and this Sale Approval Order and any such future plans or orders, the terms of the Agreement and this Sale Approval Order will control.

### TRANSFER OF ASSETS AND RELATED RELIEF

11.    Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the Seller is authorized to transfer the Assets in accordance with the terms of the Agreement. The Assets will be transferred to the Purchaser, and upon consummation of the Agreement, such transfer will (a) be valid, legal, binding and effective; (b) vest the Purchaser with all right, title and interest of the Seller in the Assets; and (c) be free and clear of all Claims except for Assumed

Liabilities with all liens, Claims, interests and encumbrances to attach to the net proceeds of the Sale Transaction, in the order of their priority and with the same validity, force and effect which they now have against the Assets, subject to any claims and defenses the Debtor may possess with respect thereto.

12.     Except as otherwise provided in the Agreement, all persons and entities (and their respective successors and assigns) including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, holding Claims (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) except for Assumed Liabilities, arising under or out of, in connection with, or in any way relating to, the Seller, the Assets, the operation of the Business prior to Closing, or the transfer of the Assets to the Purchaser, are, hereby forever barred, estopped and permanently enjoined from asserting such Claims against the Purchaser, its successors or assigns, its property or the Assets.  No such persons or entities will assert against the Purchaser or their successors in interest any liability, debt, claim or obligation arising from, related to or in connection with the ownership or operation of the Assets prior to the Closing, except for Assumed Liabilities.

13.     This Sale Approval Order (a) will be effective as a determination that, as of Closing, all Claims other than Assumed Liabilities relating to the Assets have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) is and will be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons

and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

14.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in the Debtor or the Assets will not have delivered to the Seller prior to the Closing of the Sale Transaction, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Debtor or the Assets or otherwise, then only with regard to Assets that are purchased by the Purchaser pursuant to the Agreement and this Sale Approval Order (a) the Debtor and the Purchaser are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Assets and (b) the Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Sale Approval Order, which, once filed, registered or otherwise recorded, will constitute conclusive evidence of the release of all Claims against the Assets other than the Assumed Liabilities.  This Sale Approval Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office.

15.     The Purchaser is hereby authorized to execute and deliver such other documents, statements, instruments and notices which may be necessary or desirable to fully consummate the Agreement and the Sale Transaction.

16.     All persons or entities in possession of some or all of the Assets are directed to surrender possession of such assets to the Purchaser or its designee at the time of Closing of the Sale Transaction.

17.     Following the Closing of the Sale Transaction, no holder of any lien, claim, interest or encumbrance will interfere with the Purchaser's title to or use and enjoyment of the Assets based on or related to any such lien, claim, interest or encumbrance, or based on any actions the Debtor may take in its Chapter 11 cases.

18.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Seller to transfer the Assets to the Purchaser in accordance with the Agreement and this Sale Approval Order.

19.     Insofar as continuing to operate the Debtor during the postbankruptcy period has preserved the collateral and maximized the value of the estate, which has benefitted all parties holding secured claims, and as administrative expenses have accrued, and will continue to accrue, all administrative expenses shall have priority over the payment of secured claims pursuant to, inter alia, 11 U.S.C. section 506(c), notwithstanding any prior Order of the Court.

20.     To the extent provided by Section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the

Assets sold, transferred and conveyed to the Purchaser on account of the filing or pendency of these Chapter 11 cases or the consummation of the Sale Transaction.

**ASSUMPTION AND ASSIGNMENT OF DEBTOR CONTRACTS**

21.     Pursuant to Sections 105(a) and 365 of the Bankruptcy Code, the Debtor's assumption and assignment to the Purchaser of the Debtor Contracts listed on Exhibit 2, is hereby approved, and all requirements of Section 365 of the Bankruptcy Code are hereby deemed satisfied.

22.     The Debtor is hereby authorized in accordance with Sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Debtor Contracts to the Purchaser free and clear of all Claims, and to execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Debtor Contracts to the Purchaser.

23.     The Debtor Contracts will be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Debtor Contract (including those of the type described in Sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer.  There will be no rent accelerations, assignment fees, increases or any other fees charged to the Purchaser or the Debtor as a result of the assumption or assignment of the Debtor Contracts.  No Debtor Contract may be terminated, or the rights of any party modified in any respect, including pursuant to any "change of control" clause, by any other party thereto as a result of the transactions contemplated by the Agreement.

24.     The Cure Costs under the Debtor Contracts arising or accruing prior to the date of this Sale Approval Order are shown on Exhibit 2, subject to any pending objections to such Cure Costs by the counterparties to Debtor Contracts.  Counterparties to Debtor Contracts

shall be permitted to amend and update their respective Cure Costs for any accrued but unbilled amounts or other estimated adjustments under the applicable Debtor Contracts related to pre-Closing periods, and any additional allowed amounts shall constitute administrative expense claims in the Debtor's bankruptcy case, subject to any applicable administrative expense bar date. The Debtor will pay all Cure Costs relating to Assumed Contracts and Assumed Leases (as such terms are defined in the Agreement). The Debtor is authorized and directed to pay the Cure Costs in accordance with the terms of this Order and the Agreement.

25. To the extent any Cure Costs have not been resolved by the Debtor and the applicable counterparty, or pursuant to further order of the Court, as of the Closing, the Debtor may escrow the higher of (a) the Cure Costs noticed by the Debtor; or (b) the amount set forth in any timely filed objection to Cure Costs, with such amount as agreed to by the parties or determined by the Court to be paid promptly following such disposition, and the Debtor shall be permitted to assume and assign such Debtor Contracts to Purchaser effective upon the Closing pursuant to the terms of this Sale Approval Order.

26. Payment of the Cure Costs will be in full and final satisfaction of any and all defaults under the Debtor Contracts, whether monetary or non-monetary. Each nondebtor party to a Debtor Contract hereby is forever barred, estopped and permanently enjoined from asserting against the Debtor or the Purchaser, their successors or assigns or the property of any of them, any default based on all known and unknown facts and circumstances existing as of the date of the Sale Hearing regardless of whether such default was raised or asserted prior to or at the Sale Hearing.

27. The failure of the Debtor or the Purchaser to enforce at any time one or more terms or conditions of any Debtor Contract will not be a waiver of such terms or

conditions, or of the Debtor's and the Purchaser's rights to enforce every term and condition of the Debtor Contracts.

28.     Upon the Closing of the Sale Transaction, the Purchaser will be fully and irrevocably vested with all right, title and interest of the Debtor under the Debtor Contracts.

29.     The assignments of each of the Debtor Contracts are made in good faith under Sections 363(b) and (m) of the Bankruptcy Code.

## EXERCISE OF DRAG-ALONG RIGHT AND VALUATION OF SOK INTEREST IN JOINT VENTURE

30.     The Debtor's exercise of its Drag-Along-Right, as described in the Sale Motion, is authorized in connection with the Sale Transaction on the terms set forth in the Sale Procedures Order and the Agreement.

31.     In order to exercise the Drag-Along-Right and effectuate the corresponding sale of the 50% interest of Purchaser in the Joint Venture, Purchaser will be paid the value of Purchaser's interest in the Joint Venture, consistent with the terms of the Joint Development Agreement between OKI, LLC and Purchaser (the "Joint Development Agreement"), from the gross proceeds of the Sale Transaction or otherwise.

32.     On or before November 30, 2015, Debtor and Purchaser will each provide to the other its valuation of the Purchaser's interest in the Joint Venture in light of the purchase price contained in the Agreement.  If Purchaser and the Debtor do not agree on the valuation, an independent valuation based on the applicable provisions of the Joint Development Agreement (the "Independent Valuation"), including Section 10 of the Joint Development Agreement, will be conducted not later than 90 days after the Closing with the valuation determined as of the date of the Auction.  At Closing, there will be a global

reconciliation of the items due to the Debtor from the Joint Venture, and due to the Joint Venture from the Debtor, subject to the applicable provisions of the Bankruptcy Code.

33. Purchaser will receive a credit at the Closing for the lower of its valuation of Purchaser's interest in the Joint Venture and the Debtor's valuation of Purchaser's interest in the Joint Venture, and the Debtor will escrow the difference between the two competing valuations in accordance with the provisions of the Joint Development Agreement. Within 10 days of the completion of the Independent Valuation, the additional value for the Purchaser's interest in the Joint Venture, if any, as determined in connection with the Independent Valuation, will be released from the escrow and paid by the Debtor to Purchaser and the remainder, if any, will be remitted to the Debtor.

## ADDITIONAL PROVISIONS

34. Except as expressly set forth in the Agreement, the Purchaser and its successors or assigns will have no liability for any liability, claim (as that term is defined in Section 101(5) of the Bankruptcy Code), damages or other obligation of or against the Debtor related to the Assets by reason of the transfer of the Assets to the Purchaser. The Purchaser, will not be deemed, as a result of any action taken in connection with the purchase of the Assets, to: (a) be a legal successor, or otherwise be deemed a successor to the Seller (other than with respect to any obligations arising under the Debtor Contracts from and after the Closing); (b) have, *de facto* or otherwise, merged with or into the Seller; (c) be a mere continuation or substantial continuation of the Seller or the enterprise of the Seller; or (d) have any liability whatsoever, other than the Assumed Liabilities, under any theory of, without limitation, environmental, labor and employment, products or antitrust liability, whether known or unknown at the Closing, now

existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

35.     Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing any action or proceeding, at law or in equity, against the Purchaser, its affiliates, successors and assigns, or the Assets, with respect to any (a) Claim other than Assumed Liabilities or (b) successor liability of the Purchaser for the Seller.

36.     Effective upon the Closing, no default will exist under any of the assumed Debtor Contracts and no non-debtor counterparty to any of the assumed Debtor Contracts will be permitted to declare a default by the Purchaser or otherwise take action against the Purchaser as a result of Debtor's financial condition, bankruptcy, or failure to perform any duty or obligation under any of the assumed Debtor Contracts.

37.     This Court will retain jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Approval Order and the Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith in all respects) and to adjudicate disputes related to this Sale Approval Order or the Agreement.

38.     No bulk sales law, or similar law of any state or other jurisdiction will apply in any way to the transactions contemplated by the Agreement, the Sale Motion and this Sale Approval Order.

39.     The transactions contemplated by the Agreement are undertaken by the Purchaser in good faith, as that term is used in Section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to

consummate the Sale Transaction will not affect the validity of the Sale Transaction to the Purchaser, unless such authorization is duly stayed pending such appeal.

40.     The terms and provisions of the Agreement and this Sale Approval Order will be binding in all respects upon, and will inure to the benefit of, the Debtor, its estate and its creditors, the Purchaser, and their respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting claims in the Assets to be sold to the Purchaser pursuant to the Agreement, notwithstanding any subsequent appointment of any trustee, examiner or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms will likewise be binding on such trustee (whether under Chapter 7 or Chapter 11 of the Bankruptcy Code), examiner or receiver and will not be subject to rejection or avoidance by the Debtor, its estate, its creditors, its shareholders or any trustee, examiner or receiver.

41.     The failure specifically to include any particular provisions of the Agreement in this Sale Approval Order will not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

42.     The Agreement, and any related agreements, documents or other instruments, may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not materially change the terms of the Agreement.

43.     In the event that there is a direct conflict between the terms of this Sale Approval Order and the Agreement, the terms of this Sale Approval Order will control.

44. Each and every federal, state and local governmental agency, department or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

45. The Debtor shall pay from the proceeds of the Sale Transaction or otherwise all outstanding personal property taxes, including any accrued but unbilled amounts related to pre-Closing periods, to the applicable taxing authorities promptly following the Closing. If such amounts are in dispute, the Debtor shall escrow the amount in dispute with such amount as agreed to by the applicable parties or as determined by the Court to be paid promptly following such disposition or as otherwise set forth in any plan of reorganization or liquidation filed in Debtor's bankruptcy case.

