Exhibit 3

In Re: OLGA'S KITCHEN, INC.,            Chapter 11
                                                   Case No. 15-49008

          Debtor.                              Hon.
_____/

## BRIEF IN SUPPORT OF
## MOTION FOR ENTRY OF ORDER ALLOWING
## ADMINISTRATIVE EXPENSE PRIORITY CLAIM
## FOR SUBSTANTIAL CONTRIBUTION MADE BY
## CREDITOR COSMO HOSPITALITY, LLC
## PURSUANT TO 11 U.S.C. §503(b)(3)(D) and (b)(4)

### Introduction

The court is familiar with the history preceding the ultimate sale of the assets of the Debtor and equity of the Debtor's affiliate "Olga's SOK Holdings, LLC" (the "JV") in a sale pursuant to 11 U.S.C. §363. Nearly all of that history during the bankruptcy case involves the efforts of Cosmo Hospitality, LLC ("Cosmo") to purchase the Debtor's assets. Cosmo was stalking horse from late August until the day the Motion to Approve Sale Procedures was filed, October 16, 2015, during which time it performed every function required to be stalking horse, setting the table for a competitive auction for the debtor's assets. After that date, Cosmo' actions further benefitted all potential parties that sought to bid against the Debtor's affiliate, insider SOK Ventures, LLC ("SOK"). Not only did Cosmo's effort produce an auction that otherwise would not have occurred, but they brought fairness to the bidding process. As a result Olga's estate generated over $11.2 million in sale proceeds, $3 million more than would have been paid in the absence of an auction. Under the applicable standard, Cosmo is entitled to receive payment

1

of its legal fees and expenses as an administrative expense priority claim under 11 U.S.C. §503(b)(3)(D) and (b)(4).

## Statement of facts

On August 4, 2015, the Debtor circulated a written solicitation for stalking horse bidders to which Cosmo responded. Both before and after this date, Ken Dalto, the representative of the Debtor that coordinated the stalking horse process, was in regular contact with Cosmo. See Exhibit 6A. The terms of Cosmo's Letter of Intent were negotiated and several drafts were circulated and discussed. See Exhibit 6B. After Debtor's representatives received a number of letters of intent, Cosmo was formally selected as the stalking horse bidder for the proposed §363 sale.

Cosmo's selection as stalking horse was announced in a conference call on August 20, 2015 at 11:30 a.m. among (for the Debtor) Ken Dalto, along with Eric Slone and Scott Parkinson of Dalto's office, Dalto's attorney Jerry Frank, the Debtor's Chief Restructuring Officer, panel trustee Gene Kohut, and (for the buyer Cosmo) Stefan Wanczyk, Paul Rhodes and Cosmo's counsel Rick Berg. Dalto's email record scheduling that call, and his follow up email with the contact information for the participants on the call, are attached as Exhibit 6C.

Prior to the August 20, 2105 conference call, Cosmo had been advised that while SOK would be a bidder, SOK was definitively not the stalking horse. Indeed, Ken Dalto filed an affidavit that states the **"second stalking horse came forward"** during the week of October 12- 16, 2015. See Exhibit 6D. There is no debate nor any record contradicting that Cosmo alone carried on the role of stalking horse until the day the Motion for Sale Procedures was filed on October 16, 2015. As discussed further below, the role of stalking horse has legal significance.

2

Counsel for Cosmo provided an initial draft of an Asset Purchase Agreement ("APA") on August 26, 2015. See email record attached as Exhibit 6E. For nearly two months after Cosmo submitted its APA, Cosmo and the Debtor negotiated the terms of the Asset Purchase Agreement. Counsel for Cosmo prepared numerous drafts of the APA and circulated them for discussion and negotiation with Dalto and the other debtor representatives. Copies of emails demonstrating significant, persistent, dedicated arms length negotiation and the exchange of multiple drafts of the APA are attached hereto as Exhibit 6F.