46. Nothing in this Sale Approval Order shall be interpreted to waive or discharge any tax liabilities due or owing pursuant to the Michigan Employment Security Act, including, but not limited to, existing tax liabilities and the ability of the Unemployment Insurance Agency to make determinations pursuant to the Michigan Employment Security Act regarding potential liability for taxes and rating account transfers to Purchaser if determined to be a successor by the Unemployment Insurance Agency.

47. As provided by Bankruptcy Rules 6004(h) and 6006(d), this Sale Approval Order will not be stayed for 14 days after the entry of the Sale Approval Order and will be effective immediately upon entry, and the Seller and the Purchaser are authorized to close the Sale Transaction immediately upon entry of this Sale Approval Order.

48. A hearing as to timely filed objections to Cure Costs, and Jarbou Canton Real Estate's objection regarding whether its lease was terminated shall be heard on November 30, 2015 at _____.m.

# EXHIBIT 1
## AGREEMENT

**[SEE ATTACHED]**

## ASSET PURCHASE AGREEMENT

*November 20, 2015*

This Asset Purchase Agreement (the "Agreement") is dated as of ~~October 15, 2015~~. The parties to this Agreement (individually a "Party" and collectively the "Parties") are:

SOK Venture LLC (the "Purchaser");

Olga's Kitchen, Inc., a Michigan corporation, debtor and debtor in possession in bankruptcy case number 15-49008-wjs pending in the U.S. Bankruptcy Court of the Eastern District of Michigan, Southern Division ("Company");

OKI, LLC, a Michigan limited liability company ("OKI"); and

Kobacker & Associates of Kentwood, a Michigan limited partnership, and Kobacker & Associates, a Michigan co-partnership, its limited partner in ("Kobacker" and together with Company and OKI, collectively, "Seller").

### Recitals

A.     Company is engaged in the business of owning and operating 15 Olga's restaurants, which are identified by their respective store numbers (being store numbers 106, 113, 116, 117, 119, 125, 135, 137, 139, 142, 143, 149, 150, 153 and 154) (the "Company Stores").

B.     Company's subsidiary OKI owns a 50% interest in Olga's SOK Holdings, LLC (the "JV"), which is a joint venture with Purchaser that is in the business of owning and operating eleven (11) Olga's restaurants, through the JV and its wholly-owned subsidiaries (the "JV Subsidiaries"), which are identified by their respective store numbers (being store numbers 600, 601, 603, 604, 605, 606, 607, 608, 609, 610, and 612) (the "JV Stores").

C.     Company is a partner with Kobacker in the business of owning and operating one Olga's restaurant, located in the Woodland Mall in Kentwood, Michigan, which is identified by its store number (being store number 122) (the "Kobacker Store"). The Company Stores, JV Stores and Kobacker Store are collectively referred to herein as the "Business".

D.     Company leases the locations from which the Company Stores are operated (the "Company Lease Locations") pursuant to lease agreements with landlords with respect to each Company Lease Location, and in addition, leases a location for Company's corporate headquarters (collectively, the "Company Leases").

E.     The JV and/or the JV Subsidiaries lease the locations from which JV Stores are operated (the "JV Lease Locations") pursuant to lease agreements with landlords with respect to each JV Lease Location (the "JV Leases").

F.     Kobacker leases the Kobacker Store in the Woodland Mall in Kentwood, Michigan (the "Kobacker Lease Location") pursuant to a lease agreement with a landlord with respect to the Kobacker Lease Location (the "Kobacker Lease"). The Company Stores and

Kobacker Store are collectively referred to herein as the "Seller Stores". The Company Lease Locations and Kobacker Lease Location are collectively referred to herein as the "Seller Lease Locations". The Company Leases and Kobacker Lease are collectively referred to herein as the "Seller Leases".

G. On June 11, 2015 ("Petition Date"), Company filed a voluntary petition ("Petition") for relief in the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division (the "Bankruptcy Court"), commencing a case under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 *et seq.* (the "Bankruptcy Code"), case number 15-49008-wjs (the "Case").

H. Purchaser wants to buy, and Seller wants to sell substantially all of assets of Seller, including, but not limited to, Company's interest in OKI, OKI's interest in the JV and Purchaser's interest in the JV through exercise of OKI's Drag-Along Right, pursuant to the terms contained in this Agreement.

## Agreement

In consideration of the above Recitals and the promises and provisions contained in this Agreement, the receipt and sufficiency of which is acknowledged by each of the Parties, the Parties agree as follows:

## ARTICLE 1
## DEFINED TERMS

1.1 Defined Terms. The following terms have the following meanings:

"Access Period" has the meaning set forth in Section 4.3.

"Acquired Assets" means all of Seller's right, title, and interest in and to all assets owned, used, occupied, operated and/or held for the benefit of Seller with respect to the Business, including:

(a) The Assumed Contracts and Assumed Leases;

(b) All books, records, files, and correspondence related to the Business (in whatever form they exist) ("Books and Records");

(c) Goodwill relating to the Business and the other Acquired Assets (including telephone numbers and fax numbers);

(d) Intellectual Property;

(e) Life Insurance Policies;

(f) Inventory;

2

(g)     Receivables;

(h)     Permits;

(i)     Liquor Licenses;

(j)     Tangible Personal Property;

(k)     Franchise Rights;

(l)     Intangible Assets;

(m)     Company's membership interest in OKI;

(n)     OKI's interest in the JV;

(o)     Purchaser's interest in the JV through exercise of OKI's Drag-Along Right; and

(p)     All other assets owned, used, occupied, operated and/or held for the benefit of Seller with respect to the Business.

The listed items in subsections (a)-(p) above are not intended (and shall not be construed) as all inclusive and the Acquired Assets shall be given the broadest meaning possible; provided, however, the Acquired Assets shall not include any Excluded Assets.

"Ancillary Agreements" means all of the documents, instruments and agreements (other than this Agreement) executed by one or more Party in connection with the transactions contemplated by this Agreement and/or delivered by one or more Party at Closing.

"Assumed Contracts" means the Contracts that are identified on Exhibit 1, including, in any event, the Joint Venture Agreements, which Exhibit 1 may be updated at any time prior to the Closing in Purchaser's sole discretion.

"Assumed Leases" means the Leases that are identified on Exhibit 2, which Exhibit 2 may be updated at any time prior to the Closing in Purchaser's sole discretion.

"Assumed Liabilities" has the meaning set forth in Section 3.1(a).

"Auction" has the meaning set forth in Section 4.2(b).

"Back-Up Bidder" has the meaning set forth in Section 4.1(a).

"Breach" means, with respect to a representation, warranty, covenant, obligation, or other provision of this Agreement or any instrument delivered pursuant to this Agreement (a) any inaccuracy in or breach of, or any failure to perform or comply with, such representation, warranty, covenant, obligation, or other provision, or (b) any claim (by any Person) or other occurrence or circumstance that is or was inconsistent with such representation, warranty,

3

covenant, obligation, or other provision, and the term "Breach" means any such inaccuracy, breach, failure, claim, occurrence, or circumstance.

"Claim" has the meaning given to that term in Section 101(5) of the Bankruptcy Code and (if not included within the foregoing meaning and without duplication) all claims, rights, demands, breach of Contract, promissory estoppel, injunctive relief, loss of business, loss of goodwill, covenants, actions, suits, charges, causes of action, obligations, attorneys' fees, controversies, debts, costs, expenses, damages (of every kind), judgments, suits, Orders and Liabilities whatsoever, whether known or unknown, suspected or unsuspected, fixed, vested or contingent, and of whatsoever nature, whether in law, in equity or bankruptcy, asserted, unasserted, claimed or unclaimed, foreseen or unforeseen, absolute or contingent, accrued or unaccrued, whether consequential and/or otherwise, whether permanent, temporary or intermittent, liquidated or unliquidated, joint and/or several, executory, determined, determinable and/or otherwise, conceived or not conceived, and whether intentional, unintentional, and/or inadvertent acts and/or omission, and/or all of the consequences thereof, in law, equity, bankruptcy or otherwise.

"Closing" has the meaning set forth in Section 2.5(a).

"Closing Date" has the meaning set forth in Section 2.5(a).

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including applicable provisions contained in the Code and ERISA.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Consent" means any approval, consent, ratification, waiver, or other authorization, including any Governmental Authorization.

"Contract" means any agreement, contract, obligation, promise, or undertaking, whether written or oral and whether express or implied, that is legally binding.

"Convey" or "Conveyance" means sale, transfer, conveyance, assignment and delivery.

"Cure Costs" has the meaning set forth in Section 3.1(a).

"Deposit" has the meaning set forth in Section 2.3.

"Drag-Along Right" means the "Drag-Along Right" as defined in the Joint Development Agreement.

"Effective Time" means the time at which all Closing Documents are fully executed on the Closing Date.

"Employee Benefit Plan" means any (a) qualified or nonqualified Employee Pension Benefit Plan (including any Multiemployer Plan), (b) Employee Welfare Benefit Plan, and/or (c)

4

fringe or other employee benefit plan, policy, program, and arrangement, whether or not subject to ERISA and whether or not funded.

"Employee Pension Benefit Plan" shall have the meaning set forth under Section 3(2) of ERISA.

"Employee Welfare Benefit Plan" shall have the meaning set forth under Section 3(1) of ERISA.

"Environment" means soil, land surface or subsurface strata, surface waters (including navigable waters, ocean waters, streams, ponds, drainage basins, and wetlands), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

"Environmental, Health, and Safety Requirements" means all federal, state, local and foreign statutes, regulations, ordinances and other provisions having the force or effect of law, all Orders, all contractual obligations and all common law concerning public health and safety, worker health and safety, and pollution or protection of the Environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, Release, threatened Release, control, or cleanup of any Hazardous Materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise or radiation, each as amended and as now or hereafter in effect.

"Environmental Law" means any Law that requires or relates to:

(a)     advising appropriate authorities, employees, and the public of intended or actual releases of pollutants or hazardous substances or materials, violations of discharge limits, or similar prohibitions that could have significant adverse impact on the Environment;

(b)     prohibiting, preventing, or reducing to acceptable levels the Release of Hazardous Materials, pollutants, oil, or other potentially harmful substances into the Environment;

(c)     reducing the quantities, preventing the Release, or minimizing the hazardous characteristics of wastes that are generated;

(d)     assuring that products are designed, formulated, packaged, and used so that they do not present unreasonable risks to human health or the Environment when used or disposed of;

(e)     protecting the Environment, public health and welfare, natural resources, species or ecological amenities;

(f)     reducing to acceptable levels the risks inherent in the transportation of Hazardous Materials, pollutants, oil, or other potentially harmful substances;

5

(g)     cleaning up Hazardous Materials, pollutants, oil, or other potentially harmful substances that have been Released, preventing the threat of Release, or paying the costs of such clean up or prevention;

(h)     the recovery of costs and damages by private parties, or groups of them, or any Governmental Body, for damages done to public health or the Environment, or permitting self-appointed representatives of the public interest to recover for injuries done to public assets; or

(i)     the manufacture, processing, distribution, use, treatment, storage, disposal, transportation, recycling, handling, reporting, or labeling of Hazardous Materials, pollutants, oil, or other potentially harmful substances.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" means all cash or cash equivalents, including, but not limited to, deposits such as lease deposits and utility deposits, refunds, vendor overpayments, prepaid items, and credit card payments that have been charge but not yet been processed, as well as any assets specifically set forth on Exhibit 3.

"Excluded Liabilities" has the meaning set forth in Section 3.2(a).

"Franchise Rights" means all rights of Seller in and to all pending, completed or initiated franchise registrations with any Governmental Body regarding the Business, and all records, papers, filings, forms, agreements, licenses, certificates, approvals, and correspondence related to such rights or registrations.