Indeed, even time records submitted in connection with the request by Dalto and Frank for an award of fees and expenses (through 9/9/15) acknowledge the selection of Cosmo as the stalking horse by the multiple references to discussions with Stefan, Matt, and "Utica" which is Stefan's usual place of business. See Dalto and Frank's selected time entries attached hereto as Exhibit 6G.

The facts made apparent by these email records (Exhibit 6F) are that the initial drafts of the Purchase Agreement provided that the sale would be exclusively assets, including the assets of the Joint Venture, which the Debtor would acquire and sell to the stalking horse. However, during the negotiation process, SOK, exercising its insider influence, insisted to the Debtor and its professionals that the Joint Venture be purchased only in a membership, or equity sale, not an asset sale. In this way, it became apparent, SOK could try to control and manipulate the sale process, and attempt to create conditions unacceptable to any other bidders.

In reaction to these new demands, Cosmo proposed an Agreement in which the Debtor first would acquire the Joint Venture's equity, (satisfying SOK's concerns that their equity be purchased according to the Joint Development Agreement), which the Debtor then would liquidate and sell along with all the assets of the Debtor to the successful bidder. The Cosmo

3

Asset Purchase Agreement was revised to provide for this form of transaction. The parties' email exchanges (Exhibit 6F) demonstrate that SOK told the Debtor it agreed to this structure as well. (See Jerry Frank email confirming this fact on Oct. 5, 2015 at 11:17 a.m.) More revisions were exchanged and the parties proceeded to a point at which the motion to approve sale could be filed. Counsel for Cosmo revised the proposed Bid Procedures and circulated them for approval. See Exhibit 6H.

On Saturday, October 10, 2015, after nearly two months of drafting and discussions regarding an asset sale, Jerry Frank, counsel for Dalto who was working in conjunction with the Debtor's CRO Gene Kohut, forwarded—not the Debtor's revisions, but **SOK's** revised version of the Cosmo APA, which deleted Cosmo's name as stalking horse purchaser. See Exhibit 6I. SOK revised Cosmo's form of the transaction to require sale of equity in the joint venture to the purchaser, rather than assets. The Debtor, after agreeing to Cosmo as stalking horse from the beginning, and agreeing to the structure of the transaction, and representing that SOK had in fact agreed to this structure, allowed insider SOK to inject a new form agreement that, given its terms, effectively discouraged any bidders other than SOK. (See Exhibit 6I)

For example, SOK's new version of the APA required the stalking horse to make a $500,000 deposit which would be forfeited under conditions that would not apply to SOK, e.g., SOK guarantees of leases were required to be discharged by the stalking horse. Poison pills were liberally scattered throughout the APA, to discourage competing bids. While these changes were objectionable, they did not yet state that SOK intended to be the stalking horse.

The Debtor and Cosmo conducted a conference call on Monday, October 12, 2015 at 2:00 p.m. After this discussion, Cosmo revised the SOK draft to provide for the purchase of the JV equity, and to allow for the $500,000 deposit. Two revised drafts reflecting the results of

4

those discussions were sent by counsel for Cosmo to Jerry Frank for the Debtor on October 13 and 14, 2015. See related emails at Exhibit 6J. These drafts modified the APA such that (a) no forfeiture of the deposit was possible if the landlord guarantees were not released; (b) no liabilities of the joint venture or OKI would survive the transaction or burden the purchaser thereafter; (c) no assumption and assignment of the Joint Development Agreement, Management Agreement or Operating Agreement for Holding would be required; and (d) that the sellers, prior to closing, were required to follow the Joint Development Agreement drag along procedures according to their precise terms, to assure SOK could not later charge that the "drag-along" was improper.