"Governmental Authorization" means any Consent, license, permit, waiver, or other authorization which Purchaser determines is necessary or appropriate as a condition to Closing which needs to be issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

"Governmental Body" means any (a) nation, state, county, city, town, village, district, or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign, or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (d) multi-national organization or body; or (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

"Hazardous Materials" means any substance, chemical, compound, product, solid, gas, liquid, waste, byproduct, pollutant, contaminant, condition, object, or material that is or may be hazardous to human health or safety or the environment due to its ignitability, corrosiveness, reactivity, explosiveness, toxicity, carcinogenicity, infectiousness, radioactivity, or other harmful or potentially harmful properties or effected, including all of those substances, chemicals, compounds, products, solids, gases, liquids, wastes, byproducts, pollutants, contaminants, conditions, objects, and materials and combinations thereof that are now or hereafter listed or defined as hazardous or toxic, or are regulated, pursuant to Environmental Law or

Environmental, Health, and Safety Requirements and includes, without limitation, asbestos, polychlorinated biphenyls, and petroleum (including crude oil or any fraction thereof.

"Improvements" means all buildings, structures, fixtures, appurtenances, lighting and plumbing fixtures, built-in shelving units, built-in cabinets, built-in equipment, security and alarm systems, ceiling fans, carpeting, landscaping, window treatments, as well as all other improvements with respect to the Leased Real Property and all items attached to or located at the Leased Real Property.

"Including", "included" and similar words shall be deemed to be read with the words "without limitation" after them.

"Intangible Assets" means all general intangibles within the meaning of the Uniform Commercial Code.

"Intellectual Property" means all (a) patents, patent applications and patent disclosures, (b) trademarks, service marks, trade dress, trade names, associated assumed names, logos, Internet domain names and corporate and/or Business names, websites, email addresses, and registrations and applications for registration thereof together with all of the goodwill associated therewith, (c) all licenses and sublicenses granted and obtained with respect thereto, and rights thereunder, (d) remedies against infringements thereof, and rights to protection of interests therein (e) copyrights (registered or unregistered) and copyrightable works and registrations and applications for registration thereof, (f) mask works and registrations and applications for registration thereof, (g) computer software, data, data bases and documentation thereof, (h) trade secrets and other confidential and/or proprietary information (including ideas, formulas, compositions, inventions (whether patentable or unpatentable and whether or not reduced to practice), know-how, production processes and techniques, research and development information, drawings, specifications, designs, plans, proposals, technical data, copyrightable works, financial and marketing plans and customer and supplier lists and information), (i) other intellectual property rights, (j) drawings and advertising materials, (k) all other intangible property, rights or claims, (l) formulas, (m) and all other intellectual property rights of every kind, and (n) copies and tangible embodiments thereof (in whatever form or medium).

"Inventory" means all inventories, goods, merchandise and commodities of every kind (whether food related or not), inventory in transit, supplies, and all other inventory items.

"Joint Development Agreement" means the Joint Development Agreement among the Company, OKI and Purchaser dated April 24, 2004 attached as Exhibit 4.

"Joint Venture Agreements" means, collectively, the Joint Development Agreement, JV Operating Agreement and JV Management Agreements.

"JV Liabilities" has the meaning set forth in Section 2.5(d).

"JV Management Agreements" means, collectively, the Management Agreements between the Company and each of the JV Subsidiaries attached as Exhibit 5.

7

"JV Operating Agreement" means the Operating Agreement of the JV dated October 27, 2008 attached as Exhibit 6.

"Kobacker Liabilities" means all Liabilities of Kobacker of any kind or nature, whether accrued or unaccrued, due or not due including, without limitation, any Liability under the Kobacker Lease;

"Law" means any federal, state, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, or treaty.

"Leased Real Property" means the Real Property that is being leased pursuant to the Seller Leases.

"Liability" or "Liabilities" means any liability, debt, or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether fixed or contingent, and whether due or to become due), including any liability for Taxes.

"Lien" means any Claim, mortgage, pledge, security interest, lease, tenancy, right of use, covenant, easement, encumbrance, interest, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof), any sale of receivables with or without recourse, any filing or agreement to file a financing statement as debtor under the applicable Uniform Commercial Code or any similar statute other than to reflect ownership by a third party of property leased to Seller under a lease which is not in the nature of a conditional sale or title retention agreement, or any subordination arrangement in favor of another Person), any other claim, condition, equitable interest, option, right of first refusal, or restriction of any kind, including any restriction on use, transfer, receipt of income, or exercise of any other attribute of ownership, any other rights of other in the nature of a lien, however evidenced or created, and/or other encumbrance.

"Life Insurance Policies" means all life insurance contracts or life insurance policies and all rights arising from such contracts or policies owned by any Seller, including the rights to receive, in whole or part, the proceeds payable to the beneficiaries of such policies or contracts, and all rights to receive payment of cash surrender values, refunds or other available payments arising upon cancellation, termination or surrender of any life insurance policies or life insurance contracts to which all or any of such entities may be entitled.

"Liquor Licenses" means any liquor licenses held by any Seller, including the following liquor licenses issued by the State of Michigan: Canton License No. 202642-2015 and Compuware License No. 211712-2015.

"Loss" means, with respect to any Person, any Liability, demand, claim, action, cause of action, cost, damage, deficiency, Tax, penalty, fine or other loss or expense (including reasonable legal expenses and costs and including interest and penalties).

"Material Adverse Effect" or "Material Adverse Change" means any state of facts, change, event, effect or occurrence that, individually or in the aggregate, has or could reasonably be expected to have a material adverse effect on the business, financial condition, results of operations, prospects, properties, assets or Seller (including the Acquired Assets and/or the Business).

"Order" means any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court (including the Bankruptcy Court), administrative agency, or other Governmental Body or by any arbitrator.

"Permits" means all municipal, state, federal, local or foreign consents, franchises, permits, approvals, certificates, licenses, and authorizations held or used by Seller and which relate to the Acquired Assets and/or the Business, or required under applicable Laws for the continued operation of the Business and/or the Acquired Assets.

"Permitted Liens" means: (a) statutory Liens and Liens for current Taxes or other governmental charges with respect to the Acquired Assets not yet due and payable; (b) all existing building and use restrictions, subdivision and other land use ordinances and/or regulations, easements, covenants, conditions, restrictions, zoning and other matters of record which are imposed by any Governmental Body having jurisdiction over any of the Leased Real Property, and which do not unreasonably interfere with the present use of the Leased Real Property; and (c) the rights of the public and of any Governmental Body in any part thereof taken, used or deeded for street, road or highway purposes.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, an estate, a joint venture, an unincorporated organization, and a governmental entity or any department, agency or political subdivision thereof.

"Proceeding" or "Proceedings" mean any action, arbitration, audit, hearing, investigation, litigation, lawsuit, proceeding, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body or arbitrator (including any proceeding in eminent domain or similar proceeding).

"Purchase Price" has the meaning set forth in Section 2.2.

"Real Property" means all items which are considered to be real property under applicable legal principles in the locale in which such real property is located, as well as (if not already included) all real estate, land, Improvements, and all privileges, rights, and easements belonging to or for the benefit of the land and Improvements, certificates of occupancy and rights-of-way, including all rights existing in and to any streets, roads, alleys, and other rights-of-way included or adjacent to the foregoing.

"Receivables" means all rights to payment of any kind or nature, whether or not in the ordinary course of business, including rights to payment on account, rights to payment for the sale of goods or services, all rights to refunds, pre-paid expenses, deposits, credits, rebates,

incentive payments, reimbursements, loans receivable, notes receivable or other form of payment due and owing or to become due and owing to Seller.

"Release" means any spilling, leaking, emitting, discharging, depositing, escaping, leaching, dumping, or other releasing of Hazardous Materials into the Environment, whether intentional or unintentional, and including all releases as defined under Environmental Law or Environmental, Health, and Safety Requirements.

"Sale Order" has the meaning set forth in Section 4.1(a).

"Sale Procedures Order" has the meaning set forth in Section 4.1(a).

"Successful Bidder" has the meaning set forth in Section 4.1(a).

"Sysco Payment" has the meaning set forth in Section 2.2.

"Tangible Personal Property" means all tangible personal property (including all items which are not Real Property), including computer hardware and software, tools, machinery, equipment (including office equipment, kitchen equipment, telecommunications equipment, and maintenance equipment), replacement parts, supplies, fixtures, furniture, customer amenities, goods, leasehold improvements, trucks, vans, automobiles, other vehicles, materials, and all other tangible personal property owned by Seller (including items which have been fully depreciated and/or expensed) and which are used or useable in connection with the Business.

"Tax" or "Taxes" mean any tax (including any income tax, franchise tax, branch profits tax, excise tax, gross receipts tax, employment tax, withholding tax, capital gains tax, value-added tax, sales tax, use tax, property tax, stamp tax, transfer tax, registration tax, alternative or add-on minimum tax, gift tax, or estate tax), levy, assessment, tariff, duty (including any customs duty), deficiency, or other fee, and any related charge or amount (including any fine, penalty, interest, or addition to tax), imposed, assessed, or collected by or under the authority of any Governmental Body or payable pursuant to any tax-sharing agreement or any other Contract relating to the sharing or payment of any such tax, levy, assessment, tariff, duty, deficiency, or fee.

"Tax Return" or "Tax Returns" means any return (including any information return), report, statement, schedule, notice, form, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of or compliance with any Law relating to any Tax.

## ARTICLE 2
## PURCHASE AND SALE OF ACQUIRED ASSETS; PURCHASE PRICE; DEPOSIT; CLOSING

2.1    Purchase and Sale of Acquired Assets.  Upon the terms and expressly subject to the conditions precedent set forth in this Agreement, at the Closing Seller shall Convey the Acquired Assets to Purchaser.

*$10,950,000 Cash* [initials]

2.2    Purchase Price for the Acquired Assets.  The purchase price ("Purchase Price") for the Acquired Assets is (a) ~~$8,000,000~~ plus (b) an amount equal to the cost of prepaid inventory maintained by Sysco as set forth on Schedule 2.2 attached hereto (to be updated at Closing) (the "Sysco Payment")  *plus (c) the Termination Fee credit.* [initials]

2.3    Deposit.

(a)    Within 2 business days after the entry of the Sale Procedures Order, Purchaser will pay to Gene Kohut, in his capacity as Chief Restructuring Officer of the Company (the "CRO"), an earnest money deposit in the amount of $500,000 (the "Deposit"), to be held in escrow and applied to the Purchase Price or returned to the Purchaser in accordance with the terms of this Agreement and the Sale Procedures Order.

(b)    If Purchaser is the Successful Bidder, either (i) at the Closing, the Deposit will be applied in reduction of the Purchase Price on a dollar-for-dollar basis or (ii) if Seller terminates this Agreement pursuant to Section 10.1(c) or Purchaser fails to satisfy the conditions to closing set forth in Article 6 (including pursuant to Section 4.2(g) below as to any Successful Bidder other than Purchaser), the Deposit will be immediately forfeited in full to Seller without further action of any party.

(c)    If Purchaser is the Back-Up Bidder, either (i) the Deposit will be returned to Purchaser within 2 business days of the closing to the Successful Bidder or (ii) if the Successful Bidder does not close and the Seller proceeds with a sale to Purchaser as the Back-Up Bidder, the Deposit will be applied in reduction of the Purchase Price on a dollar-for-dollar basis.

(d)    If Purchaser is not the Successful Bidder or the Back-Up Bidder, the Deposit will be returned to Purchaser within 2 business days of the Auction.

(e)    Purchaser acknowledges and agrees that the Deposit will be automatically forfeited to the Seller in the event Seller terminates this Agreement pursuant to Section 10.1(c) or Purchaser fails to satisfy the conditions to closing set forth in Article 6.

2.4    Payment of Purchase Price.  On the Closing Date, Purchaser will pay the Purchase Price, after application of the Deposit, to an account designated by Seller by wire transfer of immediately available funds, except to the extent required to pay those Liabilities provided for in Section 5.10, which amounts if paid shall be credited against the Purchase Price.  All amounts payable pursuant to this Agreement are in United States dollars.

2.5    Closing.

(a)     The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Purchaser on the earlier of (i) 1 day following entry of a final and non-appealable Sale Order or (ii) December 1, 2015; provided, however, the Closing may occur on any date selected by the Purchaser occurring after entry of the Sale Order and on or prior to December 1, 2015 (the "Closing Date").