Then, on Thursday October 15, 2015, at conference call at 11:35, the Debtor lowered the boom, and stated SOK proposed to be stalking horse at a price of $8,000,000. At 1:33 p.m., Ken Dalto sent an email that changed everything. In that email, Dalto attached drafts of an APA and related motion documents prepared by SOK, replacing Cosmo with SOK as the stalking horse Purchaser. (See emails attached as Exhibit 6K.) Cosmo expressed to the Debtor's representatives its shock, surprise and outrage at this development, and indicated it intended to retain its stalking horse role. Jerry Frank stated there was a "10 minute discussion" needed to work out the final details of Cosmo's APA, to take place during a subsequent conference call. Cosmo made several attempts to conduct that call, but the Debtor's betrayal was complete, and the discussion never happened. On the morning of October 16, 2015, Stefan Wanczyk of Cosmo informed Ken Dalto Cosmo would increase its stalking horse price to $8,100,000. That offer was confirmed in writing along with a revised APA later that same day. See Exhibit 6L.

Under cloak of darkness, at 9:30 Friday evening, October 16, 2015, the Debtor filed its Motion to Approve Sale Procedures, which had been written by SOK's counsel (Docket #277)

5

with SOK's APA attached. Cosmo was thus formally abandoned, in favor of an insider that took Cosmo's APA, changed a few lines, and offered a lower price than Cosmo's last offer.

Despite the Debtor's promise to Cosmo that it was stalking horse, despite Cosmo's having met the requests of the Debtor and SOK to modify the structure of the deal, despite Jerry Frank's statement there were "10 minutes" worth of changes to Cosmo's APA the day before the SOK bid was filed, and despite Cosmo's higher offer price made in writing before the motion was filed, the Debtor filed a motion that identified SOK as the stalking horse. And, as the court later learned, those small portions of Cosmo's APA that SOK rewrote unduly favored insider SOK's bid, and created poison pills intended to prevent any other competing offers. See Exhibit 6L, which shows Cosmo's modifications to the SOK APA.

Cosmo objected to the Debtor's Motion regarding the Sale Procedures Order on October 22, 2015 (Docket #306), and a hearing was held on that objection and others the following day, Friday, October 23, 2015, at which the court read a bench opinion allowing entry of an order approving the Motion.

Undaunted by SOK's bullying and last second coup, on October 28, 2015 Cosmo filed a motion in which it asked the court to declare that Cosmo's proposed modifications to the APA—which removed the poison pills—to be acceptable, because the modifications did not materially burden the estate. (Docket #325.) Cosmo sought and received an order granting an expedited hearing, and the Motion was heard on November 4, 2015.

As a result of Cosmo's effort in this regard, the court acknowledged the serious problems created by the Debtor's favoring the insider bidder SOK, by suspending operation of the Sale Order, and postponing the auction, to allow the court to carefully review the relevant documents, and deal with the deep and substantial manipulation undertaken by SOK, presented to the court

6

15-49008-wsd    Doc 406-3    Filed 11/30/15    Entered 11/30/15 16:36:29    Page 7 of 17

by Cosmo's motion. The court subsequently issued a letter, outlining its concerns. After another hearing on November 10, 2015, the Sale Procedures Order was modified to allow others to bid, by adding paragraphs 26 through 31 to the order:

> 26. Notwithstanding anything to the contrary in the Purchase Agreement, the amount of the nonrefundable deposit shall be $250,000.
>
> 27. Notwithstanding anything to the contrary herein or in the Purchase Agreement, SOK claims, if any, against the Successful Bidder, and after the closing against OKI and the Joint Venture, arising from or related to the Joint Venture Agreements, shall be deemed satisfied through the process set forth in paragraph 15 herein.
>
> 28. In the event that Purchaser is not the Successful Bidder, Purchaser waives any claims regarding the timing or procedure regarding the drag-along or tag-along process inconsistent with the Sale Procedures Order.
>
> 29. Notwithstanding anything to the contrary in the Purchase Agreement, the Kobacker Liabilities shall be Excluded Liabilities, and not assumed by the Successful Bidder absent them assuming contractual obligations relating thereto.
>
> 30. Notwithstanding anything to the contrary in the Purchase Agreement, any Proceeding commenced by SOK shall be excluded from Article 6 of the Purchase Agreement.
>
> 31. Notwithstanding anything to the contrary in the Purchase Agreement, the amount of the Break Up Fee shall be $150,000, and the amount of the initial bid under the Bid Procedures shall be $8,250,000.[1]