(b)     At the Closing, the parties will deliver to one another the various payments, certificates, instruments and documents referred to in Articles 5 and 6 below.

(c)     The Parties may conduct the Closing by exchanging, including by facsimile transmission, authorized signatures on duplicate originals of this Agreement and the Ancillary Agreements. Legal title, equitable title and the risk of loss with respect to the Acquired Assets and the Assumed Liabilities will pass to Purchaser at the Effective Time on the Closing Date.

(d)     On or prior to the Closing, Seller will pay in full all liabilities of the JV and any JV Subsidiaries of any kind or nature, whether accrued or unaccrued, due or not due (collectively, "JV Liabilities"). At or after the Closing, the JV will disburse all remaining JV cash to its members OKI and Purchaser in accordance with the terms of the JV Operating Agreement. Seller shall provide Purchaser with records demonstrating such payment and disbursements. All JV Liabilities are set forth on Schedule 2.5(d) (to be updated at Closing).

(e)     Following Purchaser's receipt and review of all transaction documents required to be executed pursuant to Section 2.5(d), and Purchaser's satisfaction that such transactions have been properly completed in Purchaser's reasonable discretion, Seller shall sell and deliver all Acquired Assets and assign all Assumed Contracts and Assumed Leases to Purchaser, and Purchaser shall pay the Purchase Price in the manner set forth herein.

(f)     Simultaneously with the Conveyance of the Acquired Assets to the Purchaser, the Company will exercise its Drag-Along Right pursuant to the Joint Development Agreement resulting in the Conveyance of Purchaser's membership interest in the JV to the Purchaser.

(g)     The Company will deliver to Purchaser at Closing (i) a duly executed amendment to Company's Articles of Incorporation changing its name from "Olga's Kitchen, Inc." to another name which does not include the words "Olga" or "Kitchen", and (ii) additional executed documents terminating Company's right to use all of its assumed names, which Purchaser shall file following Closing.

## ARTICLE 3
## ASSUMED LIABILITIES; EXCLUDED LIABILITIES

3.1     Assumed Liabilities.

(a)     Simultaneous with the Closing, Seller will assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code, and Purchaser will assume, the (i) the Assumed Leases and (ii) the Assumed Contracts (collectively, the "Assumed Liabilities"), but only with respect to Liabilities relating to the Assumed Leases and the Assumed Contracts that relate to periods after the Effective Time. In no event shall Purchaser be responsible for Liabilities with

respect to the Assumed Leases and/or the Assumed Contracts that (A) were incurred and/or accrued before the Effective Time on the Closing Date, or (B) which constitute costs required to cure any defaults as required by Section 365 of the Bankruptcy Code ("Cure Costs").

(b)      Notwithstanding anything in this Agreement to the contrary, in the event and to the extent that any of the Assumed Contracts or Assumed Leases cannot be assumed by Seller and assigned to Purchaser under Section 365 of the Bankruptcy Code, then this Agreement shall not constitute an agreement to assign any such particular Assumed Contract or Assumed Lease or any claim or right or any benefit arising thereunder or resulting therefrom if the agreement to assign or attempt to assign, without the required Consent would constitute a breach thereof, accelerate any obligations thereunder, permit the termination thereof or in any other way adversely affect the rights of Purchaser or Seller thereunder. Until such consent is obtained, or if an attempted assignment thereof would be ineffective or would affect the rights of Seller thereunder so that Purchaser would not, in fact, receive all such rights, Purchasers and Seller will cooperate with each other in any arrangement designed to provide for Purchaser the benefits of, and to permit Purchaser to assume, insofar as expressly set forth herein, the stated liabilities under such particular Assumed Contract or Assumed Lease, including enforcement at the request and expense and for the benefit of Purchaser of any and all rights of Seller against a third party thereto arising out of the breach or cancellation thereof by such third party or otherwise.

(c)      Purchaser shall not assume any rights or obligations under any Seller Contracts that are not Assumed Contracts or Assumed Leases, and to the extent that any Seller Contracts exist with respect to the Business that Purchaser is not choosing to assume, Seller shall be solely responsible for any financial costs associated with or otherwise dealing with them as the Bankruptcy Court determines.

(d)      Purchaser's assumption of the Assumed Liabilities shall in no way expand the rights or remedies of third parties against Purchaser as compared to the rights and remedies which such third parties would have had against Seller had the transactions contemplated by this Agreement not been consummated.

3.2     Excluded Liabilities.

(a)      Except for the Assumed Liabilities, Purchaser is not assuming any Liability of Seller of any kind, and Seller shall pay, satisfy and perform or discharge (as they and/or the Bankruptcy Court determines) all of its respective Liabilities that may affect in any way the Acquired Assets, the Assumed Leases, the Assumed Contracts or Purchaser in any way whatsoever (collectively, the "Excluded Liabilities").

(b)      Without limiting the generality of the provisions of Section 3.2(a), the Excluded Liabilities shall include, and under no circumstances shall Purchaser be deemed to assume any Liability of Seller arising out of or relating to: (i) any actual or alleged tortious conduct of Seller or any of its employees or agents which were incurred prior to the Effective Time or arose out of acts or omissions of Seller or any of its respective agents prior to the Effective Time; (ii) any Liabilities pertaining to products sold by Seller prior to the Effective Time; (iii) any claim for breach of warranty or Contract by Seller which were incurred prior to the Effective Time or arose out of acts or omissions of Seller prior to the Effective Time; (iv) any claim predicated on

13

strict liability or any similar legal theory; (v) any actual or alleged violation of any Law; (vi) any business activities of Seller; (vii) any Liability for Taxes; (viii) any Liability relating to an Excluded Asset; (ix) any Liability of Seller in connection with employee compensation expenses whether accrued before or after the Effective Time, including payroll, benefits, severance, commissions, withholding Taxes and any Liabilities under any Employee Benefit Plan, including any Liability of Seller under the Code or ERISA; (x) any Liability of Seller incurred in connection with the transactions contemplated by this Agreement; (xi) any other Liabilities which otherwise arise or are asserted by reason of the conduct of the Business prior to the Effective Time or events, acts (or failures to act) or transactions occurring or conditions existing on or before the Effective Time, (xii) any Liability arising out of, or resulting from Seller's ownership and/or use of the Acquired Assets or conduct of the Business prior to the Closing Date, (xiii) any Liability arising out of or resulting from any Contract between Company and Kobacker; (xiv) all Liabilities Seller to pay, satisfy or discharge as a condition precedent to the Closing this Transaction; (xv) the Kobacker Liabilities; and/or (xvi) any other Liability of any kind of Seller that are not Assumed Liabilities.

3.3     Costs of transaction. All costs or expenses of performance of obligations hereunder and of the consummation of the transactions contemplated by this Agreement that have not been specifically assumed by either Party under the terms hereof shall be borne by the Party incurring such cost or expense. The provisions of this Section shall survive the Closing.

**ARTICLE 4**
**SPECIAL BANKRUPTCY PROVISIONS**

4.1     Bankruptcy Actions.

        (a)     Within 1 business days after the execution of this Agreement, Seller shall file with the Bankruptcy Court a motion and supporting papers in form and substance reasonably satisfactory to Seller and Purchaser (the "Sale Motion"), seeking, among other things, entry of (i) an Order in the form attached as Exhibit A (the "Sale Procedures Order") approving (A) the bidding protections described in Section 4.2 of this Agreement or otherwise set forth in the Sale Motion and (B) the bidding and auction procedures for alternative offers for the Acquired Assets and selection of the winning bidder (the "Successful Bidder") and the back-up bidder (the "Back-Up Bidder") at the Auction in the form attached as Exhibit B (the "Bidding Procedures"), and (ii) should the purchase offer made by this Agreement constitute the highest and otherwise best offer for the Acquired Assets pursuant to the Sale Procedures Order, an Order in the form attached as Exhibit C (the "Sale Order") approving (A) this Agreement and the transactions contemplated thereby (including the sale of the Acquired Assets to Purchaser free and clear of all Liens except Permitted Liens; (B) the assumption and assignment of the Assumed Contracts and Assumed Leases; (C) the payment of all liabilities required to be paid under the terms hereof at Closing including all JV Liabilities; and (D) finding that due process has been provided to all creditors of Seller.

        (b)     Seller shall use its reasonable best efforts to have the Bankruptcy Court (i) schedule a hearing on the Sale Motion within 5 days of execution of this Agreement, (ii) enter the Sale Procedures Order as soon as practicable following the date hereof, but in any case no later than October 22, 2015, (iii) schedule the auction consistent with the Bidding Procedures

(the "Auction") for no later than November 9, 2015, (iv) schedule the hearing to approve the sale of the Acquired Assets to the Successful Bidder on the terms set forth in the Sale Order for no later than November 13, and (v) enter the Sale Order as and when contemplated by the Sale Procedures Order, but in any case no later than 1 business day after a hearing on the Sale Order.

(c)     With respect to each Assumed Contract and Assumed Lease, Seller shall (i) within 2 business days following entry of the Sale Procedures Order, file and serve a notice of Assumed Contracts and Assumed Leases for potential assumption and assignment to Purchaser, together with the corresponding Cure Costs, to each counterparty to an Assumption Contract or Assumed Lease and (ii) cooperate as reasonably necessary or desirable to provide adequate assurance of future performance to counterparties to such Assumed Contract as required under Section 365 of the Bankruptcy Code.

(d)     Within 2 business days following entry of the Sale Procedures Order, Seller shall give notice of the transactions contemplated by this Agreement and of the auction procedures described in the Sale Procedures Order to, among others, all Persons to whom Seller sent notice of the fact that Seller was seeking to sell some or all of its assets and to such other Persons and in such manner as the Bankruptcy Court shall direct or Seller may otherwise reasonably deem necessary. Seller may provide potential bidders with a copy of this executed Agreement.

(e)     Seller will provide Purchaser and Purchaser's counsel with copies of all motions, applications, and supporting papers prepared by Seller (including forms of orders and notices to interested parties) relating in any way to Purchaser or the transactions contemplated by this Agreement as far in advance as practicable prior to the service and filing thereof. Seller shall promptly give appropriate notice in accordance with Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure and any order of the Bankruptcy Court, and provide opportunity for hearing, to all parties entitled thereto, of all motions, order, hearings, or other proceedings relating to this Agreement or the transactions contemplated hereby.

(f)     Notwithstanding the inclusion of Books and Records as Acquired Assets under this Agreement, Seller may retain a copy of the Books and Records for its use in connection with preparing tax returns, filing and administering a plan of liquidation in the Bankruptcy Case and other wind down activities. After the Closing, Purchaser will provide Seller and its agents reasonable access to any pre-Closing Books and Records of Seller that are transferred to Purchaser as Acquired Assets under this Agreement.

(g)     The Sale Procedures Order shall include, among other things, the requirement that all Qualified Bidders other than Purchaser must (i) pay an amount equal to the Deposit to the CRO to be held as a forfeitable deposit on the terms set forth in the Sale Procedures Order ("Bid Deposit") and (ii) at or prior to the Closing, obtain written evidence reasonably satisfactory to Seller and Purchaser that such Qualified Bidder has obtained a release from any applicable third parties of all guarantees extended by Purchaser with respect to the JV or the JV Subsidiaries (including with respect to any real estate lease or obligations for borrowed money) as set forth on Schedule 4.1(g) (collectively, the "Guarantee Releases"). If a Qualified Bidder other than Purchaser is the Successful Bidder, (y) the Guarantee Releases shall become a non-waivable, additional condition to Closing under Article 6 of this Agreement and (z) the Successful Bidder's Bid Deposit will be immediately forfeited in full to Seller without further action of any party if

the Successful Bidder does not obtain the Guarantee Releases prior to the earlier of Closing or the Expiration Date.

4.2     Termination Fee.  If Seller agrees to sell the Acquired Assets to any other Person pursuant to this Article 4 and the Sale Procedures Order and Bidding Procedures, then Seller shall pay to Purchaser out of the proceeds of sale or any forfeited deposit from the Successful Bidder a termination fee equal to $250,000 (the "Termination Fee").  Seller and Purchaser agree that the Termination Fee is Purchaser's liquidated damages and Purchaser's only recovery because Purchaser's damages will not be reasonably calculable.