(The Sale Procedures Order was subsequently modified, corrected and entered in its final form on November 12, 2015 (Docket #363)). Most significantly, Cosmo's efforts assured an auction would occur, because Cosmo and others could safely bid. Accordingly, Cosmo timely submitted its bid and made its deposit by the required deadline of November 16, 2015. See Cosmo's redlined proposed APA submitted November 16, 2015 at Exhibit 6M.

.

---

[1] The court will recall that one request Cosmo made that the court did not grant was to require bidder's deposits to be refundable, even in the event the purchaser could not obtain all releases of all landlord guarantees given by SOK. Accordingly, in light of the court's ruling, when Cosmo submitted its proposal, the APA included provisions requiring that the deposit be forfeited if the releases were not obtained.

7

The Debtor accepted Cosmo's bid subject to entry of a court order approving a breakup fee for Cosmo, which Cosmo had made a condition of its bid. The Debtor and first secured creditor Citizen's bank endorsed this condition, as established by the Debtor's motion to qualify Cosmo's bid, and Citizens' concurrence. (Docket # 367 and 372). However, the U.S. Trustee's office filed an objection to the Debtor's motion. After discussions with the U.S. Trustee's office, it became apparent that despite the fairness, symmetry, equity and logic of Cosmo's breakup fee condition, that due to institutional mandate, the U.S. Trustee could not and would not permit any auction with more than one breakup fee.

Rather than fight a nationwide federal institutional mandate, with its inevitable appeals and delays, at the hearing on November 19, 2015, Cosmo agreed to eliminate this condition from its APA, and to participate in the auction. In exchange, Cosmo agreed to bring this motion to allow payment of an administrative expense priority payment in light of Cosmo's substantial contribution to the estate, and the Debtor made clear on the record on November 19, 2015 that it had no objection to Cosmo's claim up to the proposed amount of Cosmo's breakup fee of $150,000.

Finally, despite the clear provisions of the Corrected Amended Sale Procedures Order (Docket #363), at the auction on November 20, 2015, at 9:00 a.m., insider SOK again attempted to manipulate the sale process by insisting the Debtor conduct the auction contrary to the ordered auction procedures. SOK's maneuver this time was to demand a right to bid "in kind", using the value to the Debtor's estate resulting from the bidder's decision to reject leases or executory contracts, based on unspecified savings of cure costs.

Cosmo refused to bid in an auction that was inconsistent with the court's established procedure and demanded an immediate hearing. The auction adjourned and court conducted an

8

emergency hearing at approximately 11:30 a.m. After hearing argument, the court adjourned and stated it would review the relevant record and give a bench opinion at 2:00 p.m. Consistent with the court's earlier opinion, the court denied SOK's demand to change the bid procedures. The court enforced the Sales Procedures Order as written, and required bidding in $100,000 increments in accordance with the terms of that order.

The auction reconvened, and as a result, the auction price was bid up from Cosmo's highest and best qualified bid at $8.25 million plus $305,000 for Sysco inventory to $11.1 million plus the same $305,000. However, because that final bid belonged to SOK, and SOK was the stalking horse, SOK was not required to pay a $150,000 breakup fee, which had the effect of reducing its final offer to $10,950,000. Cosmo is currently the "back up bidder" at its final offer price of $11 million plus $305,000.