4.3     Access Period.  From the date of this Agreement until the earlier of the Closing Date or the date on which this Agreement is terminated pursuant to the terms of Article 10 (the "Access Period"), Seller shall:

        (a)     provide Purchaser and its representatives, inspectors, accountants, lawyers and consultants with reasonable access upon reasonable notice during normal business hours to the Acquired Assets, to senior management, operations and store employees, and to financial information, books, business records and other information relating to the Acquired Assets and the Assumed Liabilities, in order for Purchaser and its Representatives to conduct all "due diligence" investigations that Purchaser may wish to pursue and as otherwise provided in this Agreement;

        (b)     provide all necessary authorizations or consents reasonably required by Purchaser to perform its Governmental Body inquiries with respect to the Acquired Assets and the Assumed Liabilities;

        (c)     arrange or assist in arranging meetings and discussions with any Person referenced in any Schedule to the extent reasonably requested by Purchaser; and

        (e)     Timely and diligently comply with all of Seller's obligations and agreements set forth in this Agreement.

4.4     Post-Closing.  In the event Seller receives or fails to transfer or remit any Acquired Assets to Purchaser at Closing, or in the event Seller comes into possession of Acquired Assets after Closing, Seller shall immediately transfer possession or remit payment of such Acquired Assets to Purchaser.  Purchaser shall have the right to audit Seller's and any related fiduciary's business records related to Seller upon reasonable request, and to enforce this right by application to the Bankruptcy Court.

**ARTICLE 5**
**PURCHASER'S CONDITIONS TO CLOSE**

        In addition to the provisions of Article 4 above, the obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the following conditions precedent:

5.1     Representations and Warranties.  The representations and warranties of Seller contained in Article 8 shall be true and correct in all material respects at and as of the Closing as though then made (without giving effect to any disclosures made by Seller after the date of execution of this Agreement).

5.2     Material Adverse Change.  A copy of the Company's most recent consolidating and consolidated financial statement including balance sheet, income statement and statement of cash flows (including all operations of the JV and Kobacker) is attached hereto as Schedule 5.2 ("Financial Statement").  Since the date of the latest Financial Statement, there shall not have occurred any event which has had or would be likely to have a Material Adverse Effect.  Further, all risk of loss, damage to, or destruction of the Acquired Assets prior to the Closing shall be on Seller.  In the event of any such casualty or similar event, Purchaser, at its option, may proceed to Closing with an assignment of all insurance proceeds, etc., and an abatement of the Purchase Price equal to the amount of the loss or casualty, or terminate this Agreement.

5.3     Proceedings.  All corporate and other proceedings taken or required to be taken by Seller in connection with the transactions contemplated by this Agreement to be consummated at or prior to the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to Purchaser and its counsel.

5.4     Compliance with Applicable Laws.  Except for the provisions contained in Article 4 of this Agreement, no Proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling or charge would, in Purchaser's reasonable judgment, (a) prevent consummation of any of the transactions contemplated by this Agreement, (b) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, (c) affect adversely the right of Purchaser to own the Acquired Assets, or (d) affect adversely the right of Purchaser to lease or occupy the Leased Real Property (and no such injunction, judgment, order, decree, ruling or charge shall be in effect).

5.5     Consents.

(a)     (i)     The Purchaser shall have received (in form and substance acceptable to the Purchaser) each Governmental Authorization (including the Sale Procedures Order and Sale Order), as well as all other Consents that are required for the consummation of the transactions contemplated by this Agreement, the Ancillary Agreements and all of the other agreements contemplated by this Agreement, (ii) all Consents, if required, from third parties shall have been received by Purchaser (in form and substance acceptable to Purchaser) that are required in order to prevent a breach of, a default under, or a termination, any acceleration, change in the terms or conditions or modification of, any instrument, Contract, lease, license or other agreement (including the Assumed Contracts and Assumed Leases), and (iii) all Consents necessary for Purchaser to continue to conduct the Business shall have been received.  Seller will deliver all such Consents to Purchaser prior to the Closing.

(b)     The Sale Procedures Order and the Sale Order shall each have been entered by the Bankruptcy Court, served on all creditors of Sellers and parties in interest, and shall have

become a final order, and the applicable appeal period with respect thereto shall have expired without the filing of any appeals.

5.6     Compliance by Seller and the Company.  Seller shall have performed or complied with all agreements, obligations and covenants required by this Agreement to be performed or complied with by it by the time of the Closing.

5.7     Good Title to Acquired Assets; Releases.  The Acquired Assets shall be free and clear of any and all Liens (other than Permitted Liens) pursuant to the Sale Order.  Seller shall use its best efforts to obtain releases of all Liens (other than Permitted Liens), including appropriate UCC termination statements and mortgage discharges, against the Acquired Assets, all on terms reasonably satisfactory to Purchaser.

5.8     Disclosure Supplements.  Prior to the Closing, Seller shall supplement or amend the Exhibits and Schedules to this Agreement with respect to any matter arising after the date of execution of this Agreement or any information obtained after the date of execution of this Agreement which, if existing, occurring or known at or prior to the date of this Agreement, would have been required to be set forth or described in such Exhibit or Schedule or which is necessary to complete or correct any information in such Exhibit or Schedule or in any representation and warranty which has been rendered inaccurate thereby; provided, however, that no such supplement or amendment shall affect the representations, warranties, covenants or agreements of Seller or the conditions to the obligations of Purchaser under this Agreement.

5.9     Closing Documents.  At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following items, certificates, documents, instruments, statements and data, duly executed by Seller where required, the form and substance of which shall all be satisfactory to Purchaser:

        (a)     A bill of sale with respect to all Acquired Assets, and other instruments of transfer, that Conveys all of the other Acquired Assets to Purchaser;

        (b)     Actual exclusive physical possession of all of the Acquired Assets, free and clear of all Liens, other than Permitted Liens;

        (c)     All documents in connection with fulfilling the provisions of Section 5.6 on terms and conditions satisfactory to Purchaser, in its sole discretion.

        (d)     One or more assignment and assumption agreements with respect to the Assumed Contracts and Assumed Leases;

        (e)     An assignment of any and all claims, guarantees, warranties, indemnifications, and any other rights which Seller may have against any service providers, suppliers, laborers, material providers, or subcontractors, or with respect to the Acquired Assets or arising out of, or in connection with, but not limited to, the installation, construction, and maintenance of the Leased Real Property or other Acquired Assets;

(f)     All necessary certificates, amendments or instruments executed by the appropriate officer(s) of Seller, in proper form for filing with the appropriate Governmental Bodies or officials, and duly authorized by Seller, to effect the change of Seller's name(s) so that Purchaser shall have the full and exclusive use of Seller's name(s);

(g)     All titles to vehicles (properly endorsed) to be transferred to Purchaser and any additional documents necessary to transfer title to such vehicles to Purchaser, free and clear of Liens.

(h)     Such other and further documents, instruments, letters, Consents, affidavits, notices, assignments, and/or certificates executed by an officer of Seller, as Purchaser shall reasonably require or request to carry out and effectuate the purposes and terms of this Agreement.

5.10    Seller Liabilities.  In addition to all JV Liabilities to be paid in full at Closing, the following Seller Liabilities must be paid in full by Seller on or before Closing or from the Purchase Price:

(a)     All utilities (including natural gas, electricity, utilities and cable or satellite television service), association dues and fees, water bills, and other similar items incurred in the operation of the Business and/or ownership of the Acquired Assets shall be paid by Seller as of the Closing Date except for such liabilities of Company that constitute "Claims" accruing prior to the filing of the bankruptcy proceeding, which shall be subject to the distribution provisions of the Bankruptcy Code.  Schedule 5.10(a) attached sets forth the balances due for such utilities as of a date reasonably calculable through the date of execution this Agreement, and if there are no such balances for utilities, Seller shall produce paid receipts along with the most recent billing statement from each such utility. One day prior to the Closing Date, Seller shall provide an updated Schedule 5.10(a) current through that date. If Purchaser deems it appropriate, amounts payable for utilities may be withheld from the Purchase Price and paid at Closing, or escrowed, and in either event, such amounts paid or escrowed will be credited as payment of part of the Purchase Price on a dollar for dollar basis.

(b)     All personal property Taxes assessable with respect to any portion of the Acquired Assets, the basis of which is determined by the value of, or ownership of, assets owned as of any date on or before the Closing Date have been, or shall be, paid by Seller as of the Closing Date or from the Purchase Price.  Seller shall provide Schedule 5.10(b) setting forth the balances due for personal property Taxes as of a date reasonably calculable through the date of execution of this Agreement, and if there are no such balances for personal property Taxes, Seller shall produce paid receipts along with the most recent billing statement from each Governmental Body. One day prior to the Closing Date, Seller, shall provide an updated Schedule 5.10(b) current through that date.  If Purchaser deems it appropriate, amounts payable for personal property Taxes may be withheld from the Purchase Price and paid at Closing, or escrowed, and in either event, such amounts paid or escrowed will be credited as payment of part of the Purchase Price on a dollar for dollar basis.

(c)     All salaries, wages, federal, state and local withholding taxes, other government withholdings, accruals, vacation pay, benefits, bonuses, retention bonuses or other income or

benefit obligations whatsoever incurred during Seller's course of business or through order of the Bankruptcy Court through the Closing Date shall be paid by Seller except for such liabilities of Company that constitute Claims accruing prior to the filing of the bankruptcy proceeding, which shall be subject to the distribution provisions of the Bankruptcy Code. Seller shall provide Schedule 5.10(c) setting forth the balances due for all such amounts as of a date reasonably calculable through the date of execution of this Agreement. One day prior to the Closing Date, Seller shall provide an updated Schedule 5.10(c) current through that date. If Purchaser deems it appropriate, such unpaid amounts may be withheld from the Purchase Price and paid at Closing, or escrowed, and in either event, such amounts paid or escrowed will be credited as payment of part of the Purchase Price on a dollar for dollar basis.

Any condition specified in this Article 5 may be waived if consented to in writing by Purchaser.

# ARTICLE 6
## SELLER'S CONDITIONS PRECEDENT TO CLOSE

In addition to the provisions of Article 4 above, the obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the following conditions precedent, and the failure of such conditions shall result in the Purchaser's forfeiture of the Deposit:

6.1     Representations and Warranties; Covenants.     The representations and warranties contained in Article 9 shall be true and correct in all material respects at and as of the Closing as though then made (without giving effect to any disclosures made by Purchaser after the date of this Agreement), and Purchaser shall have performed in all material respects all of the covenants required to be performed by Purchaser at or prior to the Closing.

6.2     Proceedings.     All corporate and other proceedings taken or required to be taken by Purchaser in connection with the transactions contemplated by this Agreement to be consummated at or prior to the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to Seller and Seller's counsel.

6.3     Compliance with Applicable Laws.     As of the Closing, no Proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling or charge would, in Seller's reasonable judgment, (a) prevent consummation of any of the transactions contemplated by this Agreement, or (b) cause any of the transactions contemplated by this Agreement to be rescinded following consummation.

6.4     Consents and Approvals.     All Consents and approvals by any Governmental Bodies that are required for the consummation of the transactions contemplated by this Agreement or the other agreements contemplated by this Agreement will have been obtained at or prior to the Closing.

6.5     Closing Documents.     At or prior to the Closing, Purchaser shall deliver or cause to be delivered to Seller, or Company, as the case may be, copies of the resolutions of Purchaser authorizing the execution, delivery and performance of this Agreement.

6.6     Purchase Price. On the Closing Date, Seller shall have received by wire transfer to one or more bank accounts designated in writing by Company on behalf of Seller (at least 2 business days prior to the Closing Date), immediately available funds in an amount equal to the Purchase Price after application of the Deposit (subject to Sections 2.5(d) and 5.10).

Any condition specified in this Article 6 may be waived if consented to in writing by Seller other than the additional condition to Closing as to any Successful Bidder other than Purchaser as provided in Section 4.2(g).