The value Cosmo contributed, both as stalking horse, and as the advocate for a fair bidding process after SOK took control of the process away from the Debtor, resulted in the very auction SOK did not want—a fair one. That effort generated $2,950,000 to the estate higher than insider SOK's $8 million stalking horse bid. Without Cosmo, no bidder would have bid, and the estate would have received $2,950,000 less on sale. Under the applicable law, Cosmo is entitled to recover its expenses incurred in making this substantial contribution to the estate.

### Argument

The U.S. Bankruptcy Code, at sections 11 U.S.C. §503(b)(3)(D) and (b)(4) allows a creditor to receive payment of an administrative expense priority claim to the extent that it makes a "substantial contribution to the Debtor's estate:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, *__including__*— ...

9

>    **(3)** the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by— ...
>
>    >    **(D)** a *creditor*, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a *substantial contribution* in a case under chapter 9 or 11 of this title;
>
>    **(4)** reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.

(Emphasis supplied.)

These two sections permit recovery of two different categories of expenses. Under section (b)(3)(D), the creditor's expenses are reimbursed in all respects except for professional legal or accountants' expenses. Under Section (b)(4), legal and accounting expenses are reimbursed to "an entity whose expenses is allowable" based on its substantial contribution under section (b)(3)(D). Cosmo is a creditor qualified to seek reimbursement for its substantial contribution under section §503(b)(3)(D), and seeks reimbursement only for its attorney fees and related expenses under section §503(b)(4).

### Cosmo is a Creditor entitled to make a substantial contribution claim

First, Cosmo is a "creditor" entitled to seek reimbursement of substantial contribution expenses because it acquired a claim from Delau Fire & Safety, Inc., see Docket #301 and #303. The Delau Fire claim was listed by the Debtor in its schedule of prepetition unsecured claims. To be considered a "creditor" under the applicable definition, an entity must "have" a claim "against the Debtor that arose at the time of or before the order for relief concerning the Debtor." Cosmo fits the definition and therefore has standing to seek an administrative expense priority claim under 11 U.S.C. §503(b)(3)(D).

10

## Claims for substantial contribution are not limited to those listed in section §503(b)

Moreover, the Sixth Circuit very recently made clear that claims for substantial contribution under 11 U.S.C §503(b)(3)(D) are not limited to those specifically listed in the statute. See *In Re: Connolly North America, LLC*, 802 F.3d 810, 816 (6th Cir. 2015). In *Connolly*, the Sixth Circuit held that such claims are not limited to those asserted in cases brought under chapter 9 and 11, but could also be asserted in cases brought under Chapter 7, because the preamble to section §503(b) begins by use of the term "including", which allows for the possibility that more such claims could be asserted than those specifically listed [2]:

> ...by using the term "including" in the opening lines of the subsection, Congress built a mechanism into §503(b) for bankruptcy courts to reimburse expenses not specifically mentioned in §503(b)'s subsections. The insertion of the term indicates that Congress did not intend to provide an exhaustive list of allowable expenses. Rather, it appears that **Congress anticipated that bankruptcy courts would encounter a variety of administrative expenses and circumstances warranting reimbursement**, which it could then evaluate on a case-by-case basis depending on the specific facts of the case, the benefit conferred upon the bankruptcy estate and its creditors, and whether the expenses at issue were actual, necessary, and reasonable. (Emphasis supplied.)

The majority further noted in footnote 6 of the *Connolly* opinion that the Debtor, court and other constituencies had all agreed that the claimant made a substantial contribution, which "strongly suggests that [the claimant's] actions are of the type befitting reimbursements as an administrative expense." Cosmo has the Debtor's support in that regard in this case, (Docket #367) and had the first secured creditor Citizen Bank's support (Docket #372) when this same reimbursement took the form of Cosmo's requested (but not awarded) right to receive a breakup fee. In *Connolly*, the Sixth Circuit has encouraged to evaluate this Motion in light of its specific facts, and in light of the "benefit conferred upon the bankruptcy estate and its creditors, and

---

[2] *Connolly* originated in the Eastern District of Michigan Bankruptcy Court, before J. Tucker. The Bankruptcy Court and District Court sustained the U.S. Trustee's objection to creditor's administrative expense claim, and the 6th Circuit reversed.