**ARTICLE 7**
**ADDITIONAL COVENANTS**

7.1     Employment Matters.

(a)     Purchaser shall make offers of employment, on such terms and conditions as Purchaser in its sole and absolute discretion shall determine, and effective on the Closing Date, to such employees of, or leased to, the Business (the "Business Employees") as Purchaser in its sole and absolute discretion shall decide. The Business Employees who are hired and employed by Purchaser are referred to as "Hired Employees." Former employees of, or leased to, Seller, if any, hired by Purchaser shall be considered new hires by Purchaser.

(b)     Seller shall terminate or cause to terminate the employment of the Hired Employees as of the Closing Date, in such form as is reasonably acceptable to Purchaser.

(c)     Seller shall cooperate with Purchaser in the hiring of those of Seller's employees or leased employees, if any, as Purchaser may wish to employ.

(d)     Nothing set forth in this Agreement shall constitute an assumption by Purchaser of past or future obligations of Seller with respect to any employees or leased employees of Seller, including any Hired Employees, whether arising under existing employment agreements or arrangements (oral or written), and any such obligations shall be and remain obligations of Seller.

(e)     Seller shall retain all COBRA liability under Section 4980B of the Code and the treasury regulations promulgated thereunder with respect to continuation coverage to qualified beneficiaries, including the Hired Employees and any M&A Qualified Beneficiary, whose qualifying event occurs prior to, or in connection with, the transaction described in this Agreement. The terms "continuation coverage", "qualified beneficiary", "M&A Qualified Beneficiary" and "qualifying event" have the meanings ascribed to them under Section 4980B of the Code and the treasury regulations promulgated thereunder.

(f)     Purchaser and Seller shall furnish each other with such information concerning employees, subject to confidentiality and privacy considerations, and to take all such other action, as is necessary and appropriate to effect the transactions contemplated hereby.

(g)     Seller represents and warrants to Purchaser that Seller has delivered, at least two days prior to execution of this Agreement, a full, complete and correct Department of Labor & Economic Growth, Unemployment Insurance Agency (U/A) Form 1027.

7.2     Tax Allocations. The Purchase Price and, to the extent required, the Assumed Liabilities and relevant transaction costs, shall be allocated for Tax purposes only in accordance with Schedule 7.2. After the Closing, the Parties shall make consistent use of the allocation specified in Schedule 7.2 for all Tax purposes and in any and all filings, declarations and reports with the IRS in respect thereof, including the reports required to be filed under Section 1060 of the Code it being understood that Purchaser and Seller shall jointly prepare and deliver to one another IRS Form 8594 within 45 days after the Closing Date. In any Proceeding related to the determination of any Tax, neither Purchaser nor Seller shall contend or represent that such allocation is not a correct allocation. No Party will take any position on or with respect to any Tax return, report or filing (including amendments thereto) inconsistent with such allocations. The foregoing allocation and Schedule 7.2 shall not be considered an admission by any Party or utilized in any manner in connection with the valuation of the Purchaser interest in the JV pursuant to the Sale Procedures Order and the Joint Development Agreement.

## ARTICLE 8
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as follows, which representations and warranties shall be true and correct as of the date hereof and true and correct as of the Closing but which shall not survive the Closing:

8.1     Organization and Standing of Seller; Authorization.

(a)     Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Michigan, with full corporate power and authority to own its assets (including the Acquired Assets) and to conduct the Business subject to being a debtor in possession under chapter 11 of the Bankruptcy Code.

(b)     Upon the expiration of any applicable appeal period following the entry of the Sale Order, this Agreement will have been duly executed and delivered by Seller and shall constitute the legal, valid and binding obligations of Seller enforceable in accordance with its terms. Upon expiration of any applicable appeal period following the entry of the Sale Order, Seller will have full power and authority, corporate or otherwise, to enter into and deliver this Agreement and to execute and deliver all contemplated agreements and documents provided in this Agreement and perform the transactions contemplated herein.

8.2     Acquired Assets. At the Closing, Seller shall sell and transfer to Purchaser all of its rights, title and interest to all of the Acquired Assets, free and clear of all Liens except the Permitted Liens pursuant to the Sale Order, "AS IS", "WHERE IS" and with all faults and except as otherwise provided herein, without any warranties or representations, express or implied, of kind or nature, including without limitation, warranties or merchantability or fitness for a particular purpose. Upon entry of the Sale Order, Seller shall have the right to freely assign all of its rights, title and interest in the Acquired Assets (including the Assumed Contracts and

Assumed Leases) to Purchaser free and clear of all Liens except for the Permitted Liens and the rights of the owners of the personal property leased by Seller pursuant to the Assumed Contracts and Assumed Leases from and after the Closing Date.

8.3     <u>Consents, Approvals or Authorizations</u>. Except as set forth on <u>Schedule 8.3</u>, no Consent from, filing or registration with, or notification to, any Person or Governmental Body is required in connection with the execution and delivery of this Agreement by Seller and/or the consummation of the transactions contemplated hereby.

8.4     <u>Tangible Personal Property</u>. <u>Schedule 8.4</u> includes all of the Tangible Personal Property owned and/or leased by Seller and/or used or held for use in connection with the Business. Unless expressly set forth on <u>Schedule 8.4</u>, all Tangible Personal Property identified on <u>Schedule 8.4</u> is owned (and not leased) by Seller. All Tangible Personal Property is now, or as of Closing pursuant to the Sale Order will be, free and clear of any Liens, except for (a) those that will be discharged (or transferred to the proceeds of the Acquired Assets) concurrently with the Closing, or (b) the Permitted Liens, or (c) the rights of the owners of the Tangible Personal Property leased by Seller pursuant to the Assumed Contracts and Assumed Leases with respect to obligations accruing from and after the Closing Date.

8.5     <u>Leased Real Property</u>. With regard to all Seller Leases, other than as set forth on <u>Schedule 8.5</u>:

(a)     (i)     Each of the Assumed Leases is valid, binding, in full force and effect, and enforceable by Seller in accordance with its terms; (ii) no event has occurred which (whether with or without notice, lapse of time or both or the happening or occurrence of any other event) would constitute a default under the Assumed Leases by Seller or entitle any other party to the Assumed Leases to declare a default or to accelerate, or which does accelerate, the maturity of any indebtedness of Seller under any of the Assumed Leases; and (iii) no damage or destruction has occurred with respect to any of the Leased Real Property.

(b)     Seller has no Knowledge of any pending or threatened special assessments against the Leased Real Property.

(c)     Neither Seller nor any other Person contracting regarding services or materials for the Improvement of the Leased Real Property has incurred any Liability pursuant to which mechanic's, laborer's or materialman's Liens could be filed against the Leased Real Property or any portion of the other Acquired Assets and no notice of intent to file any such Lien has been received by Seller.

(d)     Seller is the sole occupant of the Leased Real Property and no other Person has any right to use or occupy any portion of the Leased Real Property, whether as a lessee, tenant, subtenant, at sufferance, trespasser or otherwise.

(e)     To the best of Seller's knowledge, information and belief, the present use, occupancy and operation of the Leased Real Property by Seller are in compliance with all Laws and private restrictive covenants, and there has not been any proposed change thereto that would affect any of the Leased Real Property or its use, occupancy or operation. There exists no

23

conflict or dispute involving Seller (or to the knowledge of Seller any other Person) with any Governmental Body or other Person relating to any of the Leased Real Property or the activities thereon. No portion of the Leased Real Property is subject to any classification, designation or preliminary determination of any Governmental Body or pursuant to any Law which would restrict its use, development, occupancy or operation in connection with the Business.

(f)     All requisite certificates of occupancy and other Permits and approvals required of Seller with respect to the Leased Real Property or the Improvements and the use, occupancy and operation thereof by Seller have been obtained and paid for.

(g)     The Leased Real Property are presently zoned pursuant to the building and zoning ordinances and/or use regulations in force in the area in which the Leased Real Property is situated (the "Ordinances"). The current use and condition of the Leased Real Property conforms to all Ordinances required by any Governmental Body having jurisdiction or pursuant to all Laws necessary for Seller to lawfully own, use and occupy the Leased Real Property. No fact has been brought to the attention of Seller respecting any fact, action or Proceeding, whether actual, pending, or threatened, which could result in a modification or the termination of such conformity.

8.6     Ownership of all Assets in Seller Entity. Seller owns or has a lessee's interest in all of the Acquired Assets and there are no assets of any kind which are owned by a Person other than Seller (after exercise of the Drag-Along Rights) which are necessary, used or usable in connection with the Business.

8.7     Noncontravention.

(a)     Upon the expiration of any applicable appeal period following the entry of the Sale Order, the execution and the delivery of this Agreement and the Ancillary Agreements being executed by Seller, any other documents contemplated hereby or thereby, the performance by Seller of its obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby or thereby, do not and will not (i) violate any Law or Order to which Seller or any of the Acquired Assets or Assumed Contracts or Assumed Leases, is subject, (ii) except as set forth on Schedule 8.7(a), require any Consent or notice under, or registration under or payment on account of, or conflict with, result in a breach of, or constitute (with or without the giving of notice or the lapse of time or both) a default (or give rise to any right of termination, modification (including in the case of leases, any change in the amount or nature of the rent), cancellation, maturation or acceleration or give any third Person any interests or rights therein) under, any of the terms, conditions or provisions of any (A) Assumed Contract or Assumed Lease, or any other agreement, Contract or instrument to which Seller is a party or by which any portion of its properties or assets or the Acquired Assets may be bound, including all Assumed Contracts or Assumed Leases (whether or not material), or (B) Permit or other Governmental Body authorization held or used by or binding on Seller with respect to the Acquired Assets, the Business or the Leased Real Property, or (iv) result in the imposition of any Lien upon any of the Acquired Assets.

(b)     Except as set forth on Schedule 8.7(b), Seller is not required to give any notice to, make any filing with, or obtain any Consent of any Governmental Body in order for Seller to consummate the transactions contemplated by this Agreement.

8.8     Permits.  Seller holds all Permits required for the conduct of the Business and ownership of the Acquired Assets, except where the failure to hold any such Permit would not have a Material Adverse Affect.  Seller is in compliance with the terms and conditions of all such Permits which it holds and all such Permits will be available for use by Purchaser immediately after the Closing.

8.9     Tangible Personal Property.  The Tangible Personal Property includes all equipment, and other tangible assets necessary for the current conduct of the Business in accordance with past practice.

8.10     Contracts.  All of the Assumed Contracts, Assumed Leases and all other Contracts of Seller are valid, binding and enforceable in accordance with their respective terms.  Seller has performed all obligations required to be performed by it as of the date hereof and is not in default under or in breach of nor in receipt of any claim of default or breach under any Contract to which Seller is subject; no event has occurred which with the passage of time or the giving of notice or both would result in a default, breach or event of noncompliance by Seller under any Contract to which Seller is subject; and Seller has no present expectation or intention of not fully performing all such obligations.

8.11     Tax Matters.

(a)     All Taxes that give rise to a Lien on the Acquired Assets shall either be (i) specifically subject to the Sale Order transferring to Purchaser such Acquired Assets free and clear of all Liens and encumbrances or (ii) paid in full at Closing.

(b)     Seller is not a "foreign person" for purposes of the withholding requirements of Section 1445(a) of the Code (or any corresponding provision of state, local or foreign Tax Law), and Seller has no permanent establishment in any foreign country, as defined in the relevant tax treaty between the United States of America and such foreign country.

(c)     Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholder, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly, completely and timely filed.

(d)     Seller is not a party to any Contract that has resulted or could result, separately or in the aggregate, in the obligation to make any payments that will not be deductible under Code Section 280G or which is subject to Code Section 409A.

(e)     Seller is not a party to any Tax allocation, indemnification or sharing agreement that will remain in effect following the Closing.