11

whether the expenses were actual, necessary, and reasonable." Clearly, Cosmo's legal expenses were actual, necessary and reasonable because it in fact acted as stalking horse, and in fact needed to challenge SOK's manipulations at every turn to create a fair auction setting. Further, the amount of the administrative claim Cosmo seeks to have approved is less than the breakup fee would have been.

Other cases set forth the standard the court should employ to evaluate Cosmo's substantial contribution. The case of *Amfin Financial Corp.*, 468 B.R. 827, 831-833 (N.D.Ohio 2012) describes the objective of these sections as "an accommodation between the two objectives of encouraging meaningful creditor participation in the reorganization process and keeping administrative expenses and fees at a minimum to maximize the estate for creditors." The issues for analysis, the *Amfin* court opined are as follows:

> The principal test of substantial contribution is the extent of benefit to the estate [citations omitted]. The focus is on 'whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors....there is general agreement that 'services which make a substantial contribution are those which "foster and enhance, rather than retard or interrupt the progress of reorganization."'

Id at 832. Other courts evaluate whether the creditor was acting in its self interest. See also *In Re: Alumni Hotel Corp.*, 203 B.R. 624, 632 (E.D.Mich 1996)["[t]he court considers whether the applicant's services were rendered solely to benefit the creditor or to benefit all parties in the case; whether the services provided a direct, significant and demonstrable benefit to the estate; and whether the services duplicated those provided by attorneys for the debtor or the committee of unsecured creditors].

### Cosmo made a substantial contribution to the Debtor's estate.

As noted in the Statement of Facts, the benefit conferred upon the estate by Cosmo, in comparison to what would have occurred in Cosmo's absence, is extensive, dramatic and

12

obvious. First, Cosmo performed all of the work (but received none of the credit—or breakup fee) of the stalking horse. It drafted and negotiated several versions of the Asset Purchase Agreement that ultimately was used by SOK, with minor variations, to purchase the Debtor's assets. Each modified APA changed the deal structure to accommodate the demands of SOK, being communicated through the Debtor to Cosmo. (See Exhibit F.) The role of the stalking horse is well known and well accepted in the context of bankruptcy 11 U.S.C. §363 sales.

> The purpose of a stalking horse bid is to set the floor for the auction sale of a debtor's assets. To compensate the stalking horse for the "cost" of showing its hand before the auction, conducting due diligence and otherwise facilitating the creation of a market, bankruptcy courts frequently authorize payment of a break-up fee to the stalking horse should its bid not be the successful bid.

*International Union, United Auto., Aerospace & Agr. Implement Workers of America v. MRC Indus. Group, Inc.*, 541 F.Supp.2d 902, 911 (E.D.Mich, 2008). The unsuccessful stalking horse is compensated usually by a breakup fee. In this case however, the insider SOK used its influence over the Debtor to knock Cosmo off the stalking horse. While that fact assured SOK would not incur the expense of a breakup fee if it was the successful bidder (which SOK was, and as a result which fee SOK did not incur), it does not erase all Cosmo's work performed to "set the floor" for the auction, attract bidders, conduct its due diligence and facilitate the creation of a market. Recall, the Debtor was actively discussing ***revisions to Cosmo's APA*** and its role as stalking horse until *one day prior to filing the motion to approve sale procedures.* It is Cosmo, therefore, that performed the required stalking horse work, which benefited the entire estate by establishing the ground work required for a sale to take place. This work has value, and substantially contributed to the value of the estate, because it substantially advanced the process through which the ultimate sale occurred, which generated another $2.95 million for the estate.