8.12     Intellectual Property.

25

(a)     Schedule 8.12(a) identifies, with respect to the Business and the Acquired Assets, (i) each item of Intellectual Property which has been issued to Seller or which is used by Seller or which has been applied for by Seller, (ii) each material item of unregistered Intellectual Property owned or used by Seller, (iii) each license, agreement, or other permission that Seller has granted to any third party with respect to any Intellectual Property used by Seller (together with any exceptions); and (iv) each material license, agreement or other permission under which Seller uses any Intellectual Property owned by a third party.

(b)     Except as set forth on Schedule 8.12(b), Seller has not received notice from any Person and Seller has no knowledge that the conduct of the Business or the Intellectual Property owned or used by Seller interferes with, infringes, misappropriates, or otherwise conflicts with any Intellectual Property or other rights of third parties.

8.13     Labor and Employment Matters.

(a)     Seller is not a party to or bound by any collective bargaining agreement or relationship with any labor organization.

(b)     With respect to the Business: Company has paid all wages, benefits, accrued vacation pay and accrued bonuses through the Closing Date which arose after the Petition Date. In addition (i) no labor organization or group of employees has filed any representation petition or made any written or oral demand for recognition; (ii) to the knowledge of Seller, no union organizing efforts are underway or threatened and no other question concerning representation exists; (iii) there is no employment-related charge, complaint, grievance, investigation, inquiry or obligation of any kind, pending or to the knowledge of Seller, threatened in any forum, relating to an alleged violation or breach by Seller (or its officers or directors) of any Law or Contract; and (iv) to the knowledge of Seller, Seller has not committed any act or omission giving rise to liability for any violation identified in subclause (iii) above, or as a result of any adverse workers compensation experience.

8.14     Employee Benefits.

(a)     Seller has not maintained, contributed to or had any Liability with respect to any Employee Pension Benefit Plan.

(b)     Seller does not maintain, has no obligation to contribute to and does not have any Liability (including any liability under Parts 6 and 7 of Subtitle B of Title I of ERISA and Sections 4980B, 4980D and 5000 of the Code) with respect to any Employee Welfare Benefit Plan nor with respect to any Employee Welfare Benefit Plan, whether or not terminated, which provides medical, health, life insurance or other welfare-type benefits for current or future retirees or current or future former employees or their spouses or dependents (other than in accordance with Section 4980B(f) of the Code or other applicable Law).

(c)     Seller does not maintain, contribute to or have any Liability under (or with respect to) any deferred compensation, severance or retirement plans or arrangements, employee welfare, fringe benefit, vacation, incentive or bonus plan, program, policy or other arrangement,

whether or not terminated, other than discretionary bonuses and increases in compensation in the ordinary course of business other than as disclosed to Purchaser.

(d)     No Employee Pension Benefit Plan has or has incurred an accumulated funding deficiency within the meaning of Section 302 of ERISA or Section 412 of the Code, nor has any waiver of the minimum funding standards of Section 302 of ERISA and Section 412 of the Code been requested of or granted by the Internal Revenue Service with respect to any Employee Pension Benefit Plan, nor has any lien in favor of any Employee Pension Benefit Plan arisen under Section 412(n) of the Code or Section 302(f) of ERISA.

(e)     No other trade or business is or, at any time within the past six years, has been treated together with Seller, as a single employer under Section 414 of the Code or Section 4001 of ERISA.

8.15     Environment, Health and Safety Matters.     With regarding to environmental, health and safety matters, except as provided in Schedule 8.15:

(a)     Seller has complied in all material respects and is in compliance in all material respects with Environmental Law and all Environmental, Health, and Safety Requirements.

(b)     Seller has not received any written or oral notice, report or other information regarding any actual or alleged material violation of Environmental Law or Environmental, Health, and Safety Requirements, or any liabilities or potential liabilities, including any investigatory, remedial or corrective obligations under Environmental Law or Environmental, Health, and Safety Requirements.

(c)     Seller has not assumed or undertaken any obligation for corrective or remedial action, of any other person or entity relating to Environmental Laws or Environmental, Health, and Safety Requirements with respect to any of the Real Property.

(d)     To the best of Seller's knowledge, information and belief, (i) no facts, events or conditions relating to the Leased Real Property will (A) give rise to any material investigatory, remedial or corrective obligations pursuant to Environmental Laws or Environmental, Health, and Safety Requirements, or (B) give rise to any other material Liabilities pursuant to Environmental Laws or Environmental, Health, and Safety Requirements, and (ii) there has been no Release or threatened Release of any Hazardous Material on, to, from, or under the Leased Real Property now or previously leased, or operated by Seller.

(e)     Seller has never owned or operated any underground or above-ground storage tanks, nor are there any active or inactive underground or above-ground storage tanks located at any Leased Real Property now or previously leased, or operated by Seller.  Seller has obtained, is, and has been in compliance with all licenses, Permits, certificates, and other authorizations and approvals required under all applicable Environmental Law and Environmental, Health, and Safety Requirements.  All such licenses, permits, certificates, and other authorizations or approvals are set forth in Schedule 8.15.

(f) There have been no environmental assessments, inspections, or audits conducted by Seller, any Governmental Body, or any other Person with respect to the Leased Real Property other than those with respect to which copies of the assessment, inspection, or audit reports have been delivered to Purchaser.

(g) None of the Leased Real Property now or previously owned, leased, or operated by Seller has been operated as a Treatment, Storage, or Disposal facility for Hazardous Waste (as such terms are defined under the Resource Conservation and Recovery Act or any other Environmental Law).

(h) No property or facility to which Seller transported or arranged for disposal of Hazardous Materials is listed or proposed for listing as a site requiring investigation, cleanup, or remediation or is otherwise the source of liability under Environmental Law or Environmental, Health, and Safety Requirements.

8.16    Names and Locations. Except as set forth on Schedule 8.16, with respect to the Business, during the five-year period prior to the execution and delivery of this Agreement, Seller has not used any trade name or fictitious names under which it has invoiced account debtors, maintained records concerning its assets or otherwise conducted business.

8.17    Sufficiency of Assets. The assets and properties making up the Acquired Assets and the Leased Real Property constitute all of the assets (tangible, intangible, real and personal of any nature whatsoever) that are necessary, used or available to operate the Business in the manner presently operated by Seller.

8.18    Brokers or Finders. Seller and its agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

8.19    Litigation. Except as set forth on Schedule 8.19, there is no Proceeding pending or, to the knowledge of Seller, threatened against Seller, the Acquired Assets or the Business, which, if determined adversely, would have a Material Adverse Effect upon the transactions contemplated by this Agreement, Purchaser or the Acquired Assets.

8.20    Disclosure. No representation or warranty made by Seller or its principals contained in this Agreement or in any Ancillary Agreement contains any untrue statement of material fact or omits to state a material fact necessary to make the statements and facts contained herein, in light of the circumstances in which they were or are made, not false or misleading.

8.21    Disclosure Schedules. Unless otherwise provided in this Agreement, all Exhibits and Schedules will be provided by Seller to Purchaser as soon as possible after execution of this Agreement but, in no event, later than 10 days after execution of this Agreement and shall be supplemented and updated as provided in Section 5.8.

## ARTICLE 9
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows, which representations and warranties shall be true and correct as of the date hereof and true and correct as of the Closing:

9.1     Due Organization.  Purchaser is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Michigan.  Purchaser has full power and authority to own and lease its assets and properties and to conduct its business as it is now being conducted.

9.2     Authorization.  This Agreement has been duly executed and delivered by Purchaser and constitutes the legal, valid and binding obligation of Purchaser enforceable in accordance with its terms.  Purchaser has full power and authority, or otherwise, to enter into and deliver this Agreement and to execute and deliver all contemplated agreements and documents provided in Agreement and perform the transactions contemplated therein.  Purchaser is not required to obtain the consent, approval or waiver of any person not a party to this Agreement to consummate the transactions contemplated hereby.

9.3     Financial Ability to Close.  Purchaser has adequate financial resources to consummate the transactions contemplated hereby, including the payment of the Purchase Price.

9.4     Litigation.  There is no Proceeding in progress or, to the knowledge of Purchaser, pending or threatened against or relating to Purchaser, which, if determined adversely to Purchaser, would prevent Purchaser from paying the Purchase Price to Seller; enjoin, restrict or prohibit the transfer of all or any part of the Acquired Assets as contemplated by this Agreement; or prevent Purchaser from fulfilling all of its obligations set out in this Agreement or arising from this Agreement, and Purchaser has no knowledge of any existing ground on which any such action, suit, litigation or proceeding might be commenced with any reasonable likelihood of success.

9.5     No Broker.  Purchaser has carried on all negotiations relating to this Agreement and the transactions contemplated in this Agreement directly and without the intervention on its behalf of any other party in such manner as to give rise to any valid claim for a brokerage commission, finder's fee or other like payment, except Seller's broker.  Seller shall be liable for all such payments due to its broker.

## ARTICLE 10
## TERMINATION

10.1     Termination of the Agreement.  This Agreement may be terminated as provided below:

(a)     Purchaser and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing.

(b)     Either Purchaser or Seller may terminate this Agreement if the Closing shall not have occurred on or before December 1, 2015 (the "Expiration Date").

(b)     Purchaser may terminate this Agreement by giving written notice to Seller at any time prior to the Closing (i) in the event Seller has Breached any representation, warranty,

covenant or agreement contained in this Agreement in any material respect or (ii) the conditions precedent of Purchaser to close as set forth in Section 5 of this Agreement have not been fully satisfied in Purchaser's reasonable discretion or waived in writing by Purchaser.

(c) Seller may terminate this Agreement at or any time prior to the Closing by giving written notice to Purchaser that (i) Purchaser materially failed to satisfy the conditions to closing set forth in Section 6, or (ii) Purchaser materially Breached its representation and warranties set forth in Article 9 and as a result Purchaser cannot close the transactions contemplated herein. Such notice to terminate must set forth in specific factual detail Seller's reasons for declaring Breach or failure to satisfy a condition. Seller may waive any such Breach or failure to satisfy in Seller's reasonable discretion.

(d) This Agreement shall automatically terminate if Purchaser is not selected as the Successful Bidder, subject to the provisions of the Sale Procedures Order and Bidding Procedures, including the Back-Up Bidder provisions, in which case the Termination Fee will be paid to Purchaser in accordance with this Agreement and the Bidding Procedures Order.

10.2 Limitations; Effect. Notwithstanding anything in Section 10.01 to the contrary, no Party may terminate this Agreement if such Party is in material Breach of this Agreement or if the circumstance giving rise to such Party's right to terminate results primarily from a Breach by such Party itself of any representation, warranty, covenant or agreement contained in this Agreement. If any Party terminates this Agreement pursuant to Section 10.01, all rights and obligations of the Parties hereunder and any third party beneficiaries shall terminate and there shall be no liability on the part of any Party to any other Party under this Agreement, except that nothing herein shall relieve any Party from liability for any Breach of this Agreement prior to such termination or in connection with such termination.

## ARTICLE 11
## MISCELLANEOUS

11.1 Expenses. Except as otherwise provided in this Agreement, Seller, on the one hand, and Purchaser, on the other hand, will bear their own costs and expenses (including all legal, accounting, consulting, investment banking, brokerage and other fees and expenses) (collectively, "Expenses") incurred in connection with this Agreement and the transactions contemplated hereby.

11.2 Further Assurances. Seller will execute and deliver such further instruments of conveyance and transfer and take such additional action as Purchaser may reasonably request to effect, consummate, confirm or evidence the transactions contemplated by this Agreement. Purchaser will execute and deliver such further instruments of conveyance and transfer and take such additional action as Seller may reasonably request to effect, consummate, confirm or evidence the transactions contemplated by this Agreement.

11.3 Entire Agreement. This Agreement (including the Ancillary Agreements and documents referred to herein) constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, that may have related in any way to the subject matter hereof.

11.4 <u>Counterparts</u>. This Agreement and any of the Ancillary Agreements may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopier or other electronic means (pdf, e-mail or otherwise) shall be as effective as delivery of a manually executed signature page to this Agreement. At the request of either Party, the other Party shall re-execute original forms of any such agreement or instrument thereof and deliver them to the requesting Party. No Party shall raise the use of a fax or electronic signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a fax or other electronic means as a defense to the formation of a Contract and both Parties forever waive any such defense.