13

15-49008-wsd    Doc 406-3    Filed 11/30/15    Entered 11/30/15 16:36:29    Page 14 of 17

Second, even after Cosmo was wrongfully kicked to the curb in favor of the SOK offer, Cosmo challenged the SOK form of APA because SOK's APA so clearly made bidding unfair—not just to Cosmo, but to any party that wished to submit a bid and participate at the auction. Cosmo's challenges resulted in a far more fertile bidding environment. As a result of Cosmo's challenges, the court added paragraphs 26 through 31 of the Sale Procedures Order quoted in the statement of facts above, e.g., the deposit and breakup fee were reduced, and several provisions were changed to assure SOK could not litigate with another successful bidding party. Those changes in fact permitted Cosmo to bid, because the risk of proceeding without them was too great.

Third, because there were no other bidders, had Cosmo thrown in the towel at any time, there would have been no auction. Cosmo assured the auction procedures were followed in accordance with the court's Sale Procedures Order, by denying SOK the opportunity to change the bid procedures at the last minute. The Debtor will confirm that Cosmo was the only bid submitted by the deadline (qualified or otherwise). Consequently, but for Cosmo, the stalking horse would have purchased at its original $8 million price, not the $10,950,000 it paid, plus $305,000 for Sysco. For the record, Cosmo is ready, willing and able to carry out the asset purchase at its final bid price at any time. The estate and all creditors benefitted by the additional $2,950,000 price increase solely and exclusively due to Cosmo's involvement in the bidding process.

### Cosmo's fees are reasonable

The fees and expenses sought to be recovered in this case (set forth in Cosmo's related Motion) are solely those expended by legal counsel. Notwithstanding the fact that Cosmo's principal and assistants worked over 1400 hours in performing their due diligence, financial

14

review, legal discussions, evaluation of operations, and site visits, those hours are not in the nature of "expenses" for which reimbursement can be recovered. Nonetheless, those services benefitted the estate, and the fees of Cosmo's counsel incurred in pursuit of Cosmo's objectives likewise benefitted the estate.

The fees and expenses of Cosmo's counsel are reasonable. Attached as Exhibit 6N are the detailed invoices for Butzel Long, and at Exhibit 6O are the detailed invoices for Plunkett Cooney.[3] The rate charged by Cosmo's principal attorney, Rick Berg, with 30 years experience, is $300 per hour, and very reasonable in this context. Other specialists who were brought in to assist with various aspects of the transaction and litigation charged different rates, but the overwhelming majority of time was expended at the rate of $300/hour.

While the expenses of counsel are the only amounts for which 11 U.S.C. §503(b)(3)(D) and (b)(4) allow reimbursement in this case (as distinguished from the value of the herculean efforts expended by the principal of Cosmo and his assistants themselves), the value to the estate of Cosmo's efforts far exceeds the amount of legal fees and expenses sought to be reimbursed, which value should be taken into account when evaluating this request.

## CONCLUSION

In light of the foregoing, Cosmo respectfully requests that the court enter an order allowing Cosmo an administrative expense priority claim in the amount prayed for in the related motion, in the form of Exhibit 1 attached hereto, and that such claim be paid by the Debtor forthwith and without delay.

---

[3] The records have been somewhat redacted to protect attorney client privilege.

Respectfully submitted,

| **PLUNKETT COONEY P.C.** | **BUTZEL LONG, a professional corporation** |
|---|---|
| /s/ David A. Lerner | /s/ Frederick A. Berg |
| By: David A. Lerner | By: Frederick A. Berg, Esq. |
| Atty for Cosmo Hospitality | Attys for Cosmo Hospitality, LLC |
| Assignee of Delau Fire and Safety | Assignee of Delau Fire and Safety |
| 38505 Woodward Suite 2000 | 150 W. Jefferson, Suite 100 |
| Bloomfield Hills, MI 48304 | Detroit, Michigan 48226 |
| 248-901-4010 | 313-225-7000 |
| November 30, 2015 | November 30, 2015 |

1565215