11.5 <u>Headings</u>. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

11.6 <u>Notices</u>. Any notice, demand, consent, waiver, and/or other communication required or permitted to be given under this Agreement ("<u>Notice</u>") shall be deemed to have been duly given if personally delivered, sent by email, sent by reputable overnight delivery service, or mailed, certified or registered mail, return receipt requested. Notice shall be deemed given upon the earliest to occur of (a) personal delivery, (b) when sent via email, (c) on the business day after such Notice is sent by reputable overnight delivery service, or (d) on the first day that the United States Post Office actually delivers, or first attempts to deliver, such mailed Notice (whether or not the addressee accepts such Notice). All Notices shall be sent to the appropriate addresses, and fax numbers, as the case may be, as follows:

If to Seller or Company:

    Olga's Kitchen, Inc.
    c/o Gene Kohut, Chief Restructuring Officer
    17000 Kercheval Ave., Suite 210
    Grosse Pointe, MI 48230
    gene@gktrustee.com

with a copy to:

    Robert Bassel
    PO Box T
    Clinton, MI 49236
    bbassel@gmail.com

If to Purchaser:

    SOK Venture LLC
    Attn: Mark Schostak
    25800 Northwestern Hwy.
    Southfield, MI 48075

mschostak@schostak.com

with a copy to:

> Honigman Miller Schwartz and Cohn LLP
> Attn: I.W. Winsten
> 660 Woodward Ave
> 2290 First National Building
> Detroit, MI 48226
> bwinsten@honigman.com

If to OKI:

> Dalto Consulting, Inc.
> Attn: Kenneth J. Dalto
> 32400 Telegraph Road, Suite 102
> Bingham Farms, MI 48025
> kdalto@kendalto.com

with a copy to:

> Frank & Frank, PLLC
> Attn: Jerome D. Frank
> 30833 Northwestern Hwy., Suite 205
> Farmington Hills, MI 48334
> jfrank@frankfirm.com

Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth above using any other means, but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient. Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

11.7    Governing Law; Venue.    This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Michigan without giving effect to any choice or conflict of law provision or rule (whether of the State of Michigan or any other jurisdiction) that would cause the application to this Agreement of the laws of any jurisdiction other than the State of Michigan. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the Parties in the Bankruptcy Court, or, if the Bankruptcy Court does not have jurisdiction, in the courts of the State of Michigan, County of Oakland, or, if it has or can acquire jurisdiction, in the United States District Court for the Eastern District of Michigan, and both of the Parties consent to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waive any objection to venue in those courts. Process in any action or proceeding referred to in the preceding sentence may be served on any Party anywhere in the world.

11.8    Amendments and Waivers. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Purchaser and Seller. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

11.9    Construction. Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates. Nothing in any Exhibit or Schedule attached hereto shall be deemed adequate to disclose an exception to a representation or warranty made herein unless such Exhibit or Schedule identifies the exception with reasonable particularity.

11.10    No Strict Construction. Notwithstanding the fact that this Agreement has been drafted or prepared by one of the Parties, both of the Parties confirm that it and its counsel have reviewed, negotiated and adopted this Agreement as the joint agreement and understanding of the Parties, and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any person. Seller and Purchaser acknowledge that they each have been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguity in this Agreement against the Party that drafted it has no application and is expressly waived by both Parties.

11.11    Remedies. Both of the Parties shall have and retain all other rights and remedies existing in their favor at law or in equity or bankruptcy, including any actions for specific performance and/or injunctive or other equitable relief (including the remedy of rescission) to enforce or prevent any violations of the provisions of this Agreement.

11.12    Binding Agreement; Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns; provided that neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by the Seller without the prior written consent of Purchaser, or by Purchaser without the prior written consent of Seller.

11.13    Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

11.14    Parties in Interest. Nothing in this Agreement, express or implied, is intended to confer on any person other than the Parties and their respective successors and assigns any rights or remedies under or by virtue of this Agreement.

*[signatures on next page]*

IN WITNESS WHEREOF, the undersigned have hereunto subscribed their names as of the day and date first written above.

**Purchaser:**

**SOK Venture LLC**, a Michigan limited liability company

By: _____

Print name: MARK S. Subashi

Its: MANAGE OWNER

**Seller:**

**Olga's Kitchen, Inc.**, a Michigan corporation

By: _____

Print name: GENE KOHUT

Its: C.F.O.

**OKI, LLC**, a Michigan limited liability company

By: _____

Print name: KenneTH J DATO

Its: ReceiveR

**Kobacker & Associates of Kentwood**, Michigan limited partnership

By: _____
      Its General Partner

Print name: _____

By: _____
      Its Limited Partner

Print name: _____

**EXHIBIT A**
**SALE PROCEDURES ORDER**

**EXHIBIT B**
**BIDDING PROCEDURES**

**EXHIBIT C**
**SALE ORDER**

# EXHIBIT 1
## ASSUMED CONTRACTS

**EXHIBIT 2**
**ASSUMED LEASES**

**EXHIBIT 3**
**EXCLUDED ASSETS**

**EXHIBIT 4**
**JOINT DEVELOPMENT AGREEMENT**

**EXHIBIT 5**
**JV MANAGEMENT AGREEMENTS**

**EXHIBIT 6**
**JV OPERATING AGREEMENT**

**SCHEDULE 2.2**
**SYSCO INVENTORY PAYMENT**

## SCHEDULE 2.5(d)
## JV LIABILITIES

**SCHEDULE 4.1(g)**
**SOK GUARANTEES**

## SCHEDULE 5.2
## FINANCIAL STATEMENT

**SCHEDULE 5.10(a)**
**UTILITY AMOUNTS OWED**

**SCHEDULE 5.10(b)**
**PERSONAL PROPERTY TAXES OWED**

## SCHEDULE 5.10(c)
## WAGES AND OTHER LABOR CHARGES AND BENEFITS OWED

**SCHEDULE 7.2**
**TAX ALLOCATION**

**SCHEDULE 8.3**
**GOVERNMENTAL BODY CONSENTS**

## SCHEDULE 8.4
## TANGIBLE PERSONAL PROPERTY

**SCHEDULE 8.5**
**SELLER LEASE DISCLOSURES**

**SCHEDULE 8.7(a)**
**NONCONTRAVENTION DISCLOSURES**

**SCHEDULE 8.7(b)**
**NOTICE DISCLOSURES**

**SCHEDULE 8.12(a)**
**INTELLECTUAL PROPERTY LIST**

**SCHEDULE 8.12(b)**
**INFRINGEMENT DISCLOSURES**

**SCHEDULE 8.15**
**ENVIRONMENTAL DISCLOSURES**

**SCHEDULE 8.16**
**USE OF OTHER NAMES DISCLOSURE**

**SCHEDULE 8.19**
**PENDING OR THREATENED LITIGATION DISCLOSURE**

**EXHIBIT 2**
**LIST OF DEBTOR CONTRACTS**

**[SEE ATTACHED]**

**Olga's Kitchen, Inc.**
**Listing of Assumed Contracts**

| | Description of Assumed Contract | Cure Amount |
|---|---|---|
| **Food Supply Related** | | |
| PEPSI-COLA COMPANY | Food Supply | 21,276.99 |
| SYSCO DETROIT | Food Supply | 1,459,259.49 |
| SYSCO FOOD OF ST LOUIS | Food Supply | 52,694.00 |
| **IT Related** | | |
| WHENTOMANAGE RESTAURANT | Inventory Software | 7,200.70 |
| Nextep | IT - Hardware | - |
| NCR CORPORATION | Network Firewalls | 9,241.69 |
| NCR LOCAL | Network Firewalls | - |
| NCR LOCAL OHIO | Network Firewalls | - |
| BULLSEYE TELECOM | Phone / Internet | 5,082.37 |
| MICHIGAN OFFICE SOLUTIONS | Printer & Ink Main. | 550.26 |
| POLYLOGICAL SOLUTIONS CORP | Web Hosting | 4,539.10 |
| MOOD Media | Music in Stores | - |
| OLO | Online Ordering | - |
| STELLAR RESTAURANT SOLUTIO | Carryout Orders | 11,980.30 |
| FISHBOWL | Promotions/Mkting | 8,034.96 |
| **Marketing Related** | | |
| YELP  INC | Advertising | - |
| IDENTITY | PR Firm | 12,000.00 |
| MEDIA ADVANTAGE | Social Media | 2,950.00 |
| Blackhawk | Gift Card Program | 9,395.94 |
| Interactive Communication | Gift Card Program | 8,416.80 |
| **Healthcare & Benefits Related** | | |
| CAMBRIDGE CONSULTING FROUP | Benefits Consulting | 648.00 |
| AFLAC | Healthcare | - |
| BLUE CROSS BLUE SHIELD OF MI | Healthcare | 74,658.22 |
| **Repair & Maintenance Related** | | |
| FERBER WAREHOUSING | Storage for Equip | 20,847.05 |

| Olga's Kitchen, Inc.<br>Listing of Assumed Contracts<br>APA Exhibit 1 | Description of<br>Assumed Contract | Cure Amount |
|---|---|---|

**Other Contracts**

| | | |
|---|---|---|
| FLATIRON CAPITAL | INSURANCE | - |
| Several with SOK Venture, see APA | Various | 646,701.00 |
| Michael Kosloski | Employee Stay Bonus | 50,000.00 |
| Dennis Allor | Employee Stay Bonus | 50,000.00 |
| REAL INTEGRATED | Advertising | 8,000.00 |

| | Description of Assumed Lease | Cure Amount |
|---|---|---|

### Olga's Landlords

| | | |
|---|---|---|
| EA&S INVESTMENTS #6 | HQ Lease | 13,412.57 |
| WOODLAND LIMITED PARTNERSHIP | Store Lease #122-KOB | - |
| ALTON MALL LLC / Marquette Realty Cap'l | Store Lease #125 | 40,128.59 |
| BRIARWOOD LLC | Store Lease #143 | 46,363.88 |
| CP WOODWARD CENTER LLC DBA / Bembridge Assoc., LLC | Store Lease #153 | - |
| FIDVI ASSOCIATES LLC | Store Lease #150 | 17,343.33 |
| JARBOU CANTON REAL ESTATE | Store Lease #154 | 26,477.87 |
| LAUREL PARK RETAIL PROPERT | Store Lease #142 | 31,135.85 |
| LSREF SUMMER REO TRUST 200 WESTLAND CENTERS | Store Lease #116 | 60,727.95 |
| SHOPS AT OLD ORCHARD / RAMCO - GERSHENSON | Store Lease #113 | 25,208.23 |
| SOUTHLAND JOINT VENTURE | Store Lease #117 | 115,726.23 |
| THE CROSSROADS/KALAMAZOO MALL | Store Lease #119 | 3,986.93 |
| THE HEIGHTS | Store Lease #139 | 11,571.67 |
| THE MALL OF MONROE/FRENCHTOWN | Store Lease #135 | 17,323.43 |
| TROY SPORTS CENTER LLC | Store Lease #149 | 40,569.79 |
| TWELVE OAKS MALL LLC/TAUBM | Store Lease #106 | 113,388.30 |
| TWELVE SOUTHFIELD ASSOCIATIATES | Store Lease #137 | 16,191.04 |

### Other Leases

| | | |
|---|---|---|
| Ford Motor Credit, 5/23/2013 - #1930 | Auto Lease | 7,097.68 |
| Ford Motor Credit, 5/23/2013 - #2057 | Auto Lease | - |
| Ford Motor Credit, 5/23/2013 - #2153 | Auto Lease | - |
| Ford Motor Credit, 5/23/2013 - #2247 | Auto Lease | - |
| Ford Motor Credit - 4 Lease Total (#1930, #2057, #2153, #2247) | | 7,097.68 |
| WELLS FARGO FINANCIAL LEASING | Copier Lease | 5,387.80 |
| RBS Asset Finance | Equip. Lease | - |